NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHELBY OWNBEY, <br><br> Plaintiff, <br><br> v. <br><br> AKER KVAERNER INDUSTRIAL CONSTRUCTORS, et al., <br><br> Defendants. | Civ. Action No. 07-2190 (KSH) <br><br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

**I.     INTRODUCTION**

Plaintiff Shelby Ownbey ("Ownbey") was seriously injured while performing exteriors work at the construction site of a pharmaceutical drug manufacturing facility owned by ImClone Systems, Inc. ("ImClone") in Branchburg, New Jersey. In its construction project, Imclone had designated Aker Kvaerner Pharmaceuticals, Inc. ("Aker") as its agent to provide construction management services, and then by separate contract, hired Epic Interiors, LLC ("Epic") to perform interiors work. Presently before this Court are three motions for summary judgment relating to the question of contractual indemnification: (1) ImClone's motion on its cross-claims against Epic for contractual indemnification; (2) Aker's motion on its cross-claims against Epic for contractual indemnification; and (3) Epic's motion seeking dismissal of the cross-claims asserted by ImClone and Aker. The Court's diversity in citizenship jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(a).

1

## II.     FACTUAL BACKGROUND

### A.  *The Parties to the Present Motions for Summary Judgment*

ImClone and Aker entered into a contract, dated July 15, 2002, whereby Aker would act as ImClone's designated agent during the construction project of the ImClone facility.  (Korgul Decl., Exh. A.)  Effective April 15, 2003, ImClone and Aker entered into a Revised and Restated Target Price Contract ("Revised Target Price Contract'), reaffirming Aker's obligations as ImClone's agent.  (*Id.* at Exh. C.)  According to the contract, Aker was responsible for, among other things, managing the construction site and ensuring that it was completed within the "Target Price."  (*Id.* at Exh. A, Exh. C.)

Acting pursuant to its role as ImClone's agent, Aker awarded Epic a contract to perform interiors construction work.  (Hanson Cert., Exh. C.)  The details of the contract are discussed below, *see* Part II.C.  ImClone had a separate contract with Advantage Building & Exteriors, Inc. ("Advantage") for Advantage to perform work on the exterior building panel system.  (*Id.* at Exh. J.)

On July 22, 2005, Ownbey, an Advantage employee, was injured when he fell from a scaffold while sealing the exterior walls of the ImClone facility.  According to Ownbey's complaint, he and Alfredo Escobedo ("Escobedo"), another Advantage employee, went to the site on July 20th to begin painting a rubber seal over one side of the ImClone building that was leaking water.  (Third Am. Compl. ¶ 20.)  Joe Berryman ("Berryman"), an Aker supervising safety manager and designated agent of the job site, advised Ownbey that because a boom lift could not be used to raise the workers to the level where work was needed, a two point hanging scaffold was rented from R&R Scaffolding.  (*Id.* at ¶ 21.)

Ownbey and Escobedo assembled the scaffolding on July 21st. (*Id.* at ¶ 24.) In his complaint, Ownbey alleges, that Berryman "inspected the two point hanging scaffolding and gave his approval by advising [them] that this scaffolding appeared to be properly assembled and was safe for use . . . ." (*Id.* at ¶ 27.)

As alleged in Ownbey's complaint, he, Berryman, and Escobedo made the decision as to how to raise the scaffolding over a canopy. (*Id.* at ¶ 35.) On July 22nd, Ownbey and Escobedo stood on the scaffolding while Berryman and two other Aker employees pulled on the attached ropes to raise and suspend it. (*Id.* at ¶¶ 41.) According to Ownbey, while he was suspended in air, the Aker employees "carelessly and negligently pulled harder on the ropes[,]" causing him to fall and suffer injuries described in the complaint. (*Id.* at ¶ 45-46, 58.)

