## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHELBY OWNBEY AND JOYCE OWNBEY,<br><br>*Plaintiffs*,<br><br>v.<br><br>AKER KVAERNER PHARMACEUTICALS INC., et al.,<br><br>*Defendants*. | Civil No: 07-2190 (KSH)<br><br><br>**Opinion** |
| AKER KVAERNER PHARMACEUTICALS INC.,<br><br>*Third Party Plaintiff*,<br><br>v.<br><br>ADVANTAGE BUILDINGS & EXTERIOR, INC., MID-CONTINENT CASUALTY CO., ZURICH AMERICAN INSURANCE COMPANY and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA.,<br><br>*Third Party Defendants*. | |

**<u>Katharine S. Hayden, U.S.D.J.</u>**

Shelby Ownbey filed this action on May 9, 2007 after he was injured at a construction site on July 21, 2005. At that time, Ownbey was employed by Advantage Buildings & Exteriors ("Advantage") and the accident occurred in connection with his work on property owned by ImClone Systems, Inc. ("ImClone") in Branchburg, New Jersey. His claims were settled nearly six years ago in April 2009.

1

What remains is a dispute between contractors and insurance companies, largely over the counsel fees expended during the course of this litigation.  Aker Kvaerner Industrial Constructors ("Aker") argues that it is an additional insured under a policy issued by Mid-Continent Casualty Co. ("MCC") and therefore is entitled to defense and indemnification.  MCC disputes Aker's claim to coverage, and maintains that it is subrogated to ImClone's cross-claims against Aker for contractual indemnity.  Aker filed two motions:  (1) for summary judgment on the issue of its claim for coverage under the MCC policy [D.E. 520], and (2) to dismiss MCC's claim that is subrogated to ImClone's indemnification rights against Aker [D.E. 521].  The Court referred these motions to Magistrate Judge Waldor, who issued a Report and Recommendation ("R&R") recommending that the Court find that (1) Aker was entitled to coverage as an additional insured under the MCC policy and (2) MCC's subrogation claim should be stricken. [D.E. 531].  MCC filed objections to the R&R as a whole.  [D.E. 534, 535.]

On dispositive motions, the district court must review *de novo* those portions of the Magistrate Judge's report and recommendation to which a litigant has filed objections. 28 U.S.C. § 636(b)(1).  Under this standard of review, the Court is not limited to the factual record presented to Magistrate Judge Waldor.  *See In re Paoli R.R. Yard PCB Litig.,* 221 F.3d 449, 461 (3d Cir. 2000) ("De novo means [that] . . . the court's inquiry is not limited to or constricted by the . . . record, nor is any deference due the . . . conclusion [under review].")  Having reviewed this case as a whole, *see* Sections I-II *infra*, the papers on the underlying motions before the Court, the responses and objections to the R&R, and supplemental briefs D.E. 539 and 541, the Court declines to adopt the legal conclusions reached in the R&R, and rules on the issues presented in Aker's motions as set forth below.

## I.    Factual Background

### a.    The Project

On July 1, 2002, ImClone contracted with Kvaerner Process, a division of Kvaerner U.S., Inc. ("Kvaerner Process"), for the construction of a pharmaceutical manufacturing facility at 50 Chubb Way, Branchburg, New Jersey (the "Project").  (Statement of Undisputed Material Facts ("SUMF") at ¶ 1.)  The agreement established a "target price" for completion of the Project, and Kvaerner Process, as construction manager, was responsible for managing the work to ensure that it was completed at or below that target price.  (SUMF at ¶2; Dembling Dec., Ex. A (the "Target Price Contract").[1]

ImClone, through Kvaerner Process as agent, entered into a contract with Ownbey's employer Advantage on July 15, 2002, pursuant to which Advantage agreed to "furnish and install a portion of the exterior walls of the building including the Pre-Fabricated Block Cast Panel System."  (SUMF at ¶¶ 9, 11; Dembling Dec., Ex. D.)  Two provisions of this agreement are significant here.  First, Article 16.1 required Advantage to "release, indemnify, hold harmless and defend Kvaerner Process and [ImClone] … from and against any claim, expense, or liability … arising out of" Advantage's work on the Project.  Second, pursuant to Paragraphs 18.1 and 18.2 of the General Terms and Conditions, Advantage also agreed to maintain employer's liability insurance, commercial general liability insurance and excess liability insurance that would "fully protect [Advantage] from and against any and all claims arising out of [Advantage's] operations"

---

[1]    Attorney Marc Dembling submitted a certification on Aker's behalf in connection with both the motion for coverage and the motion to strike MCC's subrogation claim.  Exhibits designated by letter correspond to the certification filed in support of the motion for coverage, and exhibits designated by number correspond to the certification filed in support of the motion to strike.

at the Project.  As to all these required policies, with the exception of worker's compensation insurance, Kvaerner Process and ImClone were to be named as additional insureds.

Advantage satisfied the latter obligation when it procured a commercial general liability policy from MCC.  The iteration of that policy now in dispute (the "MCC Policy"), No. 04-GL-000570143, was current for the period of November 25, 2004 through November 25, 2005, with limits of $1 million per occurrence. The MCC Policy provided coverage for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" arising out of the Project.  The MCC Policy also provided coverage to "Kvaerner Process, a Division of Kvaerner US Inc. [and] ImClone Systems, Inc." as additional insureds, but only "with respect to liability directly attributable to [their] performance of ongoing operations to [Advantage]" and only to the extent that Advantage "agreed by written 'insured contract' to designate [both Kvaerner Process and ImClone] as additional insured[s]" subject to the policy.

ImClone entered into a similar arrangement with Epic Interiors, LLC ("Epic") for work on the Project, again through Kvaerner Process as its agent.  The ImClone-Epic contract became effective as of July 9, 2003 and, similar to the ImClone-Advantage contract, obligated Epic to contractually indemnify Kvaerner Process and ImClone "from and against any claim, expense, or liability … on account of injury or death of persons" arising out of their work on the Project.  Epic was also required to procure a commercial general liability insurance policy, naming Kvaerner and ImClone as additional insureds thereunder.  This policy was issued by Zurich American Insurance Company ("Zurich").  It remained current through the period of September 30, 2004 to September 30, 2005, and named Kvaerner Process and ImClone as additional insureds subject to restrictions substantially similar to those contained in the MCC Policy.

