UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHELBY OWNBEY AND JOYCE OWNBEY, *Plaintiffs*, v. AKER KVAERNER PHARMACEUTICALS INC., et al. *Defendants*. | Civil No.: 2:07-cv-2190 (KSH) (CLW) **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Before the Court are motions for summary judgment filed by Zurich American Insurance Company ("Zurich") (D.E. 570), ImClone Systems, Inc. ("ImClone") (D.E. 571), and Aker Kvaerner Pharmaceuticals, Inc. ("Aker") (D.E. 572) regarding the parties' respective rights and obligations under an insurance policy issued by Zurich. The Court and the parties are familiar with the facts and long procedural history of this case, which has been the subject of motion practice that has inched along seeking to establish the rights and exposure of various players in a worksite accident that significantly injured plaintiff Shelby Ownbey. He was compensated some years ago; what has driven the litigation since are contractual indemnities offered to the property owner, ImClone, and construction manager, Aker, by two subcontractors employing Ownbey and others involved in the construction project that led to the accident, and the purported coverage that ImClone and Aker receive under these subcontractors' general liability policies as additional insureds.

1

In these motions, ImClone and Aker seek to recover defense costs as additional insureds under a policy issued by Zurich to subcontractor Epic. The Zurich policy and Aker's rights under it present substantially the same issues the Court considered in Aker's effort to recoup defense costs under a policy issued by Mid-Continent Casualty Co. ("MCC") to a different subcontractor, Advantage Building & Exteriors, Inc. ("Advantage"). Specifically, Aker purchased rights and liabilities regarding the construction project from ImClone's previous construction manager, Kvaerner Process, pursuant to an asset purchase agreement. Both MCC and Zurich argue that Kvaerner Process's additional insured rights under their policies did not pass to Aker.

In denying Aker's partial summary judgment as to MCC (D.E. 545) (the "MCC opinion"), the Court offered its own interpretation of the MCC policy and held that coverage for Aker was precluded by anti-assignment language in MCC's primary and umbrella policies. Arguing that its policy with Epic has the same anti-assignment language, Zurich seeks a declaration from the Court that the law of the case doctrine precludes Aker from arguing that it obtained any additional insured rights from Kvaerner Process under the asset purchase agreement. Aker opposes, arguing that the Zurich and MCC policies are distinct enough on the issue of assignment such that the Court's prior ruling does not apply; alternatively, Aker argues that the MCC opinion was wrong, and that the Court should exercise its authority under Fed. R. Civ. P. 54(b) to amend its holding.

For the reasons set forth below, the Court is satisfied that its previous ruling is in fact in error. Therefore, this opinion revisits the issue of coverage for Aker under the MCC policy, as is the Court's authority (and obligation) under Rule 54(b). *See* Fed. R. Civ P. 54(b); *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973) ("so long as the district court has jurisdiction over the

case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so"). The Court also finds that the Zurich policy provides additional insured coverage for Ownbey's accident to ImClone and Aker.

## I. Background

In July 2002, ImClone contracted with Kvaerner Process, a division of Kvaerner U.S., Inc., for the construction of a pharmaceutical manufacturing plant (the "target price contract"). *Ownbey v. Aker Kvaerner Pharm. Inc.*, No. CIV. 07-2190 KSH, 2015 WL 5164071 (D.E. 545), at *2 (D.N.J. Sept. 2, 2015). The agreement required Kvaerner Process to provide various construction management functions on ImClone's behalf. *Id.*

With Kvaerner Process acting as its agent, ImClone entered into a contract with Advantage, effective July 15, 2002, under which Advantage agreed to install certain portions of the exterior walls of the plant (the "Advantage contract"). *See Ownbey*, No. CIV. 07-2190 KSH, 2015 WL 5164071, at *2. That contract required Advantage to "release, indemnify, hold harmless and defend Kvaerner Process and [ImClone] . . . from and against any claim, expense, or liability . . . arising out of" Advantage's work on the project and to name them as additional insureds on its liability insurance policy issued by MCC. *Id.*