### B. The Epic Contract

On June 9, 2003, Aker—on behalf of ImClone—awarded Epic a contract for interiors work at ImClone's facility project site. (Hanson Cert., Exh. C.) The contract referred to ImClone as the "Owner" (referring to the facility site) and to Epic as the "Contractor." (*Id.*) Article 3.0 defined the scope of Epic's work:

> Except as otherwise expressly provided elsewhere in this Contract, Contractor shall, in strict compliance with the Contract Documents, supply all materials, labor, supervision, construction supplies and consumables, tools, surveying, approval drawings, construction equipment, unloading, services, testing services, testing devices, warehousing/storage, freight, sales tax, permits, scaffolding, transportation, and each and every item of expense, including overhead and profit, required to perform and complete the Work as described in the Contract Documents to the satisfaction and acceptance of Owner or its Agent.

(*Id.*)

Attached to the contract was an appendix entitled "General Terms & Conditions for Lump Sum Contracts Where Owner has Designated an Agent to Act on Owner's Behalf." The

appendix applied to Epic's contract because Aker was ImClone's designated agent. The definitions section provides:

> 1.0  DEFINITIONS
> "Owner" means Imclone Systems, Inc.
>
> "Kvaerner Process" or "Agent" means [Aker] Kvaerner Process, a division of Kvaerner US Inc., acting as agent for Owner for the purpose of administering and managing this contract and for any other purpose defined in the Signature Document.
>
> "Contractor" means the party obligated to perform the Work required by this Contract.

(*Id.*)

The contract's indemnification clause followed:

> 16.0 INDEMNITY
>
> 16.1  Contractor agrees to release, indemnify, hold harmless and defend Kvaerner Process and Owner, the affiliated companies of each, and all of their directors, officers, employees, agents and representatives, from and against any claim, expense, or liability, cost and expenses (including court costs and attorneys fees) on account of injury or death of persons (including the employees of Kvaerner Process, Owner, Contractor and Contractor's lower tier subcontractors and suppliers and any other contractors or subcontractors) or damage to or loss of property (including the property of Kvaerner Process or Owner) or delay (including all attorneys fees to enforce contractors indemnification obligations) *arising out of this Contract*, irrespective of any fault or negligence of Kvaerner Process and/or Owner, their affiliated companies, their respective officers, agents or employees excepting where the sole cause of such injury or death of persons or damage to or loss of property is the negligence of Kvaerner Process or Owner.

(*Id.*) (emphasis added.)

During the construction project, ImClone needed laborers to perform general clean-up work at the site. Aker—again acting on behalf of ImClone—issued a field work order to Epic (referred to as "Field Work Order 109" in the record) on June 20, 2005, directing Epic to provide laborers and a truck lull for the project. (Hanson Cert., Exh. D.)  In his deposition, Edwin

4

Carlson, Aker's Subcontractor Administrator, stated that ImClone had paid Epic pursuant to the field work order. (*Id*., Exh. F., at 47:8-24.)

On August 3, 2005, after Ownbey's accident, Epic submitted Proposed Change Order No. 00256 ("PCO 256") to Aker. (Korgul Decl., Exh. F.) Epic's written request sought additional payment in the sum of $22,333.14 for "Laborers and Lull for Project Use for July 2005." (*Id.*) As indicated in the employee time sheets attached to the order, the requested payment included labor performed by Epic employees Lou Ghetti ("Ghetti") and Jim Bicker ("Bicker") on July 22, 2005, the day of Ownbey's accident. (*Id.*) It is undisputed that Ghetti and Bicker were pulling on the ropes attached to the scaffold when Ownbey fell. (Third Am. Compl. ¶ 41, ImClone Br. 5, Aker Br. 4, Epic Opp'n. Br. 3-4.)

The Epic contract was formally amended to include the costs of the laborers and truck lull from the July 2005 clean-up project, and as stated above, the parties do not dispute that Epic was paid for this work. (Korgul Decl., Exh. G.)

### III.   STANDARD OF REVIEW

A court may grant summary judgment where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the moving party who bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" if a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

"The summary judgment standard does not change when, as here, the parties have filed cross-motions for summary judgment." *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop.*

*Cas. Co. of Am.*, 559 F. Supp. 2d 504, 509 (D.N.J. 2008); *see also Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).