**b. Kvaerner Process to Aker**

On February 27, 2004, Kvaerner U.S. Inc. sold assets of its unincorporated division, Kvaerner Process, to Aker.  (Dembling Dec., Ex. B ("Asset Sale and Purchase Agreement" or the "agreement").)   Aker takes the position that this sale effected a transfer of "management, employees, office locations, assets, rights and obligations of Kvaerner Process."   But the agreement itself proves more nuanced.  Taken in steps, the whereas clause provides that Kvaerner U.S. Inc. "agreed to sell and [Aker agreed] to buy certain assets and to assume certain obligations in respect of [Kvaerner Process]."  (Ex. B.)  The agreement then breaks down transferred and excluded assets/liabilities on an individual basis.  "Acquired Assets" are set forth in Schedule 1.1 and also in Section 1.1, which describes categories of transferred assets in subsections (a) through (k).

Subsection (d) transferred to Aker "the Transferred and Assumed Contracts, including all rights, benefits and obligations thereunder." (Ex. B, Article 1.1(d).)  The Asset Sale and Purchase Agreement defines "Transferred and Assumed Contracts" as "the Assignable Contracts, No Consent Contracts, and No License Contracts listed on Schedule 1.5." (Ex. B., Article 1.5.)  "Assignable Contracts" are "Customer Contracts" that do not require consent to transfer, or for which consent already has been obtained, and are identified in Schedule 1.5 (Ex. B., Article 1.2), and "Customer Contracts" consist of "all of [Kvaerner Process's] contracts for the provision of engineering or construction services and/or products with customers of [Kvaerner Process]." (Ex. B., Article 1.6.)  Schedule 1.5 of the agreement, subtitled "Pharmaceutical Division," is broken down into three subsections with individual contracts listed beneath each:  Assigned Contracts (of which there are four), No Consent Contracts (three), and No License Contracts (none).

The Target Price contract, entered into on July 1, 2002, was identified in the Asset Sale and Purchase Agreement as an "Assignable Contract" and specifically referenced in Schedule 1.5 as "ImClone Systems – BB50 Commercial Facility." The actual effect of this transfer, however, is complicated by another agreement—the Revised and Restated Target Price Contract, entered into between ImClone and Aker.  (Dembling Dec., Ex. C.)  This agreement has an effective date that *precedes* the Asset Sale and Purchase Agreement, and provides that *Aker*, not Kvaerner Process, entered into the Target Price Contract with ImClone on July 15, 2002.  Its object was to revise the original Target Price Contract in order to reflect changes in the scope of work thereunder.

Aker also sought to revise the MCC Policy to ensure that it, not Kvaerner Process, maintained rights thereunder as an additional insured.  On May 10, 2005, approximately 14 months after the Asset Sale and Purchase Agreement, Aker claims that it caused the certificate of liability insurance on the MCC Policy to be reissued to reflect that Aker was entitled to coverage.  However, the certificate provides, in capital letters, "ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER."  It also goes on to state that the certificate does not itself amend, extend or alter the coverage provided by the express terms of the MCC Policy.

## II.   Procedural History

On July 22, 2005, Shelby Ownbey, Advantage's employee, was seriously injured when he fell approximately 15 feet from a scaffold erected at the Project.  He filed suit on May 9, 2007, asserting claims of negligence, among others, against Aker and R&R Scaffolding, LTD.  (D.E. 2.) Ownbey later amended the complaint on June 26, 2007 (D.E. 49), July 12, 2007 (D.E. 120), March 28, 2008 (D.E. 520) adding new defendants:  ImClone, Epic, and Safe Works, LLC.

As Ownbey's claims for liability began to take shape, the litigation took on a dual purpose for insurance coverage.   On August 3, 2007, ImClone answered and cross-claimed against Advantage (D.E. 15) for contribution and indemnification.   Later, ImClone added claims for breach of contract and contractual indemnification against Epic, Advantage and Aker, and claims for coverage against Zurich, MCC and Liberty Mutual Insurance Company.   Aker also filed cross-claims against all named defendants for contractual indemnification and contribution, and filed a third-party complaint against Advantage and MCC for contractual indemnification and insurance coverage, among other relief.   (D.E. 19.)   MCC answered the third-party complaints filed by Aker and ImClone on November 29, 2007 (D.E. 42) and January 28, 2008 (D.E. 48), respectively.   With regard to coverage, MCC admitted only that it issued an insurance policy to Advantage, as named insured, bearing policy number 04-GL-000570143, which was current through the date of Ownbey's accident.

Aker first provided notice of the Ownbey litigation to MCC in August 2007 and requested coverage under the Policy as an additional insured.   By email dated February 20, 2008, MCC "agreed to provide a defense for ImClone Systems, Inc. and Aker Kvaerner Pharmaceuticals, Inc. under a reservation of rights."   One week later, MCC again advised Aker that it agreed "to assume the defense of Aker Kvaerner Pharmaceuticals, Inc. … subject to the terms and conditions of [the MCC Policy]."   Finally, in a letter dated June 5, 2008, MCC stated that "Aker Kvaerner and ImClone have been made additional insureds" on the MCC Policy, subject to a reservation of rights.

In September 2008, having had ample time to exchange discovery, the parties engaged in mediation before the Hon. John Keefe Sr. in attempt to resolve the case.   Judge Keefe's efforts notwithstanding, this first mediation proved unsuccessful.   The action became further complicated

when, prior to another mediation effort in January 2009, MCC raised for the first time that, because Kvaerner Process—not Aker—was listed as an additional insured under the Policy, MCC was not required to provide coverage.  As a result, Aker had to obtain coverage counsel to pursue its claims for insurance and indemnity against MCC, Advantage, Zurich, and Epic.

On March 13, 2009, MCC conceded that ImClone was covered under both the MCC Policy and the MCC excess policy for damages arising out of Ownbey's accident, which provided $3 million in total coverage.  MCC also acknowledged that Advantage owed both Aker and ImClone contractual indemnification pursuant to Paragraph 16.1 of the Advantage Contract:  "Mid-Continent, on behalf of its named insured, Advantage, concedes the obligation of Advantage, pursuant to Clause 16.1 of the contract between ImClone and Advantage to indemnify, hold harmless and defend [Aker] and ImClone, except to the extent that either [Aker] or ImClone is found to be solely negligent."  (Final Pretrial Order (Coverage), Stipulated Facts, ¶14.)  MCC later recognized its obligation to insure that right of indemnification:  "Mid-Continent and Advantage have agreed that Advantage owes indemnity to Aker Kvaerner, unless Aker Kvaerner is found solely liable[, and] Mid-Continent has agreed that it insures that obligation."  (Final Pretrial Order (First-Party Action), Stipulated Facts, ¶40).