With Kvaerner Process acting as its agent, ImClone also entered into a contract with Epic, effective July 9, 2003 (the "Epic contract"). The Epic contract provides that the "Scope of Work includes, but is not limited to, furnishing all labor, materials, accessories, tools and incidentals as may be required, to build and finish the Project's Building Interiors in their entirety . . ." *See* Affidavit of Ron Delmar, dated May 12, 2009, Exh. A ("Epic Contract") (D.E. 570-39), at ImClone 7059. Paragraph 30.1 of the Epic contract provides that "[a]t any time, Kvaerner Process may direct [Epic] to make a change within the general scope of this Contract

by issuing a formal written change order[,]" and that "[c]hanges to the Work may include additions, deletions or alterations to the general scope of the Work[.]" Epic Contract, at ImClone 7040. Paragraph 31.0 of the Epic contract provides a set of procedures whereby Kvaerner Process may make changes to the scope of work by submitting an "Addendum, Change Order or Field Work Order" to Epic. *Id.* at ImClone 7040–7041.

The Epic contract required Epic to maintain a commercial general liability insurance policy and to name Kvaerner Process and ImClone as an "Additional Insured as concerns work performed under this Contract[.]" *Id.* at ImClone 7035. Epic procured the requisite liability insurance from Zurich (the "Zurich policy"). The Zurich policy names as an additional insured "any person or organization with whom you have agreed, through written contract, agreement or permit, executed prior to the loss, to provide additional insured coverage." *See* Certification of Timothy P. Smith, Esq., dated January 13, 2017, Exh. 25 ("Zurich Policy") (D.E. 570-29), at ZA00004. The Zurich policy provides that additional insured coverage applies "only with respect to liability arising out of [Epic's] ongoing operations performed for that insured." *Id.*

ImClone subsequently entered into a revised target price contract with Aker with an effective date of July 15, 2002, providing that Aker—not Kvaerner Process—entered into the target price contract with ImClone (the "revised target price contract"). *See* Revised Target Price Contract (D.E. 570-26); *Ownbey*, No. CIV. 07-2190 KSH, 2015 WL 5164071, at *3. The revised target price contract imposed upon Aker the construction management obligations for which ImClone had originally contracted with Kvaerner Process. *See id.*

On February 27, 2004, Kvaerner U.S. Inc. entered into an asset purchase agreement with Aker providing that Kvaerner U.S. Inc. agreed to sell and Aker agreed to buy certain assets and to assume certain obligations in respect of Kvaerner U.S. Inc.'s unincorporated division,

4

Kvaerner Process. *Ownbey*, No. CIV. 07-2190 KSH, 2015 WL 5164071, at *8. One of the assets specifically transferred under the agreement was ImClone's target price contract with Kvaerner Process for construction of the manufacturing plant, including "all rights, benefits, and obligations thereunder." *Id*. The asset purchase agreement also transferred from Kvaerner Process to Aker "Non-Consumer Contracts," which the agreement defines as "the contracts of [Kvaerner Process] in existence on the Closing Date," excluding "contracts for the provision of engineering or construction services and/or products with customers of [Kvaerner Process]." *Id.*

In or about June 2005, Field Work Order 109 was issued pursuant to the Epic contract, directing Epic to "Provide Laborers for project cleanup[,]" and to "Furnish a powered lift truck 'lull' for project usage." *See* Field Work Order 109 (D.E. 570-40). On July 22, 2005, Shelby Ownbey, an Advantage employee, was seriously injured when he fell approximately 15 feet from a scaffold erected at the project. *See Ownbey*, No. CIV. 07-2190 KSH, 2015 WL 5164071, at *4. At the time of the accident, two union laborers that Epic provided in connection with Field Work Order 109, James Bickar and Louis Ghetti, were assisting in raising the scaffold on which Ownbey was standing when he fell. *See* Joint Pretrial Order (D.E. 402), at ¶ 19. After the accident, Epic submitted Proposed Change Order 256, in part requesting payment for Bickar's and Ghetti's work. *See* Proposed Change Order 256 (D.E. 571-9). Epic subsequently submitted Change Order 016 which, by its express terms, formally incorporated Field Work Order 109 into the Epic contract, including payment for the time incurred by Bickar and Ghetti on the day of the accident. *See* Change Order 016 (D.E. 570-41).

Ownbey and his wife sued Aker, ImClone, Epic, and others for damages relating to the accident. *See* Third Amended Complaint (D.E. 55). All of plaintiffs' claims eventually settled. However, Aker and ImClone filed cross-claims and third-party suits against Advantage, MCC,

5

Zurich, and Aker's insurer, Liberty Mutual Insurance Company, seeking to recover counsel fees incurred in the defense of plaintiffs' claims (D.E. 79, 80).