## IV.     DISCUSSION

As a preliminary matter, the parties acknowledge—and the Court agrees—that New Jersey law governs in this case.  It is well-established that where federal court jurisdiction is based on diversity of citizenship, the district court must apply the choice of law rules of the state in which it sits.  *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Generally, contract interpretation is a question of law in New Jersey.  *Smithkline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 159 (3d Cir. 1996) (citing *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.*, 767 F.2d 43, 47 (3d Cir. 1985)).  The reviewing court's objective is to interpret the intent of the contracting parties at the time they entered into the contract, as revealed by the language of the contract itself, as well as the surrounding circumstances.  *Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 244 (3d Cir. 2005). The same holds true for interpreting unambiguous indemnity provisions.  *Mantilla v. Nc Mall Assocs.*, 167 N.J. 262, 272 (N.J. 2001) (citing *Cozzi v. Owens Corning Fiber Glass Corp.*, 63 N.J. Super. 117, 120 (App. Div. 1960)).  But the New Jersey Supreme Court has carved out an exception to the general rule when the provision's meaning is ambiguous.  In such a case, the court must strictly construe the clause against the indemnitee.  *Mantilla*, 167 N.J. at 272 (quoting *Ramos v. Browning Ferris Indus., Inc.*, 103 N.J. 177, 191 (1986)).  A contract "will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms." *Mantilla*, 167 N.J. at 272-73 (quoting *Ramos*, 103 N.J. at 191 (1986)).  In other words, absent unambiguous language regarding the

terms of indemnification, such provisions warrant strict construction. *Id*. at 269. Lest there be any confusion, the Supreme Court in *Mantilla* articulated: "[T]here is a presumption against indemnifying an indemnitee for its own negligence that can be rebutted only by plain language clearly expressing a contrary intent." *Id.*

The New Jersey Supreme Court refined its approach to interpreting indemnification provisions strictly in *Azurak v. Corporate Property Investors*, 175 N.J. 110 (N.J. 2003), a case involving a shopping mall (indemnitee) seeking to invoke an indemnification provision against a contracting janitorial company (indemnitor) after a customer sued for injuries sustained when she slipped:

> Significantly, the Court's analysis in *Mantilla*, by omission, eschewed the consideration of a "broad" or "limited" form of indemnification . . . . We read *Mantilla* as a reiteration of *Ramos* and its "bright line" rule requiring "explicit language" that indemnification and defense shall include the indemnitee's own negligence. . . .
>
> In sum, we accept the Court's clear and explicit language as meaning what it says and conclude that the absence of clear and explicit language addressing indemnification . . . precludes recovery . . . .

*Id.* at 111-12 (citing with approval the appellate division's opinion, *Azurak*, 347 N.J. Super. 516, 523-24 (App.Div. 2002)). The Court applied the precedent of *Mantilla* and *Ramos*, concluding that the following indemnification provision was *not* unequivocal and unambiguous as to the indemnitee's negligence and, therefore, failed to pass muster.

> Contractor [PBS] shall indemnify, defend and hold harmless each Indemnitee [the Mall] from and against any claim (including any claim brought by employees of Contractor), liability, damage or expense (including attorney's fees) that such Indemnitee may incur relating to, arising out of or existing by reason of (i) Contractor's performance of this Agreement or the conditions created thereby (including the use, misuse or failure of any equipment used by Contractor or its subcontractors, servants or employees) or (ii) Contractor's breach of this Agreement or the inadequate or improper performance of this Agreement by Contractor or its subcontractors, servants or employees.

*Azurak*, 347 N.J. Super. at 517-18.

District courts and New Jersey appellate courts since have applied the "*Ramos-Mantilla-Azurak*" framework in interpreting indemnity provisions—the contract's terms must establish an unequivocal intent to indemnity.  *E.g.*, *Carpenter v. Jersey Shore Univ. Med. Ctr.*, 2009 U.S. Dist. LEXIS 29838, at *12 (D.N.J. 2009) (Wolfson, J.); *Darcy v. N.J. Transit Rail Operations, Inc.*, 2007 U.S. Dist. LEXIS 33989, at * 8 (D.N.J. 2007) (Kugler, J.); *Hertz Corp. v. Zurich Am. Ins. Co.*, 496 F. Supp. 2d 668, 678 (E.D. Va. 2007); *Laws v. Quest Diagnostics*, 2009 N.J. Super. Unpub. LEXIS 1360, at *9 (App. Div. 2009); *Krastanov v. Honvanian*, 2008 N.J. Super. Unpub. LEXIS 1360, at *5 (App. Div. 2008); *Englert v. The Home Depot*, 389 N.J. Super. 44, 54 (App.Div. 2006).