These concessions notwithstanding, MCC maintained its position that it was not obligated to provide Aker with coverage as an additional insured.  On May 15, 2009, Aker filed a motion for summary judgment against MCC for coverage (D.E. 207) and MCC opposed (D.E. 245) for the same reasons outlined in its formal denial of coverage.  MCC argued that Aker was not listed as an additional insured under the MCC Policy, and that, even if it were, Aker could not satisfy the policy's contractual prerequisites to coverage because (1) Advantage (the named insured) was not performing "ongoing operations" for Aker, but rather for ImClone alone, and (2) that no

"insured agreement" or "written contract" required that Aker be named as an additional insured. (D.E. 245 at 10-13.)

Separate and apart from its claims against MCC, Aker continued to pursue its right to coverage and indemnification from Epic's carrier, Zurich, which purportedly arose out of ImClone's contract with Epic. As with MCC, Aker filed a third-party complaint against Zurich seeking coverage under the Zurich Policy. Zurich also disputed coverage, but not on the grounds that Epic failed to name Aker as an additional insured. Rather, in its opposition to Aker's motion for summary judgment, Zurich relied on the language of the trigger clause itself, which required that the allegedly covered occurrence "arise out of" Epic's "ongoing operations" under its contract with ImClone.

These were not the only motions before the Court. In May 2009, the parties filed a series of motions regarding issues of liability and coverage: 15 motions for summary judgment (D.E. 171, 176, 178, 181, 184, 186, 187, 190, 193, 202, 203, 204, 206, 207, and 208), two motions in limine (D.E. 191 and 195), one motion to dismiss (D.E. 194), one motion for order of sale (D.E. 192), and one motion to amend (D.E. 215). The Court conducted a telephone conference with all parties on June 18, 2009 to address these filings. In an effort to streamline motion practice, the parties agreed on which of the pending motions required a decision by the Court so that the parties could resume settlement efforts. The four motions identified by the parties related to Epic's duty to indemnify Aker and ImClone: D.E. 186, ImClone's motion for summary judgment compelling Epic to provide contractual indemnification; D.E. 206, Aker's motion for summary judgment on its contractual indemnification claim against Epic; D.E. 187, Epic's motion for summary judgment seeking dismissal of ImClone and Aker's cross-claims for contractual indemnification; and D.E. 190, Zurich's letter to the Court joining in Epic's motion for summary judgment. Finding issues

of fact as to whether the incident arose out of Epic's involvement, and as to whether Aker and/or ImClone were solely negligent, the Court denied the selected motions in an order dated December 21, 2009—the remaining motions were administratively terminated and the parties resumed settlement discussions. The matter was then referred to Judge Keefe for a third round of mediation, and motion practice resumed approximately one year later.[2]

Following the third mediation, settlement discussions were partially successful in that Ownbey entered into a settlement agreement in April 2011, with Zurich, Epic, Aker and ImClone.[3] (Dembling Dec., Ex. 16 ("Zurich Settlement").) The agreement was structured in accordance with the decisions in *Deblon v. Beaton*, 2013 N.J. Super. 345 (Law Div. 1968) and *CNA v. Selective*,

---

[2]     Between January and March 2011, 13 dispositive motions were filed, 13 of which sought summary judgment: D.E. 375, National Union Fire Insurance Company of Pittsburgh, PA seeking dismissal of Aker's claims against it for defense and indemnity; D.E. 378, ImClone seeking dismissal of Ownbey's negligence claims; D.E. 379 and 380, Epic seeking dismissal of Ownbey's claims against it; D.E. 381, Advantage seeking dismissal of all claims for contribution, R&R Scaffolding's claim for contractual indemnification, and Aker's implied indemnification claim; D.E. 383, ImClone seeking defense and indemnification from Zurich as an additional insured; D.E. 410, Zurich seeking dismissal of Aker's claims as an additional insured; D.E. 413, ImClone seeking judgment on its breach of contract claim against Aker for failure to obtain additional insurance on its behalf; D.E. 416, MCC's motion to dismiss Aker's third-party complaint for coverage under the MCC Policy; D.E. 417, Aker's motion for judgment on its claims for defense and indemnification under the Zurich Policy; D.E. 418, Aker's motion for judgment on its claims for defense and indemnification under the MCC Policy; D.E. 419, Liberty Mutual's motion for judgment on ImClone and Aker's claims for defense and indemnification from MCC, and for attorney's fees from MCC; D.E. 420, Liberty Mutual's motion for judgment on ImClone and Aker's claims for defense and indemnification from Zurich, and for attorney's fees from Zurich. Upon consideration of these filings, the Court found that "addressing the motions in the [underlying negligence action] and proceeding with the trial of the negligence action before addressing the coverage issues may narrow or eliminate coverage disputes, and thereby further the goals of Fed. R. Civ. P. 1." (D.E. 431.) The pending submissions were then denied or administratively terminated.

[3]     With regard to ImClone and Aker's status as parties to the settlement, the agreement provided that "[s]ince at least September 2008, Aker and ImClone have repeatedly demanded that Advantage and [MCC] honor their agreement and obligations to defend and indemnify … but Advantage and [MCC] have repeatedly failed to do so leaving Aker and ImClone exposed to such judgment such that Aker and ImClone have no choice other than to enter into this agreement."