Aker moved for partial summary judgment against MCC, seeking a declaration that it was an additional insured under the policy that MCC issued to Advantage (D.E. 520). In an opinion dated September 2, 2015 (D.E. 545), the Court ruled that Aker did not qualify as an insured under the MCC policy, and found that Kvaerner Process's rights under the policy as an additional insured did not transfer to Aker when Aker purchased Kvaerner Process's assets due to anti-assignment language in MCC's primary and umbrella policies. The Court denied Aker's motion for reconsideration (D.E. 551).

Zurich now moves for summary judgment (D.E. 570) on the third-party claims for defense costs brought by ImClone and Aker, arguing that: (1) Aker does not qualify as an additional insured because the policy Zurich issued to Epic contains anti-assignment language similar to MMC's policies; and (2) the loss did not arise out of Epic's "ongoing operations," as is contractually required to trigger additional insured coverage. ImClone and Aker have also moved for summary judgment (D.E. 571, 572) seeking a declaration that Zurich is required to reimbursement them for defense costs related to this action.

The motions were fully briefed (D.E. 570, 577, 580, 581, 571, 578, 582, 572, 575, 583). The Court makes its decision on the papers.

## II.  Legal Standard

Under Federal Rule of Procedure 56, "[s]ummary judgment is appropriate when the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "has the burden of demonstrating that the evidentiary record presents no genuine issue

Zurich, and Aker's insurer, Liberty Mutual Insurance Company, seeking to recover counsel fees incurred in the defense of plaintiffs' claims (D.E. 79, 80).

Aker moved for partial summary judgment against MCC, seeking a declaration that it was an additional insured under the policy that MCC issued to Advantage (D.E. 520). In an opinion dated September 2, 2015 (D.E. 545), the Court ruled that Aker did not qualify as an insured under the MCC policy, and found that Kvaerner Process's rights under the policy as an additional insured did not transfer to Aker when Aker purchased Kvaerner Process's assets due to anti-assignment language in MCC's primary and umbrella policies. The Court denied Aker's motion for reconsideration (D.E. 551).

Zurich now moves for summary judgment (D.E. 570) on the third-party claims for defense costs brought by ImClone and Aker, arguing that: (1) Aker does not qualify as an additional insured because the policy Zurich issued to Epic contains anti-assignment language similar to MMC's policies; and (2) the loss did not arise out of Epic's "ongoing operations," as is contractually required to trigger additional insured coverage. ImClone and Aker have also moved for summary judgment (D.E. 571, 572) seeking a declaration that Zurich is required to reimbursement them for defense costs related to this action.

The motions were fully briefed (D.E. 570, 577, 580, 581, 571, 578, 582, 572, 575, 583). The Court makes its decision on the papers.

## II.  Legal Standard

Under Federal Rule of Procedure 56, "[s]ummary judgment is appropriate when the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "has the burden of demonstrating that the evidentiary record presents no genuine issue

of material fact." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). A court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). "Interpretation of an insurance contract is a question of law for the Court's determination, and thus the issue may be decided on summary judgment." *U.S. Specialty Ins. Co. v. Sussex Airport, Inc.*, No. CV145494SRCCLW, 2016 WL 2624912, at *3 (D.N.J. May 9, 2016) (citing *Simonetti v. Selective Ins. Co*, 372 N.J. Super. 421, 428 (App. Div. 2004)).

## III. Discussion

### A. The MCC Opinion

Aker argues that it obtained Kvaerner Process's additional insured rights under the Zurich policy pursuant to the 2004 asset purchase agreement between Aker and Kvaerner U.S. Inc. In the MCC opinion (D.E. 545), the Court held that anti-assignment language in MCC's policies prevented any such transfer of additional insured rights to Aker with respect to MCC. Asserting that its policy with Epic has identical anti-assignment language, Zurich argues that the law of the case doctrine bars a finding that the asset purchase agreement transferred Kvaerner Process's additional insured rights under the Zurich policy to Aker. *See* Zurich's Moving Br. (D.E. 570), at pp. 12–15.