Excerpting the pertinent phrases from the provision, Epic agreed to indemnify "from and against any claim, liability or expenses . . . on account of injury or death of persons . . . arising out of this Contract, irrespective of any fault or negligence" of ImClone or Aker.  (Hanson Cert., Exh. C at 16.0 Indemnity.)  The major exception to the absolute indemnification is "where the sole cause of such injury or death of persons . . . is the negligence of [Aker] or [ImClone]." (*Id.*)

In their briefs, ImClone and Aker ask this Court to find that Ownbey's accident (1) arose out of the Epic contract, and (2) was not solely due to their own negligence.  They contend, as does Epic, that the contract language is such that this Court does not need to do any fact-finding in concluding whether Ownbey's accident does or does not qualify for indemnification.  They point to specific facts establishing that Epic employees were the ones pulling on the ropes attached to the scaffolding when Ownbey fell.  (Aker Br. 9, ImClone Br. 5.)

But Epic's brief states that its employees were improperly borrowed by Berryman, the Aker supervisor, and, therefore, any negligence claim asserted by Ownbey does not "arise out

8

of" the contract and the indemnification provision does not apply. (Epic Opp'n Br. to ImClone's and Aker's motions 1.) Epic broadly asserts that it "had nothing to do with the decision to use the scaffold at issue." (*Id.* at 4.)

From the foregoing, it appears that notwithstanding the parties' assertions, the facts are in dispute. But there is an over-arching reason why these motions do not succeed. The language in the Epic contract indemnifies Aker and ImClone from liability "irrespective" of their negligence "excepting" where the sole cause of the injury or damage is the negligence of one or the other of them. As such, the provision gives --- and then, depending on the facts, may take away. Inherent in any application of it is the requirement that conclusions be drawn about the role the indemnitees played in events leading to injury or damage—and that is simply not an unambiguous indemnification from liability and defense.

In short, the Epic contract does not provide unambiguous indemnification. In the *Azurak* decision, which rejected a provision containing language that appears in this one, the New Jersey Supreme Court was very clear that courts must avoid "the consideration of a 'broad' or 'limited' form of indemnification." *Azurak*, 175 N.J. at 111. But this is precisely what ImClone and Aker are asking the Court to do. Their motions are denied.

Epic has filed a summary judgment motion seeking to dismiss the cross-claims filed by ImClone and Aker. While the thrust of the motion rests upon the validity of the indemnification provision, Epic's arguments are directed against Ownbey.[1] The parties have agreed that the

---

[1] In its brief, Epic's first point-heading argues that Ownbey's third amended complaint should be dismissed because it is time-barred, pursuant to N.J.S.A. 2A:14-2. The second point-heading argues that summary judgment is proper because there is no genuine issue as to a material fact. After a discussion of summary judgment case law, Epic applies the standard to its case in one sentence: "In the present case, there are no genuine issues of material fact to be litigated and Epic is entitled to summary judgment as a matter of law." (Epic Br. 9.) Epic's brief does not

Court's review of the pending motions is limited to the issue of contractual indemnification. As a consequence, Epic's argument that Ownbey's claims are time-barred is deemed to have been withdrawn at this time. Based on the analysis in this opinion, Epic's motion directed to the cross-claims must be denied.

## V. CONCLUSION

For the foregoing reasons, (1) ImClone's motion for summary judgment on its cross-claims for contractual indemnification against Epic is **denied**; (2) Aker's motion for summary judgment on its cross-claims for contractual indemnification against Epic is **denied**; and (3) Epic's motion for summary judgment seeking dismissal of the cross-claims for contractual indemnification asserted by ImClone and Aker is **denied**.

An appropriate order will be entered.

/s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

---

discuss the validity of the indemnification provision—the subject of the Court's attention at this time.