354 N.J. Super. 369 (App. Div. 2002), and "specifically release[d] Aker, ImClone and Epic from any corporate or person liability, and specifically release[d] them to the extent that coverage exist[ed] for such claims through Zurich, National Union, Federal Insurance Company, American Insurance Guarantee Company (as the excess insurance carrier of ImClone), Liberty Mutual, IF P&C Insurance Company Ltd. (reinsurer of Liberty Mutual's policy) or to the extent such could be satisfied by Epic based on contractual indemnity." (Zurich Settlement, at 4.) The agreement made clear however, that the "*Deblon* release preserve[d] limited claims [Ownbey has] against ImClone and/or Aker, but only to the extent that any judgment procured against those entities can be and is in fact satisfied pursuant to Advantage's contractual indemnity obligation owed to ImClone and/or Aker <u>or</u> by [MCC] pursuant to additional insured coverage owed to ImClone or Aker." (Zurich Settlement, at 4.) Ownbey agreed that, to the extent judgment was entered against either ImClone or Aker, he would not record the judgment in any jurisdiction or make any effort to collect against the assets of either entity. Rather, recovery in such a situation would be "limited to proceeds that are recoverable from Advantage as the [indemnitor] of ImClone and/or Aker and/or the proceeds of the policies of insurance issued by [MCC] to Advantage." (Zurich Settlement, at 5.) In exchange for this special release, ImClone and Aker agreed to assign to Ownbey "all contractual indemnity rights that ImClone and Aker [had] against Advantage based upon Advantage's contract with ImClone," though each retained their right to pursue Advantage and/or MCC under the same theory for counsel fees "incurred in connection with the Ownbey Litigation."

Aker argues that, after the Zurich Settlement was complete, "and as a result of the assignment therein by ImClone and [Aker] of their respective claims against MCC and Advantage, MCC and Advantage were the only remaining parties with any liability exposure." (Aker

Subrogation Motion, at 10.)  Eight days after the Zurich Settlement, MCC finalized a settlement agreement with Ownbey.  This agreement was purportedly entered into with Ownbey on behalf of MCC, Advantage, Aker and ImClone.  Its stated purpose was to "establish a full, complete and unconditional release by plaintiff to 'Aker', 'ImClone', 'Mid-Continent', and 'Advantage' in the [underlying litigation]" and the agreement provided that "[a]ll of the 'preserved' claims provided to plaintiff in the Deblon release as to 'Aker' and 'ImClone' are now released and extinguished and an unconditional release is to be provided to 'Advantage' and 'Mid-Continent.'"  (Howarth Certification, Ex. F ("MCC Settlement").)  The agreement recites that MCC paid $550,000.00 to Ownbey.  Though purportedly entered on behalf of Aker and ImClone (together with MCC and Advantage), Aker and ImClone assert that they did not sign or approve the settlement—the agreement was signed only by attorney Jerald J. Howarth, with the "express authority of [his] client," MCC.

On May 10, 2011, MCC requested that ImClone consent to entry of judgment against it in the amount of $545,000.00.  By letter dated May 20, 2011, ImClone objected and refused to agree to MCC's proposed consent judgment—ImClone maintained that, by virtue of the Zurich Settlement and subsequent stipulation of dismissal (D.E. 473), "there is no claim in this matter for ImClone to consent to judgment upon." (Dembling Cert., Ex. 18 at 2.)  ImClone further asserted that "[w]hen MCC settled the case, it was doing so to reduce MCC's exposure, not protect ImClone" and objected to MCC's apparent "threat to unilaterally file a Consent Judgment." (Dembling Cert., Ex. 18 at 3.)  Undeterred, in a letter to the Court dated May 27, 2011, MCC requested that the consent judgment be entered as a reflection of the plaintiff's resolution of the case.  (Dembling Cert., Ex. 20.)

In an order dated August 1, 2011, the Court denied the letter request (D.E. 496) in light of (1) Aker's assertions that it did not participate in, nor was it advised of the MCC settlement negotiations; (2) the fact that plaintiffs no longer had claims against ImClone upon which a judgment could be entered; and (3) the "plain language of the proposed consent order reflecting that it actually is sought as an effort by [MCC] to preserve a subrogation claim."  On that basis, the Court "declin[ed] to permit Mid-Continent to use this tactic as a means to assert a subrogation claim."

In a joint status filing with the Court on August 26, 2011, Aker claimed that, among other relief, it was entitled to (1) "judgment for coverage counsel fees and costs incurred and to be incurred to compel Advantage and MCC to acknowledge and satisfy the contractual indemnity obligation owed to Aker"; and (2) "judgment for coverage counsel fees and costs incurred by Aker in this lawsuit as required to prosecute the various coverage claims made against MCC."  In that same filing, MCC claimed that it "[sought] judgment against Aker, via subrogation, by asserting ImClone's right of contractual indemnity."

The foregoing is the context in which the R&R was issued.  Aker's two motions sought (1) partial summary judgment on the issue of whether it is an additional insured under the MCC Policy (D.E. 520); and (2) an order striking or dismissing the subrogation claim that MCC is purporting to assert against it.  (D.E. 521.)  Judge Waldor's R&R found that, by reason of the Asset Sale and Purchase Agreement, Aker "merged" with, and became a successor to, Kvaerner Process, which then gave rise to a transfer of the MCC Policy notwithstanding the parties' failure to amend the language of the policy itself.  This finding barred MCC under the anti-subrogation rule from pursuing Aker's cross-claims against ImClone in subrogation.  As explained below, this Court

finds that Aker is not entitled to coverage under the MCC Policy and dismisses MCC's subrogation claim.

III.     Discussion

a.   Aker's Motion for Coverage

MCC objects to the Magistrate Judge's finding that Aker was an additional insured under the Policy on a number of bases.  First, MCC argues that no theory of "successor corporation" law could reform the policy at issue so as to transfer coverage from Kvaerner Process to Aker.  In this same vein, MCC argues that (1) no successor rights could have transferred, because the Revised and Restated Target Price Contract had an effective date that preceded the Asset Sale and Purchase Agreement; and (2) even if applicable, the R&R's theory of transfer by succession would apply only to named insured rights, not the additional insured rights at issue here.  Second, MCC argues that no "insured contract" obligated Advantage to name Aker as an additional insured, as required under the language of the policy.  Finally, MCC objects to the R&R on the grounds that the work performed by Advantage was for ImClone alone, and that Aker therefore failed to demonstrate that the covered incident was attributable to Advantage's "ongoing operations for [Aker]."

i.   Were Additional Insured Rights Transferred?

To determine whether Aker may be viewed as an additional insured, a threshold question must be answered:  Did *any* rights under the Policy pass from Kvaerner Process to Aker by reason of the Asset Sale and Purchase Agreement?  ImClone's contract with Advantage (entered into by Kvaerner Process as ImClone's agent) required Advantage to name *Kvaerner Process* as an additional insured, which Advantage caused to occur in the MCC Policy.  Aker maintains that, upon entering into the Asset Sale and Purchase Agreement, it obtained all "rights and liabilities of Kvaerner Process under the Target Price Contract."  Though Aker largely assumes that such a

14

transfer was effected, it seems to argue that the additional insured rights were passed in one of two ways, either (1) explicitly and contractually under the Asset Sale and Purchase Agreement or (2) pursuant to some theory of corporate succession by reason of Aker's having "merged" with Kvaerner Process. The Court addresses each avenue in turn.