The law of the case doctrine "limits relitigation of an issue once it has been decided" in an earlier stage of the same litigation. *Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003). The doctrine is designed to "promote finality, consistency, and judicial economy." *Id.* at 786. However, as the Third Circuit has "consistently held, when (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and

7

would create manifest injustice, the law of the case doctrine does not apply and the court is free to reconsider an earlier denial of summary judgment." *Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016) (internal quotations and citation omitted). Thus, Zurich's law of the case argument requires the Court to revisit the MCC opinion to ensure that a perpetuation of the Court's previous ruling does not create a manifest injustice here. Specifically, should the Court perceive error in its earlier decision that MCC was not required to cover Aker as an additional insured, Zurich's law of the case argument fails and, as Aker argues, the Court has power and discretion under Fed. R. Civ. P. 54(b) to amend its previous ruling.

Fed. R. Civ. P. Rule 54(b) provides in relevant part:

> [T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties rights and liabilities.*

Fed. R. Civ. P. Rule 54(b) (emphasis added); *see also Simmermon v. Gabbianelli*, 932 F. Supp. 2d 626, 630 (D.N.J. 2013) (in the absence of certification for immediate appeal, "an order of partial summary judgment is subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of the parties"); *U.S. ex rel. Haskins v. Omega Inst., Inc.*, 25 F. Supp. 2d 510, 514 (D.N.J. 1998) ("courts retain jurisdiction over their interlocutory orders which are not certified for immediate appeal and may modify them at any time before trial"). The Third Circuit has noted that "so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973). For the reasons set forth below, the Court is satisfied that law of the case doctrine does

not apply because "the [MCC opinion] was clearly erroneous and would create manifest injustice[.]" *Roberts*, 826 F.3d at 126. Thus, in the interests of justice, and pursuant to its Rule 54(b) authority, the Court will change its ruling in the MCC opinion.

In the MCC opinion, the Court found:

> Section F of the Common Policy Conditions expressly states that "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." Furthermore, the MCC umbrella policy issued to Advantage provides that "[MCC] shall not be bound by any assignment of interest by any insured unless our consent to such assignment is endorse onto this policy." Taken together, these provisions make clear that MCC "shall not recognize" an assignment in the absence of its consent, and they therefore serve to bar any transfer of rights here.

*Ownbey*, No. CIV. 07-2190 KSH, 2015 WL 5164071, at *9. But because Aker was only seeking coverage under MCC's primary policy, the Court erred in considering anti-assignment language in the MCC umbrella policy.

The anti-assignment clause in the MCC primary policy provides:

> *Your* rights and duties under this policy may not be transferred
> without our written consent except in the case of death of an
> individual named insured.

MCC Policy (D.E. 570-28), at p. 23 (emphasis added). The policy defines the term "your," providing that:

> Throughout this policy the words "you" and "your" refer to the
> *Named Insured* shown in the Declarations, and any other person or
> organization qualifying as a Named Insured under this policy.

MCC Policy (D.E. 570-28), at p. 7 (emphasis added). The policy lists the "Named Insured" as Advantage. *Id.*, at p. 2.

Thus, when read in conjunction with the definitions, the express language of the anti-assignment clause in the MCC policy prohibits the transfer of "[Advantage's] rights and duties"

9

under the policy. Because the unambiguous language of the MCC policy only prohibits a transfer of *Advantage's* rights thereunder without MCC's consent, the Court erred in holding that the MCC policy precluded a transfer of additional insured rights.

The MCC policy expressly names Kvaerner Process as an additional insured. *See* MCC Policy (D.E. 570-28), at p. 6. The Court has changed its previous ruling and found that the MCC policy does not bar an assignment of additional insured rights. Now the Court must determine whether Kvaerner Process's additional insured rights under the MCC policy were transferred to Aker under the 2004 asset purchase agreement. Aker argues that an "assignment of [Kvaerner Process's] additional insured rights was effected separately and independently under both Sections 5.1 and 2.1 of the [asset purchase agreement]." Aker's Moving Br. (572-1), at p. 8. The Court agrees.