### 1. Transfer by Contract

The Asset Sale and Purchase Agreement was entered into between Kvaerner U.S. Inc., as seller, and Aker Kvaerner Pharmaceuticals, Inc., as purchaser, on February 27, 2004—about a year and a half before the accident. The agreement's second whereas clause provides that "[Kvaerner U.S. Inc.] has agreed to sell and [Aker] has agreed to buy *certain assets* and to assume *certain obligations* in respect of [Kvaerner U.S. Inc.'s 'Pharma Division,' Kvaerner Process] on and subject to the terms of this Agreement." The agreement then breaks down the transfer on an itemized basis.

"Acquired assets" include "all the right title and interest of [Kvaerner U.S. Inc.] in, to and under all of the assets used primarily in [Kvaerner Process] at the Closing Date, as set forth in Schedule 1.1 …, including, without limitation," certain assets detailed in Section 1.1(a)-(k). Two of those subsections require consideration here: (1) "Non-Customer Contracts," identified in subsection (c); and (2) "Transferred and Assumed Contracts," identified in subsection (d). Non-Customer Contracts are defined to include "the contracts of [Kvaerner Process] in existence on the Closing Date" that are not "Customer Contracts," or "contracts for the provision of engineering or construction services and/or products with customers of [Kvaerner Process]."[4] Transferred and

---

[4] The agreement also provides that Non-Customer Contracts shall mean "the contracts listed on Schedule 1.15 attached." Schedule 1.15 states only "See Attached." Following a thorough search of the agreement, the Court cannot identify any related "attachment" and therefore relies only on the remainder of the definition, which provides that Non-Customer Contracts shall include,

Assumed Contracts, by contrast, are those listed in Schedule 1.5, which specifically includes the "ImClone Systems" contract for the BB50 Commercial Facility and "all rights, benefits, and obligations thereunder."

It is at least plausible (though the Court does not so rule) that either provision could have transferred Kvaerner Process's rights as an additional insured to Aker.  First, the Non-Customer Contract definition appears to reach, with limited exception not applicable here, all contracts to which Kvaerner Process was a party on February 27, 2004—on its face, this could be seen to embrace the MCC Policy, under which Kvaerner Process was named as an additional insured. Second, pursuant to the agreement's definition, Transferred and Assumed Contracts also purport to transfer all "rights" and "benefits" under the Target Price Contract—again, by some broad measure, Kvaerner Process's additional insured rights under the MCC Policy could be viewed as a "right" or "benefit" under the Target Price Contract.

But even if the Court found that a transfer was effected under either provision, that transfer would nonetheless be subject to the language of the MCC Policy and any restrictions on assignment contained therein.[5]  Under New Jersey law, "[a] policy of insurance is a contract of

---

"whether or not listed on Schedule 1.15, the contracts of [Kvaerner Process] in existence on the Closing Date that are not Customer Contracts."

[5]      The MCC Policy was counter-signed by Mid-Continent Casualty in Oklahoma and contains riders specific to that state.  This presents a choice-of-law issue.  Sitting in diversity, this Court applies New Jersey choice-of-law principles, which call for a two-step inquiry considering whether:  (1) there is an actual conflict between the laws of New Jersey and Oklahoma; and (2) if there is a conflict, whether the choice-of-law provision in the contract should be enforced.  MCC submits, and the Court agrees, that "[t]he laws of New Jersey and Oklahoma mirror the enforceability of insurance contracts that contain non-assignment clauses."  This consistency notwithstanding, New Jersey courts typically have found that choice of law provisions in liability insurance policies generally are disregarded where, as here, the insured risk is in-state. *See Param Petroleum Corp. v. Commerce and Industry Ins. Co.,* 296 N.J. Super. 164, 170 (N.J. App. Div. 1997) ("[C]hoice-of-forum and choice-of-law agreements in liability insurance policies should generally be ignored at least when the insured risk is in this State.")  Consequently, the Court applies New Jersey law to its analysis of the MCC Policy.

indemnity, personal to the party to whom it is issued, or for whose interest the insurer undertakes to be responsible in case of loss, and cannot be transferred to a third person, so as to be valid in his hands against the insurer, without the insurer's consent." *Haskell Props., LLC v. Am. Ins. Co. Part of Fireman's Fund Ins. Co. Group*, 2014 N.J. Super Unpub. LEXIS 2428, at *9 (Law Div. June 6, 2014) (quoting *Kas v. Hartford Fire Ins. Co.*, 58 N.J.L. 34, 36 (Sup. Ct. 1895)).  For a no-assignment clause to prohibit an insured's power to effect a transfer of rights under the policy, the provision "generally must state that non-conforming assignments (i) shall be 'void' or 'invalid,' or (ii) that the assignee shall acquire no rights or the non-assigning party shall not recognize any such assignment." *Owen v. CNA Ins.,* 167 N.J. 450 (N.J. 2001).  And while courts have permitted transfer of a vested chose in action under a policy, "New Jersey draws a sharp distinction between the assignability of an insurance policy and of the assignability of a right to payment." *Haskell*, 2014 N.J. Super. Unpub. LEXIS 2428, at *10.  "[W]here no right to payment exists, no assignment can exist." *Id; see also Elat, Inc. v. Aetna Cas. and. Sur. Co.*, 280 N.J. Super. 62, 67 (App. Div. 1995) ("The rationale for this conclusion is related to the purpose behind a no-assignment clause in a … liability policy[,] which is to protect the insurer from insuring against a different risk than intended.")

Because the Asset Sale and Purchase Agreement took place before the date of Ownbey's loss, Aker argues for the transfer of a right to insurance, not a discrete right to payment already owed under the policy.  Consequently, a no-assignment clause, if sufficiently stated, would bar any alleged transfer of additional insured rights under New Jersey law.  Such is the case here. Section (F) of the Common Policy Conditions expressly states that "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured."  Furthermore, the MCC umbrella policy issued to Advantage provides

17

that "[MCC] shall not be bound by any assignment of interest by any insured unless our consent to such assignment is endorsed onto this policy."  Taken together, these provisions make clear that MCC "shall not recognize" an assignment in the absence of its consent, and they therefore serve to bar any transfer of rights here.