First, section 5.1 provides that Aker shall assume "all the rights, economic interest and Liabilities associated with the Assignable Contracts[,]" which the purchase agreement specifically defines to include the target price contract pursuant to which Kvaerner Process was performing its work on the project. *See* Asset Purchase Agreement, § 1.2 and Schedule 1.5. The target price contract provides that Kvaerner Process's liability "shall not exceed the recovered proceeds of the insurance expressly specified in this [Article 8]," which provides for the procurement of additional insured coverage. *See* Target Price Contract (D.E. 572-6), at Art. 8. Thus, the Court finds that Kvaerner's insurance rights in connection with the project constitute "rights" or "economic interests" associated with the target price contract that were transferred to Aker under the asset purchase agreement.

Separately, section 2.1 of the asset purchase agreement transferred to Aker the "Acquired Assets," which the agreement defines to include "all right, title and interest" in Kvaerner

10

Process's "Non-Customer Contracts, including all rights, benefits and obligations thereunder . . . ." *See* Asset Purchase Agreement, §§ 2.1, 1.1. Non-Customer Contracts are defined to include "the contracts of [Kvaerner Process] in existence on the Closing Date" that are not "Customer Contracts," defined as "contracts for the provision of engineering or construction services and/or products with customers of [Kvaerner Process]." *Id.*; *see also Ownbey*, No. CIV. 07-2190 KSH, 2015 WL 5164071, at *2. The Court finds that MCC policy falls within the definition of Non-Customer Contracts, and that Kvaerner Process's additional insured rights thereunder constitute "Acquired Assets" under the asset purchase agreement. Thus, the Court finds that Aker obtained Kvaerner Process's additional insured rights under the MCC policy in connection with the 2004 asset transfer.

But that does not end the inquiry. The MCC policy provides that an additional insured is covered "only with respect to liability directly attributable to [Advantage's] performance of ongoing operations for that insured." MCC Policy (D.E. 570-28), at p. 6. Although the Court did not reach this issue in the MCC opinion, MCC argued in its papers that because Advantage contracted with ImClone, Advantage's work at the time of Ownbey's accident was not part of its "ongoing operations" *for Aker*, as is required for Aker to obtain additional insured coverage under the MCC policy. Specifically, MCC argued that because: (1) the Advantage contract was between Advantage and ImClone; (2) ImClone paid for the work; (3) Kvaerner Process was only acting as ImClone's agent; and (4) Aker's name does not appear anywhere in the Advantage contract, "it cannot be persuasively argued that any 'ongoing operations' by Advantage was being performed for anyone but ImClone[.]" *See* MCC Opp. Br. (D.E. 525), at pp. 29–32. The Court disagrees.

MCC does not deny that the Advantage contract obligated Advantage to, among other things: (1) "guarantee" to Kvaerner that "the (a) Work will meet or exceed the requirements of the Contract . . ."; (2) submit to Kvaerner shop, detail and installation drawings and schedules for Kvaerner approval; (3) seek Kvaerner's approval prior to obtaining subcontractors; (4) adhere to progress schedules approved by Kvaerner; (5) provide progress reports to Kvaerner; (6) comply with Kvaerner's rules governing Advantage's employees; and (7) comply with Kvaerner's direction regarding changes in the scope of Advantage's work. *See* MCC's Response to Aker's Statement of Undisputed Facts, at ¶ 15. As explained above, the revised target price contract named Aker as the construction manager for the project, and Aker obtained Kvaerner Process's rights and obligations regarding the project under the asset purchase agreement. Aker was not a party to the Advantage contract, but the Court finds that Advantage owed ongoing obligations to Aker with respect to the project. Therefore, Advantage's "ongoing operations" on the day of the accident were being performed for Aker as well as for ImClone.

Because Aker was an additional insured under the MCC policy for whom Advantage was performing "ongoing operations" at the time of Ownbey's accident, Aker is entitled to partial summary judgment on the issue of defense costs from MCC.

**B. The Zurich Policy**

The Court now turns to whether ImClone and Aker are entitled to additional insured coverage for Ownbey's accident under the Zurich policy. The Zurich policy provides that an additional insured is any party "with whom [Epic] [] agreed, through written contract, agreement or permit, executed prior to the loss, to provide additional insured coverage[.]" *See* Zurich Policy (D.E. 570-29), at ZA00004. The Epic contract required Epic to maintain a commercial general liability insurance policy and to name ImClone and Kvaerner Process as an "Additional