### 2.   Transfer by Operation of Law

Apart from the issue of express assignment, Aker also takes the position that it is an additional insured under the MCC Policy because the Asset Sale and Purchase Agreement "constitute[d] a de facto merger or continuation by Aker of the business operations of Kvaerner Process."  (Aker Supplemental Br., at 2.)  Aker argues that it should be found the "successor" to Kvaerner Process because "the entire Kvaerner Process/Pharma Division business and operations were sold and transferred to Aker wholesale, and [] Aker fully assumed and continued the Kvaerner Process business and operations … under a new corporate flag."  Upon such a finding, Aker submits that it must then be deemed an additional insured under the MCC Policy because "entities that purchase assets and assume liabilities of another entity are entitled to the benefits of coverage under the seller's insurance policy for post-sale claims arising out of the assets."  (Aker Reply Br. at 9.)

In so arguing, Aker relies primarily on the decision in *Arrowood Indem. Co. v. Atlantic Mut. Ins. Co.*, 96 A.D.3d 693 (N.Y. App. Div. 1st Dep't 2012).  In *Arrowood*, the court sought to determine whether the insurer was obligated to defend and indemnify plaintiffs Kerry, Inc. and Mastertaste, Inc. in connection with personal injury claims brought on by the conduct of a predecessor entity, St. Louis Flavors Corp.  The First Department found that, "[e]ven if the [Asset Purchase Agreement] did not expressly transfer the [insurance] policy to Kerry, the benefits or coverage under those policies transferred, as a matter of law, to Kerry as the alleged successor to

St. Louis's pre-acquisition liabilities." *Id.* at 694-95.  Furthermore, the court noted that "[t]he lack of [the insurer's] consent to a transfer of benefits to Kerry … is unimportant, as all of the underlying plaintiffs' product sale and exposure allegations show that the potential liabilities in question arose before the transfer, and as such, [the insurer] cannot claim that its risk increased." *Id.* at 695.

Aker argues that, as in *Arrowood*, it became the successor to Kvaerner Process by reason of the Asset Sale and Purchase Agreement, and should be deemed an additional insured as a consequence thereof.  With little supporting argument, Aker essentially asks this Court to follow that decision and endorse a broad operation of law approach, pursuant to which coverage follows prospective liability even in the absence of a formal, contractual assignment of the same. But unlike *Arrowood*, the incident that triggered a claim under the Policy (Ownbey's accident) did not occur until *after* the effective date of the alleged merger.   The difference is critical—and, significantly, highlights a thread common to the majority of opinions considering this issue nationwide.

The concept that Aker advances is often attributed to the Ninth Circuit's decision in *Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353 (9th Cir. 1992).  The plaintiff in that action claimed that California Cooler products caused her child's apparent birth defects. Brown-Forman, which purchased California Cooler two years after the child's birth, was a named defendant in the action and sought indemnity from Allied Mutual Insurance Company, one of California Cooler's insurers.  *Id.* at 1355-56.  Allied argued against the transfer, claiming that the asset sale agreement excluded contracts that required third-party consent to assignment, and that the policy itself contained an express no-assignment clause.  *Id.* at 1357.  But the Ninth Circuit held in favor of coverage, finding that the policy rights at issue transferred by operation of law

even though they did not transfer under the express terms of the parties' contract. *Id.* at 1357-58. The court based this ruling in part on product line successor liability, pursuant to which a purchaser of substantially all assets of another entry assumes, with some limitations, the obligation for product liability arising from the selling firm's presale conduct. *Id.* As to the effect of the policy's no-assignment clause, the Ninth Circuit found that a transfer by operation of law would not harm the underlying policy of those provisions—protecting against an unforeseen increase in risk—because, when the loss occurs before the transfer, the insurer covers only the risk evaluated when the policy was written. *Id.*

The District of New Hampshire reached a similar conclusion in *Total Waste Management Corp. v. Commercial Union Ins. Co.*, 857 F. Supp. 140, (D.N.H. 1994). The plaintiff in that underlying action alleged that Total Waste Management Corp. ("TWM") was responsible for the release of hazardous substances on its property, in part due to the conduct of George West, a company from which TWM purchased certain assets years earlier. While TWM and George West did not merge, the district concluded that "[l]ike a corporation succeeding to the rights of the merged corporation, a potential successor corporation by definition should also be entitled to those same rights." *Id.* at 151. Characterizing the decision in *Northern Ins.* as one based on product-line successor liability, the *Total Waste Management* court concluded that "the Ninth Circuit's reasoning is persuasive authority in deciding whether a potential corporate successor is entitled to coverage under its predecessor's insurance policy." *Id.* at 152.

From these decisions, two main lines of authority appear to flow: (1) those cases permitting a transfer of insured rights where the occurrence triggering liability preceded the asset purchase; and (2) those cases rejecting transfer of insured rights by operation of law, and endorsing a strict contract-based approach to the passage of rights and liabilities under an asset purchase agreement.

20

Under the former view, an asset purchase agreement that is ambiguous as to rights in an insurance policy will nonetheless effect a transfer of those rights by operation of law, but likely only where the effective date of the agreement follows the liability incident. *See Century Indem. Co. v. Marine Group, LLC*, 848 F. Supp. 2d 1238, 1256 (D. Or. 2012) ("[I]f a finder of fact determines that BAE or TMG did indeed succeed to the liabilities of NWMIW, the benefits of the insurance policies will flow to BAE and TMG just as the liability for an occurrence that took place prior to their tenure does."); *Koppers Indus., Inc. v. Beazer East, Inc.*, 1996 WL 33577709, at *6 (W.D. Penn. Mar. 5, 1996) (limiting *Northern Ins.*'s product line successor theory to situations where the "predecessor corporation, which allegedly sold a defective product, is no longer in existence"); *Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F. Supp. 2d 483, 492 (N.D. Ohio 2006) (citing collection of cases that concluded "*Northern Insurance* merely stands for the proposition that coverage can be imposed by operation of law when the underlying liability is also imposed by operation of law").