Insured as concerns work performed under this Contract[.]" Epic Contract (D.E. 570-39), at ImClone 7040. Thus, the Court finds that both ImClone and Kvaerner Process qualify as additional insureds under the Zurich policy and that, as with its rights under the MCC policy, Kvaerner Process's additional insured rights under the Zurich policy were assigned to Aker in connection with the 2004 asset transfer.[1]

The remaining issue is whether Ownbey's accident arose out of Epic's "ongoing operations" for ImClone and Aker. The Zurich policy provides additional insured coverage "only with respect to liability arising out of [Epic's] ongoing operations performed for that insured." *See* Zurich Policy (D.E. 570-29), at ZA00004. Zurich argues that Ownbey's accident did not arise out of Epic's "ongoing operations" because "Epic's 'ongoing operations' were limited by its contract with ImClone to performing *interior* carpentry and sheetrocking[,]" whereas, on the day of his accident, Ownbey "was using the scaffold to perform *exterior* sealant work in the course of his employment with Advantage." Zurich's Moving Br. (D.E. 570-1), at p. 15 (emphasis added). However, this overlooks the fact that the Epic contract expressly contemplates changes to the initial scope of work.

As explained above, paragraph 30.1 of the Epic contract provides that "[a]t any time, Kvaerner Process may direct [Epic] to make a change within the general scope of this Contract

---

[1] The Court acknowledges that because Kvaerner Process was not a party to the contract between ImClone and Epic, an argument might be made that Kvaerner Process was not a party "with whom" Epic agreed in writing to provide additional insured coverage. However, the Epic contract expressly and unambiguously requires Epic to obtain additional insured coverage *for Kvaerner Process*. Moreover, under New Jersey, a third-party may sue to enforce a contract when it is an intended beneficiary. *See Ross v. Lowitz*, 222 N.J. 494, 513, 120 A.3d 178, 189 (2015). Therefore the Court finds that Kvaerner Process was a party "with whom" Epic agreed in writing to provide additional insured coverage and thus had additional insured rights under the Zurich policy prior to the asset transfer. *See Nav-Its, Inc. v. Selective Ins. Co. of America*, 183 N.J. 110, 118 (2005) (insurance policies are to interpreted broadly in favor of coverage under New Jersey law).

by issuing a formal written change order[,]" and that "[c]hanges to the Work may include additions, deletions or alterations to the general scope of the Work[.]" Epic Contract, at ImClone 7040. Paragraph 31.0 of the Epic contract provides a set of procedures whereby Kvaerner Process may make changes to the scope of work by submitting an "Addendum, Change Order or Field Work Order" to Epic. *Id.* at ImClone 7040–7041. In or about June 2005, Field Work Order 109 was issued, directing Epic to "Provide Laborers for project cleanup[,]" and to "Furnish a powered lift truck 'lull' for project usage." *See* Field Work Order 109 (D.E. 570-40). At the time of the accident, two union laborers that Epic provided in connection with Field Work Order 109, James Bickar and Louis Ghetti, were assisting in raising the scaffold on which Ownbey was standing when he fell. *See* Joint Pretrial Order (D.E. 402), at ¶ 19. After the accident, Epic submitted Proposed Change Order 256, in part requesting payment for Bickar's and Ghetti's work. *See* Proposed Change Order 256 (D.E. 571-9). Finally, Epic submitted Change Order 016 which, by its express terms, formally incorporated Field Work Order 109 into the Epic contract, including payment for the time incurred by Bickar and Ghetti on the day of the accident. *See* Change Order 016 (D.E. 570-41). Because Epic expressly amended its contract to provide and pay two laborers who were directly involved in Ownbey's accident, the Court finds that the accident arose out of Epic's "ongoing operations" for ImClone and Aker. Accordingly, ImClone and Aker are entitled to additional insured coverage under the Zurich policy.

### IV. Conclusion

For the reasons set forth above, the Court vacates that portion of its order issued on September 2, 2015 (D.E. 546) denying Aker's motion for partial summary judgment as to MCC (D.E. 520) and grants that motion. The Court denies Zurich's motion for summary judgment (D.E. 570) disclaiming additional insured coverage for ImClone and Aker, and grants ImClone's

14

and Aker's motions for summary judgment (D.E. 571, 572) seeking additional insured coverage under the Zurich policy. An appropriate order will be entered.

s/ Katharine S. Hayden_____
Katharine S. Hayden, U.S.D.J.

Dated: September 1, 2017