By contrast, under the contractual approach, many courts have disregarded entirely the notion that insurance benefits could transfer by operation of law where the asset purchase agreement fails to identify the policy itself. In *General Accident Ins. Co. of America v. Superior Court*, 55 Cal. App. 4th 1444 (1997), Western MacArthur ("WM"), an asbestos distribution company that had taken over Western Asbestos Company, sought a declaratory judgment that certain insurers owed it duties of defense and indemnification. In the underlying liability action, WM was found liable under the successor liability rule for Western Asbestos's products, which, in turn, engendered more cases filed against WM. The California appellate court, however, declined to follow *Northern Ins.* and held that WM was not entitled to the insurance coverage of its corporate predecessor. In so holding, the court was driven by the fact that "insured-insurer

relationship is a matter of contract," while "[s]uccessor liability is a matter of tort duty and liability." *Id.* at 1451. "It is one thing to deem the successor corporation liable for the predecessor's torts; it is quite another to deem the successor corporation a party to insurance contracts it never signed, and for which it never paid a premium, and to deem the insurer to be in a contractual relationship with a stranger." *Id.* at 1451.

While the New Jersey Supreme Court has yet to decide whether insurance rights pass to "successor" corporations under asset purchase agreements, application of either theory of transfer here compels the same result. Under the contract-based approach, the court would look to the language of the Asset Sale and Purchase Agreement and determine whether the parties intended for rights under the MCC Policy to pass from Kvaerner Process to Aker. Having already engaged in that analysis in Section IV(a)(i)(1), *supra*, this Court finds that, while insured rights may have been encompassed by the language of the Asset Sale and Purchase Agreement, the no-assignment clauses contained in the MCC Policy prohibits transfer of any benefits thereunder.

Under the operation of law approach, assuming that Aker was deemed Kvaerner Process's "successor," the court would find the transfer of insured coverage inappropriate because the incident triggering liability occurred after the Asset Sale and Purchase Agreement was consummated—a conclusion consistent with both the underlying purpose of consent to assignment clauses in insurance policies and New Jersey's treatment of the same. While New Jersey courts generally have upheld the effect of no-assignment clauses in liability policies, limited exception is reserved for transfers of an accrued right to payment thereunder. *Givaudan Fragrances Corp. v. Aetna Casualty & Surety Co.,* No. A-2270-12T4 (N.J. App. Div. Aug. 12, 2015) ("[I]f there has been an assignment of the right to collect or to enforce the right to proceed under a policy after a loss has occurred, the insurer's risk is the same because the liability of the insurer becomes fixed

at the time of the loss."); *Kupersmith v. Delaware Ins. Co.*, 81 N.J.L. 664, (E. & A. 1911) ("[A]ssignment of a policy of insurance after a … loss does not assign the policy as to future indemnity [] without the consent of the insurer, where such consent is one of the conditions of the policy, but is limited to the claim for a loss thereunder."); *Haskell Props., LLC*, 2014 N.J. Super Unpub. LEXIS 2428 at *10 ("Assignments of rights under a contract of insurance may occur without consent when the assignment is of a chose in action, or an accrued right to payment."). This is because the very purpose of a no-assignment clause is to protect the insurer from *unforeseen* risks. *See Federal Insurance Co. v. Purex Indus., Inc.*, 972 F. Supp. 872, 889 (D.N.J.1997); 3 Couch on Insurance § 35.8 ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity."). When the transfer or assignment occurs after the event giving rise to coverage, the risk in that scenario is no longer unforeseen— rather, it has been reduced to a fixed claim for *payment* under the policy. This rationale informs the "sharp distinction" that New Jersey law has drawn between pre- and post-assignment liability, and further supports the likelihood that the New Jersey Supreme Court would not find in favor of coverage here.

Based on the foregoing, the Court denies Aker's motion for coverage.

### b.   Aker's Motion to Strike MCC's "Subrogation" Claim

Aker also moved to strike or dismiss MCC's purported subrogation claim, raised in connection with an April 2011 status conference. The essence of that claim is as follows: Pursuant to Paragraph 7.1 of the Revised and Restated Target Price Contract, and in the event of a "judgment or settlement" entered against, or into by, ImClone, ImClone can seek indemnity against Aker to the extent caused by the "willful or negligent acts or omissions of the indemnifying party, its agents

23

or employees." This right of indemnification, so the argument goes, passed to MCC after it entered into the April 18, 2011 settlement with plaintiff, purportedly on ImClone's behalf.

Aker moved to dismiss or strike this claim, arguing that (1) MCC settled with the plaintiff solely to settle the claims raised against it and its named insured, Advantage, and therefore paid nothing to Ownbey on ImClone's behalf; (2) the purported subrogation claim is barred because MCC failed to preserve it in the final pretrial order; and (3) the claim is barred by the indemnity obligation that Advantage owes Aker, together with MCC's admission that that obligation is covered by MCC; and (4) the claim is barred by the anti-subrogation rule because Aker, like ImClone, is an additional insured under the MCC Policy. Because the R&R found that Aker was entitled to coverage under the Policy, it determined that MCC was barred from pursuing ImClone's claim under the anti-subrogation rule. Having already concluded that Aker is not an additional insured under the MCC Policy, this Court finds the anti-subrogation rule inapplicable but dismisses the subrogation claim for the following reasons.

### i. Was a Benefit Conferred on ImClone?

Subrogation is an equitable doctrine intended "to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it" and serves to "promote 'essential justice' between the parties." *Liberty Int'l Underwriters Can. v. Scottsdale Ins. Co.*, 955 F. Supp. 2d 317 (D.N.J. 2013) (quoting *Feigenbaum v. Guaracini*, 402 N.J. Super. 7, 20 (N.J. Super. 2008)). The doctrine is most often used in the insurance context, in situations when "an insurer has indemnified an insured for damages sustained in accordance with the provisions of an insurance contract." *Fidelity & Casualty Co. v. First Nat'l Bank*, 397 F. Supp. 587, 588 (D.N.J. 1975). In such cases equity demands that the insurer be reimbursed for its payment to the insured, "otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the

24

third party, or in the absence of such double recovery by the insured the third party would go free despite the fact that he has the legal obligation in connection with the loss or damage." *Standard Accident Ins. Co. v. Pellecchia*, 15 N.J. 162, 171 (N.J. 1954).

Subrogation is not, however, an absolute right. At bottom, it is grounded in equity and "is applied pursuant to equitable standards and with due regard to the legal and equitable rights of others." *Fidelity*, 397 F. Supp. at 589. Generally, "the doctrine is based upon the principle that a benefit has been conferred upon the insured at the expense of the insurer." *Id.* at 589; *see also Commercial Union Ins. Co. v. Bituminous Casualty Corp.*, 851 F.2d 98, 100 (3d Cir. 1988) ("The insurer who pays for a loss obtains the insured's right of action against a third party ultimately responsible for the loss.") This begs the question: May MCC recover from Aker on ImClone's behalf if ImClone already settled its claims with Ownbey through the Zurich Settlement?

On April 7, 2011, plaintiffs entered into a settlement agreement with Zurich, Epic, Aker and ImClone (the "Zurich Settlement"), and the parties expressly agreed that the settlement was "in accordance with *Deblon v. Beaton*, 103 N.J. Super. 345 (Law Div. 1968) and *CNA v. Selective*, 354, N.J. Super. 369 (App. Div. 2002)." In *Deblon* the plaintiff filed a negligence against Foley, the owner of the car in which plaintiff's decedent was a passenger, and against Beaton, the driver. Beaton was covered under Foley's liability policy, issued by Allstate, and also under an excess policy issued by the Jersey Insurance Company of New York of the Pacific of New York Group ("Jersey"). Before a trial on liability, Deblon executed a "covenant not to sue" pursuant to which Foley and Beaton were released to the extent of their personal assets and Allstate coverage, but not with regard to Beaton in his capacity as an insured of Jersey. Jersey took the position that the covenant released Beaton entirely, and that an action could not lie against it as Beaton's excess carrier. The court disagreed. Honoring the covenant not to sue as drafted, the court essentially

25

held that defendants in such circumstances may be viewed in three distinct capacities—individual, insured of the primary carrier, and insured of the excess carrier—and may be released as the individual and insured of the primary, but not as the excess insured.  The *CNA* action proceeded on similar lines, though it involved co-primary carriers rather than one primary and one excess. Endorsing the *Deblon* settlement, the Appellate Division in *CNA* found that the defendant tortfeasor and settling insurer were "relieved of personal liability" by reason of the special release.

The Zurich Settlement also contained a special release as to ImClone and Aker.  Ownbey "specifically release[d] … ImClone … *from any corporate or person liability*, and specifically release[d] them to the extent that coverage exist[ed] for such claims through Zurich, National Union, Federal Insurance Company, American Insurance Guarantee Company (as the excess insurance carrier of ImClone), Liberty Mutual, IF P&C Insurance Company Ltd. (reinsurer of Liberty Mutual's policy) or to the extent such could be satisfied by Epic based on contractual imdemnity."  (Zurich Settlement, at 4.)  The agreement preserved only "limited claims [Ownbey has] against ImClone … to the extent that any judgment procured against those entities can be and is in fact satisfied pursuant to Advantage's contractual indemnity obligation owed to ImClone and/or Aker <u>or</u> by [MCC] pursuant to additional insured coverage owed to ImClone or Aker." (Zurich Settlement, at 4.)  Ownbey agreed that, to the extent judgment was entered against either ImClone or Aker, he would not record the judgment in any jurisdiction or make any effort to collect against the assets of either entity—recovery would be "limited to proceeds that are recoverable from Advantage as the [indemnitor] of ImClone and/or Aker and/or the proceeds of the policies of insurance issued by [MCC] to Advantage."  (Zurich Settlement, at 5.)

While MCC conceded that ImClone and Aker were "bullet proof" from any liability to plaintiff following the Zurich Settlement, it nonetheless proceeded to settle with Ownbey on April

19, 2011, purportedly on ImClone's behalf.  Its stated purpose was to "establish a full, complete and unconditional release by plaintiff to 'Aker', 'ImClone', 'Mid-Continent', and 'Advantage' in the [underlying litigation]" and the agreement provided that "[a]ll of the 'preserved' claims provided to plaintiff in the <u>Deblon</u> release as to 'Aker' and 'ImClone' are now released and extinguished and an unconditional release is to be provided to 'Advantage' and 'Mid-Continent.'" (Howarth Certification, Ex. F ("MCC Settlement").)  Aker submits that neither it nor ImClone signed or approved the settlement—it was signed only by attorney Jerald J. Howarth on behalf of his client, Mid-Continent Casualty.

ImClone then refused to agree to MCC's proposed consent judgment—it maintained that, by virtue of the Zurich Settlement and subsequent stipulation of dismissal (D.E. 473), "there [was] no claim in this matter for ImClone to consent to judgment upon."  (Dembling Cert., Ex. 18 at 2.) ImClone further asserted that "[w]hen MCC settled the case, it was doing so to reduce MCC's exposure, not protect ImClone" and objected to MCC's apparent "threat to unilaterally file a Consent Judgment."  (Dembling Cert., Ex. 18 at 3.)  This Court also denied MCC's attempt to enter a consent judgment on ImClone's behalf, noting that (1) no showing had been made that plaintiffs had the authority to bind ImClone to the settlement; (2) ImClone asserted that it was not contemporaneously advised of the settlement, or alerted to MCC's apparent decision to allocate a portion of the settlement to ImClone's purported liability; and (3) an order had already been entered "dismissing all of plaintiffs' liability claims against ImClone" [D.E. 473] and, as such, "plaintiffs no longer have claims against ImClone upon which a judgement can be entered in their favor."  On that basis, the Court "declin[ed] to permit Mid-Continent to use this tactic as a means to assert a subrogation claim."

Aker now argues that, taken together, this complicated history proves MCC's subrogation claims deficient because MCC never paid anything to Ownbey on its behalf, or settled any claims that plaintiff had against ImClone. The Court agrees. By reason of the Zurich Settlement, ImClone was relieved of all personal liability as to claims raised against it by Ownbey. MCC conceded as much, indicating immediately thereafter that ImClone was "bullet proof" going forward, but nonetheless attempted to manufacture a settlement with plaintiffs in order to preserve potential claims in subrogation. While MCC's true motive in orchestrating the settlement (what this Court charitably referred to as a "tactic to assert a subrogation claim") remains unknown, insight may be drawn from MCC's decision to do so on its own, exclusive of the other actors. Equity takes into account all of this. And because subrogation is based on the principle that a benefit has been conferred upon the insured at the expense of the insurer, MCC's subrogation claim must be dismissed.

## IV.    Conclusion

For the foregoing reasons, Aker's motion for coverage as an additional insured under the MCC Policy is denied and Aker's motion to dismiss MCC's subrogation claim is granted. An appropriate order will be entered.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date: September 2, 2015