**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---

**SHELBY OWNBEY AND JOYCE OWNBEY, h/w**

*Plaintiffs,*

v.

**AKER KVAERNER PHARMACEUTICALS, INC., et al.**

*Defendants.*

CIVIL ACTION No. 2:07-cv-02190-KSH-CLW

---

**AKER KVAERNER PHARMACEUTICALS, INC.**

Third Party Plaintiff,

v.

**ADVANTAGE BUILDINGS & EXTERIOR, INC., MID-CONTINENT CASUALTY CO., ZURICH AMERICAN INSURANCE COMPANY, and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA.,**

Third Party Defendants.

---

**BRIEF IN SUPPORT OF AKER KVAERNER PHARMACEUTICALS, INC.'S MOTION FOR AN AWARD OF ATTORNEY FEES**

**TABLE OF CONTENTS**

I.   INTRODUCTION.......................................... 1
II.  CASE HISTORY ........................................ 3
     A.   OVERVIEW OF THE LAWSUIT......................... 4
          1.   The Project And The Parties............... 5
          2.   Liability Case........................... 6
          3.   Coverage Case............................ 7
     B.   MCC AGREED TO PROVIDE COVERAGE FOR AKER AND IMCLONE,
          BUT WITHDREW COVERAGE ON THE EVE OF MEDIATION,
          PRECIPITATING THE START OF THE COVERAGE CASE (August
          2007 – October 2008)........................... 8
     C.   MCC AGREED TO RESUME THE DEFENSE OF AKER AND IMCLONE,
          BUT SUDDENLY RENEGED AGAIN, COLLAPSING A SECOND
          MEDIATION (October 2008 – January 2009)........ 11
     D.   DISCOVERY AND SUBMISSION OF THE INITIAL, JOINT PRE-
          TRIAL ORDERS (October 2008 – May 2009)......... 13
     E.   THE FIRST SET OF MOTIONS FOR SUMMARY JUDGMENT (May 2009
          – June 2009)................................... 15
     F.   THE THIRD MEDIATION FAILED BECAUSE MCC AND ZURICH AGAIN
          REFUSED TO PROVIDE ANY MEANINGFUL SETTLEMENT OFFERS
          (November 2010)................................ 17
     G.   THE SECOND SET OF MOTIONS FOR SUMMARY JUDGMENT (January
          2011-February 2011)............................ 17
     H.   THE DEBLON SETTLEMENT AND THE MCC/ADVANTAGE SETTLEMENT
          (January 2011 – April 2011).................... 18
     I.   MCC SOUGHT A SHAM CONSENT JUDGMENT AGAINST IMCLONE
          (OVER ITS OBJECTIONS) IN AN EFFORT TO CONCOCT A
          FRIVOLOUS SUBROGATION CLAIM AGAINST AKER (April 2011 –
          August 2011).................................. 21
     J.   AS ORDERED BY THE COURT, THE PARTIES SUBMITTED A TABLE
          SUMMARIZING ALL CLAIMS REMAINING IN THE COVERAGE CASE
          (August 2011)................................. 22
     K.   FINAL DISMISSAL OF MCC'S FRIVOLOUS SUBROGATION CLAIM
          AND INITIAL DISPOSITION OF AKER'S COVERAGE CLAIM
          AGAINST MCC (November 2012-September 2015)..... 23
     L.   THE FOURTH COURT-ORDERED MEDIATION WITH JUDGE KEEFE AND
          A SETTLEMENT CONFERENCE WITH JUDGE WALDOR BOTH FAILED
          BECAUSE MCC AND ZURICH FAILED TO MAKE ANY GOOD FAITH
          OFFERS (April 2016 – October 2016)............. 26
     M.   FINAL DISPOSITION OF AKER'S COVERAGE CLAIMS AGAINST MCC
          AND ZURICH (January 2017 – July 2018).......... 27
III. AKER'S COVERAGE COUNSEL SERVICES ................... 28
IV.  AKER IS ENTITLED TO RECOVER ALL COVERAGE COUNSEL
     COSTS/EXPENSES INCURRED PROSECUTING ITS CLAIMS AGAINST MCC,
     ZURICH, ADVANTAGE AND EPIC..................... 30

i

A.    AKER IS A "SUCCESSFUL CLAIMANT" UNDER RULE 4:42-9(A)(6) AND THUS IS ENTITLED TO RECOVER ALL FEES/EXPENSES INCURRED PROSECUTING ITS CLAIMS AGAINST MCC AND ZURICH ................................................... 30

B.    AKER IS ENTITLED TO RECOVER ALL FEES/EXPENSES INCURRED PROSECUTING ITS CLAIMS AGAINST EPIC AND ADVANTAGE PURSUANT TO THE ATTORNEYS' FEE PROVISIONS CONTAINED IN THE EPIC AND ADVANTAGE CONTRACTS..................... 32

C.    AKER HAS PROPERLY DOCUMENTED AND ALLOCATED ITS FEES/EXPENSES BETWEEN MCC, ZURICH, ADVANTAGE AND EPIC 33

V.    THE FEES/EXPENSES THAT AKER INCURRED WERE REASONABLE AND APPROPRIATE UNDER THE CIRCUMSTANCES OF THIS CASE.......... 36

A.    AKER'S COVERAGE COUNSEL FEE RATES ARE REASONABLE..... 38

B.    THE SERVICES AND WORK PERFORMED BY AKER'S COVERAGE COUNSEL WERE REASONABLE AND APPROPRIATE FOR PROSECUTION OF AKER'S INSURANCE COVERAGE AND CONTRACTUAL INDEMNITY CLAIMS................................................... 39

VI.   CONCLUSION ................................................ 40

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

<u>Allstate Ins. Co. v. Sabato</u>, 380 N.J. Super. 463, 882 A.2d 972 (App. Div. 2005)...........................................30

<u>Baughman v. U.S. Liab. Ins. Co.</u>, 723 F. Supp. 2d 741 (D.N.J. 2010)................................................34, 38

<u>Furst v. Einstein Moomjy, Inc.</u>, 182 N.J. 1, 860 A.2d 435 (2004). ........................................................37

<u>Litton Indus., Inc. v. IMO Indus., Inc.</u>, 200 N.J. 372, 982 A.2d 420 (2009)...........................................33, 37

<u>Occhifinto v. Olivo Const. Co., LLC</u>, 221 N.J. 443, 114 A.3d 333 (2015)...........................................31

<u>R.M. v. Supreme Court of New Jersey</u>, 190 N.J. 1, 918 A.2d 7 (2007)...........................................31, 37

<u>Rendine v. Pantzer</u>, 141 N.J. 292, 661 A.2d 1202 (1995)......38, 39

<u>Rode v. Dellaciprete</u>, 892 F.2d 1177 (3d Cir. 1990)..............37

<u>Saffos v. Avaya Inc.</u>, 419 N.J. Super. 244, 16 A.3d 1076 (App. Div. 2011)........................................38, 39

<u>Sears Mortg. Corp. v. Rose</u>, 134 N.J. 326, 634 A.2d 74 (1993)....30

<u>Triffin v. Automatic Data Processing, Inc.</u>, 411 N.J. Super. 292, 986 A.2d 8 (App. Div. 2010)...............................39

<u>Walker v. Giuffre</u>, 209 N.J. 124, 35 A.3d 1177 (2012)...........34

<u>**Other**</u>

New Jersey Court Rule 4:42-9(a)(6).........................*passim*

New Jersey Rule of Professional Conduct 1.5(a).............36, 37

iii

Aker Kvaerner Pharmaceuticals, Inc. ("Aker") respectfully submits this brief in support of its Motion for an Award of Attorney Fees ("Application") against Mid-Continent Casualty Co. ("MCC"), Zurich American Insurance Co. ("Zurich"), Advantage Building & Exterior, Inc. ("Advantage") and Epic Interiors, LLC ("Epic").

## I. <u>INTRODUCTION</u>

After over a decade of litigation, Aker has prevailed on all of its insurance coverage and contractual indemnity claims against MCC, Zurich, Advantage and Epic and is therefore entitled to recover its coverage counsel legal costs for two reasons. <u>First</u>, Aker is entitled to recover legal costs incurred prosecuting its claims for additional insured coverage against MCC and Zurich because, under this Court's opinion and Order dated September 1, 2017 [DE 589 & 590] ("September 2017 Order"), Aker is a "successful claimant" in an insurance coverage dispute under New Jersey Court Rule 4:42-9(a)(6).  <u>Second</u>, Aker is entitled to recover legal costs incurred prosecuting its claims for contractual indemnification against Advantage and Epic because their contracts include attorneys' fee provisions that obligate them to reimburse Aker for all legal costs Aker incurred to enforce their respective contractual indemnity obligations.

Throughout the entire duration of this ten-year-plus litigation, MCC and Zurich, on behalf of themselves and their

1

respective insureds Advantage and MCC, have (1) denied and aggressively disputed their respective insurance coverage and contractual indemnity obligations to Aker for Mr. Ownbey's underlying personal injury claims, (2) failed and refused, for the first four years of this lawsuit, to settle the underlying claims, and (3) despite the fact that the Court has ruled in Aker's favor on the merits of its insurance coverage and contractual indemnity claims, have steadfastly refused to make any good faith offers to resolve Aker's coverage counsel fee claim, but instead have made trivial settlement offers of literally pennies on the dollar.

As a result, Aker was forced to engage coverage counsel to prosecute its additional insured and contractual indemnity claims.  Over the decade-plus duration of this lawsuit, Aker has incurred approximately $1.4 million in coverage counsel fees and expenses, and will continue to incur additional legal costs in connection with this Application and responding to MCC's and Zurich's oppositions and motions regarding this Application.

As shown herein, the legal costs that Aker incurred were reasonable and necessary to prosecute and prevail on its claims. Aker has carefully documented and supported its fees and has properly and reasonably apportioned them among MCC, Zurich,

2

Advantage and Epic.[1]  Aker also retained highly-experienced, New Jersey insurance coverage counsel to evaluate Aker's coverage counsel fees and provide expert opinions regarding the reasonableness of the fees incurred.[2]  Such counsel opined that the legal costs Aker incurred were reasonable and necessary in this long-complex matter, and counsel's written assessment submitted herewith.

Aker therefore requests the Court enter an order and final judgment in its favor and against MCC, Zurich, Advantage and Epic, awarding Aker recovery of fees and expenses in the amounts specified in the accompanying Fee Allocation spreadsheet, as such will be amended hereafter to include all legal costs incurred through the conclusion of this case.[3]

## II. <u>CASE HISTORY</u>

While the Court is undoubtedly familiar with the instant litigation, Aker presents a historical overview in order to

---

[1] This information is contained in Exhibits 1, 2, and 3 hereto.  Exhibit 1 shows hours and amounts billed relating to certain task groupings that are explained in the Appendix.  Exhibits 2 and 3 show the time and expense entries as well as their allocation among the MCC, Zurich, Advantage, and Epic.  For legibility, the same information on fees has been presented two ways, with Exhibit 2 showing dollar amounts and Exhibit 3 showing hours.  The task codes used in Exhibits 2 and 3, as well as their relation to the task groupings used in Exhibit 1, are explained in the Appendix.
[2] <u>See</u> Certification of Lynda A. Bennett.
[3] Aker filed herewith invoices for counsel fees and expenses incurred through the end of January 2019.  Aker will hereafter amend its fee submission to include all legal costs incurred through the end of this case, including costs related to this fee Application and related motions filed by MCC and Zurich.

3

demonstrate the reasonableness and necessity of the coverage counsel fees and expenses it incurred.

## A.   OVERVIEW OF THE LAWSUIT

This lawsuit arose out of a July 22, 2005 accident ("Accident") that occurred during construction of a commercial manufacturing facility for ImClone Systems, Inc. ("ImClone") located in Branchburg, New Jersey ("Project").  On that day, plaintiff Shelby Ownbey ("Plaintiff"), an employee of Advantage, one of the contractors working on the Project, was attempting to use a scaffold to scale an exterior wall of the facility to perform construction work for Advantage.  The scaffold collapsed, causing Plaintiff to fall and suffer bodily injuries.  At that time, Aker was providing construction management services and acting ImClone's representative for construction of the Project.

Although this case was commenced by Plaintiff as a personal injury suit, ultimately this case grew to include two major, bifurcated components – (1) Plaintiff's personal injury case (the "Liability Case") and (2) the insurance coverage and contractual indemnity claims asserted by Aker and ImClone against certain co-defendants and the third-party insurers ("Coverage Case").[4]

---

[4] The facts and case history stated in this Section II.A. are supported by the Joint Pretrial Orders filed with respect to the Liability Case and Coverage Case.  [See DE 588].

1.    **The Project And The Parties**

ImClone is the owner of the Project.  Through a Target Price Contract dated July 15, 2002, ImClone retained Kvaerner Process, a division of Kvaerner US Inc. ("Kvaerner"), to act as construction manager for the Project.  Kvaerner and Aker subsequently entered into an Asset Sale and Purchase Agreement dated February 27, 2004, under which Aker was assigned Kvaerner's interests and obligations with respect to the Project.  In October 2004, ImClone and Aker entered into a Revised and Restated Target Price Contract, which had an effective date of April 15, 2003 and reaffirmed Aker's status as ImClone's agent and representative for the construction phase of the Project.

To execute the construction of the Project, ImClone entered into contracts with various trade contractors.  Those trade contractor contracts were administered and managed by Aker.  In July 2002, acting through Kvaerner, ImClone entered into a contract with Advantage, whereunder Advantage agreed to supply and construct the exterior curtainwall system for the Project ("Advantage Contract").  [DE 570-27].

Likewise, in July 2003, ImClone entered into a contract with Epic to supply and construct various interior components of the Project ("Epic Contract").  [DE 572-2].  By way of amendments to the Epic Contract, two Epic employees provided various additional work on the project, including participating in the scaffold lift

5

operation when the Accident occurred.  Advantage also retained

R&R Scaffolding, Ltd. ("R&R") to supply the scaffold system that

Plaintiff was using when the Accident occurred.

The Advantage and Epic Contracts required Advantage and

Epic, respectively, to maintain general liability insurance that

named Aker as an additional insured.[5]  Epic's relevant policy was

Zurich Policy no. GLO 386693-00 ("Zurich Policy").[6]  [DE 572-9].

Advantage's relevant policy was MCC Policy no. 04-GL-000570143

("MCC Policy").[7]  [DE 570-28].  In addition, the contracts

required Advantage and Epic to indemnify Aker for third-party

claims, including claims based upon Aker's own negligence.

## 2.   Liability Case

Plaintiff commenced the Liability Case by filing a complaint

on May 8, 2007, which he subsequently amended multiple times.

[DE 1, 4, 8, 12 & 55].  As his claims developed, Plaintiff

asserted negligence and other claims against Aker, ImClone, Epic

and R&R, seeking millions of dollars in damages for the bodily

injuries he suffered in the Accident.  [See DE 53, ¶ 6 (alleging

"multimillion dollar exposure")].  In the Liability Case, Aker

was represented by Richard P. Maggi of McDermott & McGee.

---

[5] Aker also had its own general liability insurance policy issued by Liberty Mutual Insurance Company ("Liberty").

[6] National Union Fire Insurance Company of Pittsburgh, PA ("NU") issued to Epic an excess liability policy ("NU Excess Policy").

[7] MCC also issued to Advantage an excess liability policy (the "MCC Excess Policy").

6

Aker and ImClone joined Advantage as a third party defendant, asserting claims for contractual indemnity for the Plaintiff's claims under the Advantage Contract. [DE 15 & 19]. As discussed further below, by April 2011, Plaintiff had settled his claims against the various defendants through three sequential settlements with the different groups of defendants.

### 3.    **Coverage Case**

The Coverage Case commenced in October 2008. The parties to the Coverage Case included the following: (1) Aker and ImClone, third-party plaintiffs; (2)Advantage; (3) MCC, Advantage's primary and excess insurer; (4) Epic; (5) Zurich, Epic's primary insurer; (6) National Union, Epic's excess insurer; and (7) Liberty, Aker's general liability insurance carrier.

Aker and ImClone each asserted claims against MCC, Zurich, Advantage and Epic. First, Aker and ImClone each asserted claims against MCC and Zurich, seeking coverage (defense and indemnity) for the Liability Case as additional insureds under the MCC Policy and Zurich Policy, respectively. [See DE 15 & 19]. Second, Aker and ImClone asserted claims against Advantage and Epic, seeking defense and indemnity for the Liability Case pursuant to the indemnification provisions of the Advantage Contract and Epic Contract, respectively. [See DE 15 & 19].

7

B.    **MCC AGREED TO PROVIDE COVERAGE FOR AKER AND IMCLONE, BUT WITHDREW COVERAGE ON THE EVE OF MEDIATION, PRECIPITATING THE START OF THE COVERAGE CASE (August 2007 – October 2008)**

In or about August 2007, Aker demanded that MCC and Advantage provide defense and indemnity for the claims asserted by the Plaintiff in the Liability Case.  [DE 19].  In February 2008 (and again in June 2008), MCC agreed to provide Aker coverage as an "additional insured" under the MCC Policy (and did likewise for ImClone).  [DE 209-25 & 209-27].  Although MCC agreed in theory to defend Aker, in reality it largely failed to do so, forcing Aker to pursue coverage claims against MCC.  [DE 580, at 28-29, ¶¶ 135-37].

After significant discovery was completed in the Liability Case, a mediation was scheduled before Judge Keefe for September 3, 2008.  Prior to the mediation, MCC advised it would attend the mediation with settlement authority and endeavour to settle the Plaintiff's claims on behalf of Aker and ImClone.  [DE 580, at 29, ¶¶ 139-40].

On the eve of the mediation, however, MCC withdrew its defense of Aker and ImClone and revoked all settlement authority. In doing so, MCC asserted for the first time a new (and frivolous) defense, arguing that the Accident did not arise out of Advantage's "ongoing operations" and thus the predicate to Aker's and ImClone's right to additional insured coverage was not satisfied.  [DE 580, at 29-30, ¶¶ 141-45].  MCC's change in

8

position and denial of coverage, of course, caused the mediation to fail and raised for the first time a dispute over insurance coverage for the Liability Case.

As a result, Aker engaged K&L Gates, its customary insurance coverage counsel with whom it had a longstanding relationship, to pursue its rights under various insurance policies.[8]  [See DE 70 & 77].  ImClone also engaged coverage counsel.  [See DE 72].

At K&L Gates, Pittsburgh-based partner Joseph L. Luciana, III acted as lead counsel, with Pittsburgh-based partner Ronald J. Chleboski, Jr. acting as "second chair."  Both were experienced insurance and construction litigators who had previously represented Aker and its affiliates.  Mr. Luciana took primary responsibility for the claims against MCC and Advantage, while Mr. Chleboski took primary responsibility for the claims against Zurich and Epic.  Pittsburgh-based mid-level associate Megan E. Smith Miller of Pittsburgh provided substantial assistance on discovery, research, motion practice and other aspects of the case.  Newark-based senior associate Margaret T. Korgul acted as "local counsel" to assist with New Jersey-specific issues.  Pittsburgh-based paralegal Roberta A. Cramer

---

[8] Due to this longstanding relationship, K&L Gates discounted its fees by 10%.

9

was also assigned to the matter at this time.  These five individuals formed the core team at K&L Gates.[9]

The commencement of insurance coverage disputes at this stage of the lawsuit required a substantial effort by the K&L Gates case team to assess the coverage and contractual indemnity issues, review and understand the significant discovery that had already occurred in the Liability Case and comply with tight deadlines that were imposed in the Coverage Case, so further associates, paralegals, and other timekeepers were given discrete tasks to assist the core team as needed.

By letter dated October 16, 2008, in view of the coverage dispute, the parties sought a stay of the Liability Case and leave to file amended crossclaims and third-party claims for insurance coverage and contractual indemnity.  [DE 75].  On October 20, 2008, the Court entered its Seventh Amended Pretrial Scheduling Order [DE 76] setting an initial, expedited schedule, which provided that the parties would (a) file their amended pleadings and discovery requests necessary for the coverage case by October 27, 2008; (b) complete all coverage case depositions

---

[9] On March 1, 2010, Mr. Luciana and Mr. Chleboski became founding partners of DFL Legal.  Aker elected to retain DFL Legal as its counsel in this action and the case files were transferred.  Ms. Cramer joined DFL Legal in 2011.  DFL Legal did not have a New Jersey office, so Mr. Maggi acted as local counsel until his retirement in 2013.  [See DE 512].  The local counsel role was then filled by Marc L. Dembling of Methfessel & Werbel ("M&W").  [See DE 512].  In this application, Aker seeks reimbursement M&W's fees and expenses as set forth in the Certification of Marc L. Dembling.

10

by December 10, 2008; and (c) file all dispositive motions in the coverage case by January 9, 2009.

Between September 2008 and October 2008, the K&L Gates case team completed the following: (1) case orientation and "ramp up" activities noted above; (2) initial legal research, analyses and assessment of Aker's insurance coverage and contractual indemnity claims; (3) preparation and service of demands upon MCC/Advantage and Zurich/Epic; and (4) preparation and filing of Aker's Amended third party complaint for its coverage and contractual indemnity claims. The initial efforts by K&L Gates accounted for approximately 146 hours of time and approximately $37,000 of fees and expenses. [See Exhibit 1, Task Grouping A].

The initial case schedule was subsequently amended, as necessary for the parties and the Court to complete discovery and pretrial proceedings for both the Liability Case and the Coverage Case. In the Coverage Case, discovery closed in or about March 2009, the parties filed the Joint Pretrial Order (for the coverage claims) in April 2009, and the parties filed and briefed the first round of motions for summary judgment between May 2009 and June 2009. [DE 161, 171 to 209, 220 to 261 & 281 to 291].

C.    **MCC AGREED TO RESUME THE DEFENSE OF AKER AND IMCLONE, BUT SUDDENLY RENEGED AGAIN, COLLAPSING A SECOND MEDIATION (October 2008 – January 2009)**

As noted, in October 2008, K&L Gates (on behalf of Aker) made demands upon MCC and Advantage to resume the defense of

11

Aker.  K&L Gates also reasserted demands upon Zurich and Epic to do likewise.  [DE 75].  Zurich refused on behalf of itself and Epic to provide any coverage or indemnity for Aker or ImClone.

By November 2008 (in response to K&L Gates' demand letter), MCC abandoned and withdrew its short-lived (and frivolous) claim that the Accident did not arise out of Advantage's ongoing operations and agreed to provide coverage for Aker.  Indeed, by letters dated November 5, 2008 and December 2, 2008, MCC agreed to (1) pay all defense and expert fees incurred by Aker in the Liability Case (fees which it previously agreed to cover, but for the most part failed to pay); (2) attend a rescheduled mediation with settlement authority; and (3) pay all coverage counsel fees Aker incurred through K&L Gates.  [DE 527-6 & 161, at 17, ¶ 45].

As a result, a second mediation was scheduled for January 13, 2009.  Between December 2008 and the mediation, MCC represented it would attend with meaningful settlement authority and endeavor to settle the case.  [DE 161, at 17, ¶ 46].

At the mediation, MCC advised Aker that it was asserting yet another new, purported "defense" to coverage, this time arguing that Aker (the successor to Kvaerner Process as the construction manager for ImClone) was not an additional insured under the MCC Policy.  [DE 580, at 32, ¶ 160].  And, contrary to its prior representations, MCC failed to provide any meaningful settlement offers to Plaintiff.  Zurich also attended the mediation and

12

refused to provide any settlement offers to Plaintiff.  [DE 580, at 32, ¶¶ 161-62].  As a result, the second mediation failed.

Thereafter, K&L Gates again demanded that MCC and Advantage defend and indemnify Aker.  On February 24, 2009, MCC, through counsel, again conceded its obligation to defend and indemnify Aker, but asserted for the first time that it would do so pursuant to the contractual indemnity obligation of its insured, Advantage.  [DE 580, at 32, ¶ 166].

Thus, despite its repeated admissions that it owed coverage to Aker as its additional insured, starting in 2009, MCC reneged on its commitment to provide such coverage and wrongfully thereafter denied coverage.  [See DE 209-25 & 209-27].  Further, despite expressly agreeing to reimburse Aker for all coverage counsel fees incurred through at least December 2008, MCC has failed and refused to pay any of Aker's coverage counsel fees. [DE 527-6 & 161, at 17, ¶¶ 45-46].

D.    **DISCOVERY AND SUBMISSION OF THE INITIAL, JOINT PRE-TRIAL ORDERS (October 2008 – May 2009)**

Discovery in the Coverage Case was significant and accounted for approximately 650 hours of billed time and over $210,000 of fees and expenses.[10]  When the Coverage Case commenced, the Court ordered that discovery be completed on an expedited basis to avoid undue delay to the Liability Case.  At the time the

---

[10] See Exhibit 1, Task Groupings B, C, D, and E (part).

13

Coverage Case began, discovery in the Liability Case was already far along.  Given that the contractual indemnity and insurance coverage disputes were so intertwined with the Liability Case, Aker's coverage counsel (K&L Gates) had to digest the discovery in the Liability Case at the same time it was actively engaging in discovery in the Coverage Case.  The discovery in the Liability Case included tens of thousands of pages of written discovery and document productions, sixteen depositions, and seven experts (including medical and engineering experts) who issued reports and were deposed.

The additional discovery efforts undertaken in the Coverage Case included the following:

- Document Productions:  The total volume of documents exchanged in the Coverage Case (i.e., excluding documents produced in the Liability Case) exceeded 13,000 pages. Aker's own production efforts required counsel to review and process documents archived in New Jersey and Houston, Texas.
- Written Discovery:  The parties exchanged several sets interrogatories relative to the Coverage Case.
- Depositions:  Between February 2008 and May 2009, Aker took eight depositions on Coverage Issues.[11]  Most of these depositions were taken in-person in New Jersey.
- Discovery Motion Practice:  Sixteen Coverage Case discovery issues involving Aker were raised to the Court's attention either by Aker or jointly with another party.  [DE 99, 123, 124, 125, 126, 131, 132, 133, 134, 142, 148, 149, 151, 152, 154 & 163].

In addition, the parties submitted a Joint Pretrial Order concerning the Coverage Case on April 3, 2009.  [DE 161, 161-2,

---

[11] In one instance, the witness did not show up for the deposition even though counsel had traveled to attend it.

14

161-3].  Again, because the Coverage Case disputes were so intertwined with the facts of the Liability Case, Aker's coverage counsel had to review and closely coordinate with Mr. Maggi concerning the Joint Pretrial Order for the Liability Case, which was being prepared at the same time.  K&L Gates (by necessity) took the lead in coordinating with all coverage counsel in drafting, negotiating and finalizing the 110-page pretrial order (in addition to a 40-page exhibit list), a significant undertaking representing approximately 136 hours and $40,000.[12]

**E.    THE FIRST SET OF MOTIONS FOR SUMMARY JUDGMENT (May 2009 – June 2009)**

In accordance with the Pretrial Order, a total of *sixteen* motions for summary judgment were filed in the Coverage Case on May 15, 2009 by Advantage [DE 181], Aker [DE 192, 206, 207 & 208], Epic [DE 171, 184 & 187], ImClone [DE 178, 186, 193 & 203], Liberty [DE 204], MCC [DE 194], National Union [DE 202], and Zurich [DE 176].  On June 8, 2009, Aker filed *ten* oppositions to the motions filed against it. [DE 224, 225, 226, 227, 248, 254, 255, 256, 257 & 258].  Aker expended significant effort on this motion practice, totaling over 600 hours and $200,000.00.[13]

On June 18, 2009, the Court held a telephonic conference with counsel, advising the Court would consider and rule on the

---

[12] See Exhibit 1, Task Group E (part).
[13] See Exhibit 1, Task Group F.

key motions that were needed to help facilitate resolution of the key coverage claims.  During the conference, Zurich asserted that the key motions for determination of the relative coverage obligations of MCC and Zurich were the motions concerning Epic's (Zurich's insured) contractual indemnity obligations to Aker and ImClone.[14]  Based upon Zurich's representations, the parties and the Court determined that the Court should initially decide the motions related to this issue, and the parties later submitted a joint letter memorializing this determination.  [DE 287].  Thus, the Court administratively dismissed all motions, excepting the cross motions regarding Epic's contractual indemnity obligation, namely motions by Aker [DE 206], ImClone [DE 186], and Epic [DE 186], the latter of which Zurich had joined [DE 190].  [DE 288].

Briefing of the surviving motions was completed in June 2009.  Upon consideration of these motions, the Court initially denied Aker's and ImClone's motions seeking a determination that Epic owed defense and indemnity for the Liability Case, concluding that issues of fact existed.  [DE 295 & 296].  By Order dated July 8, 2010, however, the Court modified its initial

---

[14] In this regard, Zurich reasoned as follows:  Advantage had admitted it was obligated to indemnify Aker and ImClone for their own negligence, but Epic denied any such obligations; if Zurich owed coverage to ImClone and Aker, it would be subrogated to their rights; if Epic was correct that it did not owe contractual indemnity, Zurich would be entitled to recover all coverage amounts it provided from MCC, Advantage's insurer, because Zurich would be subrogated to Aker's and ImClone's contractual indemnity rights against Advantage.

16

Order, holding that Epic did owe contractual indemnity to Aker

and ImClone for the Plaintiff's claims.  [DE 340].

**F.    THE THIRD MEDIATION FAILED BECAUSE MCC AND ZURICH AGAIN REFUSED TO PROVIDE ANY MEANINGFUL SETTLEMENT OFFERS (November 2010)**

By that same order dated July 8, 2010, the Court ordered the

parties to mediation before Judge Keefe.  [DE 340].  The

mediation was held on November 8, 2010.  Once again, both MCC and

Zurich failed to make reasonable, good-faith offers to resolve

Plaintiff's claims, leading to the failure of the mediation.

**G.    THE SECOND SET OF MOTIONS FOR SUMMARY JUDGMENT (January 2011-February 2011)**

Given that the insurers were still refusing to step up and

settle the case, ImClone requested that the Court allow the

parties to refile motions for summary judgment to resolve the

open coverage issues.  [DE 373].  The Court allowed such filing

and so during January and February 2011, the parties filed a

total of five motions for summary judgment in the Coverage Case,

in addition to several more in the Liability Case.  [DE 383, 409,

413, 416 & 417].  The Coverage Case motions all concerned

additional insured coverage, with ImClone and Aker arguing that

they were entitled to such coverage, and MCC and Zurich arguing

they were not, and ImClone arguing that Aker had failed to obtain

for it adequate additional insured coverage.

17

By order dated February 28, 2011, however, the Court administratively dismissed the motions pending before it, including those filed in 2011 that the Court had recently authorized. [DE 431]. On March 3, 2011, the Court ordered the parties to refrain from further motion practice except for motions in limine. [DE 434]. Aker's legal fees during this period of motion practice totaled 36 hours and $14,000.[15]

## H.   THE DEBLON SETTLEMENT AND THE MCC/ADVANTAGE SETTLEMENT (January 2011 – April 2011)

At the end of the November 2010 mediation, counsel for MCC advised Aker and ImClone it would seek to settle the underlying claims made against Aker and ImClone by way of a Deblon settlement. MCC asserted that it was prepared to fund a reasonable amount for a settlement, provided Zurich did likewise, but since Zurich refused to do so, MCC would not fund the full settlement amount. Therefore, MCC proposed to fund a settlement with Plaintiff and obtain a full release of Aker's and ImClone's liability, but the release would nominally preserve Plaintiff's liability claims against Aker and ImClone only insofar as Plaintiff could obtain a judgment against Zurich and/or Epic for any liability verdict based upon Aker's and ImClone's indemnity and insurance coverage claims against Zurich and Epic.

---

[15] See Exhibit 1, Task Grouping G.

18

Several weeks passed, yet MCC did not progress any potential Deblon settlement.  In an effort to advance such, counsel for ImClone volunteered to prepare a draft Deblon settlement agreement, based upon which MCC could progress settlement discussions with the Plaintiff.  Counsel for ImClone circulated an initial draft of the settlement in January 2011.

Soon thereafter, MCC advised that it had reached an agreement in principal with Plaintiff for a Deblon settlement, but would not conclude the Deblon settlement.  Instead, over a period of weeks of revising drafts of the Deblon agreement, MCC attempted to incrementally revise the terms of settlement to include releases by Aker of significant components of its claims for coverage counsel fees.

This was contrary to MCC's Deblon settlement proposal to which Aker and ImClone had agreed, whereby MCC would settle the Plaintiff's claims against Aker and ImClone, and preserve for later resolution all disputes concerning the counsel fee claims. MCC ultimately refused to conclude the Deblon settlement without obtaining a separate release from Aker on the coverage disputes. Hence, the settlement effort failed.

In light of MCC's refusal to conclude a Deblon settlement, Zurich proposed to Aker and ImClone that it would fund a Deblon settlement with Plaintiff to fully extinguish Aker's and ImClone's potential liability to Plaintiff.  In April 2011, a

19

Deblon settlement between Plaintiff, Zurich, Aker, ImClone, Epic and Liberty was concluded (the "Deblon Settlement"), whereby Zurich paid Plaintiff an undisclosed settlement amount to fully resolve all of Aker's and ImClone's liability exposure. Consistent with the initial Deblon agreement proposal made by MCC (and standard Deblon agreements), the Deblon Settlement extinguished Aker's and ImClone's liability exposure to Plaintiff, but preserved all of Aker's and ImClone's rights against Zurich and Epic for recovery of coverage counsel fees.[16]

After Zurich concluded the Deblon Settlement, only MCC, Advantage, and R&R retained exposure to Plaintiff.  On April 20, 2011, Plaintiff stipulated to the dismissal of its claims against MCC and Advantage, which resulted from a settlement (the "MCC Settlement") that resolved Plaintiff's remaining claims (excluding his claims against R&R), for which MCC and Advantage had sole liability exposure (in light of the Deblon Settlement). [See DE 473].  Plaintiff settled with R&R by April 27, 2011, thereby fully resolving all of Plaintiff's claims.  [DE 475].

During this phase of litigation, the extended negotiations, including many telephone calls and emails, amounted to over 120 time entries, approximately 161 hours, and over $70,000 in fees.[17]

---

[16] Aker released its bad faith claim against Zurich as part of the Deblon Settlement.  This does not affect the instant application because, under NJ Rule 4:42-9(a)(6), Aker has a clear entitlement to recover coverage counsel fees even without bad a faith claim.

[17] See Exhibit 1, Task Grouping L.

I.    **MCC SOUGHT A SHAM CONSENT JUDGMENT AGAINST IMCLONE (OVER ITS OBJECTIONS) IN AN EFFORT TO CONCOCT A FRIVOLOUS SUBROGATION CLAIM AGAINST AKER (April 2011 – August 2011)**

In a two-sentence letter to the Court dated April 19, 2011, MCC for the first time raised its purported (and frivolous) subrogation claim against Aker. [DE 460]. Aker promptly responded with a letter to the court bearing the same date making the points that MCC's purported claim was devoid of merit, MCC had not asserted or preserved any such claim, and allowing MCC to pursue its purported claim would force Aker "to incur unnecessary attorneys' fees, costs and expenses to respond." [DE 461].

On April 28 and May 4, 2011, several weeks after MCC settled with Plaintiff – notably, without any participation or consent from ImClone – counsel for MCC requested that ImClone agree to entry of a consent judgment against it for the full amount MCC had agreed to pay Plaintiff in order to resolve the liability exposure of MCC and its insured, Advantage. [DE 477 & 482]. Naturally, ImClone refused, advising counsel for MCC that ImClone would not participate in MCC's proposed "sham" consent judgment. [See DE 489 & 492].

Undeterred, on May 27, 2011, *MCC petitioned the Court, seeking entry of a consent judgment against ImClone over ImClone's objection:  thereby asking the Court to enter an unconsented consent judgment*. [DE 488]. The Court was not fooled and by order dated August 1, 2011 denied MCC's petition.

21

[DE 496].  MCC sought this "sham" consent judgment as part of its scheme to concoct a bogus subrogation claim against Aker.[18]

After no fewer than seven submissions by MCC, ImClone and Aker, the Court rejected MCC's request for a consent judgment, stating that MCC's improper "tactic" whereby it attempted to assert a subrogation claim against Aker lacked merit.  [DE 496].

**J.    AS ORDERED BY THE COURT, THE PARTIES SUBMITTED A TABLE SUMMARIZING ALL CLAIMS REMAINING IN THE COVERAGE CASE (August 2011)**

At an April 18, 2011 hearing and via minute entry made the next day, the Court advised the parties the Court would subsequently assess the remaining indemnity and coverage claims and determine a procedure and schedule for resolution of the case, advising the parties not to make submissions until the Court requested same.  [DE 462].  Further proceedings from April 2011 to June 2011 dealt with the consequences of the resolution of the Liability Case.

On August 1, 2011, the Court ordered the parties to jointly prepare and submit a table/matrix that summarized all claims remaining in the Coverage Case.  [DE 495].  Aker (again by necessity, as the other parties were not doing so) took the lead in coordinating with the parties and finalizing the joint submission, which Aker filed on behalf of the parties on

---

[18] The Court revisited this issue in September 2015 and finally disposed of MCC's frivolous subrogation claim.  [DE 546].

22

August 26, 2011.  [DE 497].  In doing so, Aker incurred about 50 hours and $20,000 in fees.[19]

## K.    FINAL DISMISSAL OF MCC'S FRIVOLOUS SUBROGATION CLAIM AND INITIAL DISPOSITION OF AKER'S COVERAGE CLAIM AGAINST MCC (November 2012-September 2015)

Having not received direction from the Court on a schedule and procedure for resolution of the case, by letter dated November 19, 2012, Aker requested the Court schedule a status conference to discuss same and set a schedule and procedures to do so.  [DE 506].  On December 12, 2012, in response to that letter, the Court requested the parties submit a joint letter outlining the topics that the parties proposed for discussion at the requested conference.  [DE 508].  On February 13, 2013, the parties submitted the requested joint letter.[20]  [DE 510].

As of November 14, 2013, a status conference to discuss resolution of the outstanding claims in the Coverage Case had not been scheduled, so Aker filed a motion on that date to schedule such a status conference.  [DE 515].  The Court thereafter scheduled a conference for December 27, 2013 before Judge Waldor, at which the Court set a schedule for Aker to submit two motions: (1) a motion for summary judgment on additional insured coverage

---

[19] See Exhibit 1, Table M.
[20] As stated in the joint letter, submission of the joint letter was delayed by the need to circulate multiple drafts of the letter to all counsel and obtain approval for the final language, the winter holidays, and the extended illness of counsel for one of the parties.  [DE 510].

23

under the MCC Policy; and (2) a motion to strike MCC's frivolous subrogation claim.  [DE 519].

As authorized by the Court, on January 31, 2014, Aker filed these two motions, briefing for which was completed in February and March 2014.  [DE 520 to 528].  In the motion for summary judgment, Aker sought an order that it was entitled to coverage as an additional insured only under the MCC Policy (i.e., the primary layer policy that MCC issued to Advantage).  [DE 520-9].

On October 1, 2014, Judge Waldor issued Report & Recommendation, whereby she recommended that both of Aker's motions be granted.  [DE 531].  MCC objected to Judge Waldor's the Report & Recommendation, and its objection was fully briefed by the end of October 2014.  [DE 532 to 536].

On May 29, 2015 Judge Hayden requested supplemental briefing relative to the MCC's objection on two topics:  (1) choice of law; and (2) the basis by which Aker was the successor to Kvaerner Process' rights under the MCC Policy.  [DE 537].  Aker submitted it supplemental brief addressing the topics as ordered on June 12, 2015.  [DE 538].  On June 22, 2015, MCC filed its submission, but its submission did _not_ address the topics as requested by the Court.  [DE 539].  Therefore, the next day, the Court dismissed MCC's submission as non-responsive, and gave MCC three days to submit a responsive brief.  [DE 540].

24

On June 26, 2015, MCC filed its revised submission, *wherein for the very first time ever it argued that that a "no-assignment" clause in the excess liability policy it had issued barred the assignment by Kvaerner Process to Aker of its rights under the primary layer, MCC Policy*.  [DE 541].  Aker objected to MCC's newly raised argument and requested that it be allowed an opportunity to respond to the new argument, but the Court denied Aker's request.  [DE 542; DE 544].

On September 2, 2015, the Court issued an order and opinion (the "September 2015 Order") whereby it:  (1) granted Aker's motion to dismiss MCC's subrogation claim; (2) denied Aker's motion for summary judgment seeking a determination that it is entitled to additional insured coverage under the MCC Policy; and (3) granted summary judgment in favor of MCC, ruling that the "no-assignment" clause (which MCC had unveiled just a few months before) barred the Kvaerner Process assignment.  [DE 546].

On September 16, 2015, Aker filed a motion for reconsideration of the September 2015 Order.  [DE 547].  This motion was briefed in October 2015.  [DE 548-550].  On November 17, 2015, the Court denied Aker's motion for reconsideration, thereby sustaining its September 2015 Order.  [DE 551].

25

For these submissions and motion practice, Aker incurred legal costs of approximately 470 hours and $155,000.[21]

**L. THE FOURTH COURT-ORDERED MEDIATION WITH JUDGE KEEFE AND A SETTLEMENT CONFERENCE WITH JUDGE WALDOR BOTH FAILED BECAUSE MCC AND ZURICH FAILED TO MAKE ANY GOOD FAITH OFFERS (April 2016 – October 2016)**

On January 15, 2016, the Court again ordered the parties to mediate the remaining claims.  [DE 554].  A full-day mediation before Judge Keefe was held on April 26, 2016.  Both MCC and Zurich failed to make any good faith offers to settle Aker's $1+ million fee claim, but instead made nominal offers – literally offering single pennies on the dollar against Aker's claims – that Aker could not reasonably (and did not) accept.

On July 6, 2016, the Court held a settlement conference  at which MCC and Zurich refused to make any further offers, but requested that Aker be ordered to provide a detailed fee claim/allocation to supplement the preliminary fee allocation it previously provided to MCC and Zurich.  Aker advised this would be a costly effort and questioned the utility of the effort, considering that both Zurich and MCC had consistently refused to make any good faith settlement offers.  The Court, however, ordered Aker to prepare a detailed fee allocation, and Aker did so and provided such to MCC and Zurich on September 9, 2016.[22]

---

[21] See Exhibit 1, Task Code H.

[22] The detailed fee allocation that Aker provided in September 2016 reflected Aker's allocations between MCC, Zurich, Advantage and Epic of the $1.1 million in coverage counsel fees/expenses it incurred from September 2008 through June

On October 21, 2016, Judge Waldor held another settlement/status conference.  [DE 559; DE 565].  Yet again, MCC and Zurich refused to make any further settlement offers to Aker. Hence, Judge Waldor set a schedule for submission of motions for summary judgment on the primary remaining claims, namely Aker's and ImClone's claims against Zurich for additional insured coverage.  [DE 568].

**M.    FINAL DISPOSITION OF AKER'S COVERAGE CLAIMS AGAINST MCC AND ZURICH (January 2017 – July 2018)**

In January 2017, Zurich, Aker and ImClone each filed motions for summary judgment, and briefing was completed by the end of January.  [DE 570-584].  On September 1, 2017, the Court issued an opinion and order (the "September 2017 Order"), whereby it reversed its September 2015 Order, denied Zurich's motion for summary judgment, and granted ImClone's and Aker's motions for summary judgment.  [DE 589 & 590].  By way of its September 2017 Order, the Court ruled that Aker is entitled to additional insured coverage for the claims asserted against it in the Liability Case under both the MCC Policy and the Zurich Policy.

---

2016.  The work product provided was comprised of an explanatory letter and 90 pages of ledger-sized spreadsheets reflecting each and every time and expense line item included in coverage counsel's invoices and Aker's allocation of each item to one or more of the defendants.  (A copy of Aker's September 9, 2016 letter and the summary spreadsheet reflecting the roll up of its detailed allocations is attached hereto as Exhibit 4.)  The 2016 detailed allocations replaced the preliminary, summary-level fee claim allocations that Aker provided to MCC and Zurich in connection with prior settlement discussions and mediations.

Both insurers moved for reconsideration in September 2017, and briefing of these motions was completed in October and November 2017.  [DE 591 to 602].  On July 9, 2018, the Court entered an opinion and order denying the motions for reconsideration, thereby affirming its September 2017 Order, and its determination that MCC and Zurich both owe Aker coverage for the underlying Liability Case.  [DE 605].  Fees for this phase of motion practice amounted to approximately 250 hours and $80,000.[23]

### III.   AKER'S COVERAGE COUNSEL SERVICES

The instant litigation has been large and complex by any measure.  It has included, among other things, the following:

- Over 600 docket items;
- In the Coverage Case alone, scores of written discovery requests (document requests, interrogatories and requests for admissions) and responses thereto served by and upon Aker;
- Document productions totalling several tens of thousands of pages (13,000+ pages of which were produced in the Coverage Case), most all of which were used in the Coverage Case;
- Just in the Coverage Case, sixteen discovery motions involving Aker;
- 23 depositions, eight of which were taken in the in the Coverage Case, and most all of which were directly relevant to and used in the Coverage Case;
- Solely in the Coverage Case, 32 dispositive motions and cross-motions filed by and against Aker;
- Preparation of two Final Pretrial Orders in the Coverage Case;
- Four mediations

In this large, complex and 10-year-long litigation, Aker necessarily and reasonably incurred substantial coverage counsel

---

[23] See Exhibit 1, Task Code I.

28

fees and expenses successfully prosecuting its claims against

MCC, Zurich, Advantage and Epic as follows:

- Through January 31, 2019, Aker incurred coverage counsel fees totalling $1,390,246.14 (4,006.5 hours of legal services) and expenses totalling $89,908.75 [see K&L Gates and DFL Legal invoices and Fee Allocation spreadsheets, attached as Exhibits 2 & 3];
- Between February 1, 2019 and the present, additional Coverage Counsel fees/expenses and expert and consultant fees incurred in connection with preparing this Application and responding to related filings by Zurich and MCC; and
- Local counsel fees and expenses totalling $9,932.49 [see Declaration of Marc Dembling]

As reflected in Aker's invoices and Fee Allocation

spreadsheets (Exhibits 2 & 3), Aker is not seeking recovery of

all of the coverage counsel fees and expenses it incurred in this

lawsuit, but instead is only seeking recovery of those

fees/expenses that were necessarily and reasonably incurred in

connection with prosecuting its claims against MCC, Zurich,

Advantage and Epic.  In this regard, Aker has painstakingly

allocated each and every individual fee and expense item between

those incurred in prosecution of claims against MCC, Zurich,

Advantage and/or Epic (for which recovery is sought) and those

incurred relative to disputes with ImClone or National Union

(approximately $80,000 in fees/expenses, for which Aker does not

seek recovery).  As explained further below, Aker's allocation

also properly and reasonably allocates fees between those for

which one or more parties are joint and severally liable and

those for which one party is solely liable.

29

**IV.** **AKER IS ENTITLED TO RECOVER ALL COVERAGE COUNSEL COSTS/EXPENSES INCURRED PROSECUTING ITS CLAIMS AGAINST MCC, ZURICH, ADVANTAGE AND EPIC**

Generally, in United States litigation, litigants must bear their own attorney's fees, unless a statute or contractual provision provides otherwise.  As set forth below, Aker is entitled to recover the legal costs it incurred successfully prosecuting its claims by virtue of *both* an applicable statute and contractual attorneys' fee provisions.

**A.** **AKER IS A "SUCCESSFUL CLAIMANT" UNDER RULE 4:42-9(A)(6) AND THUS IS ENTITLED TO RECOVER ALL FEES/EXPENSES INCURRED PROSECUTING ITS CLAIMS AGAINST MCC AND ZURICH**

New Jersey Court Rule 4:42-9(a)(6) provides that a claimant that successfully prosecutes a claim for insurance coverage "shall" be entitled to recover its attorneys' fees and costs:

> (a) Actions in Which Fee Is Allowable.  No fee for legal services shall be allowed in the taxed costs or otherwise, except…
> ***
> (6) In an action upon a liability or indemnity policy of insurance, in favor of a successful claimant.

It is well-settled that under Rule 4:42-9(a)(6), "a successful insured is presumptively entitled to attorneys' fees and need not establish that the insurer acted in bad faith or arbitrarily in declining a claim."  Allstate Ins. Co. v. Sabato, 380 N.J. Super. 463, 473, 882 A.2d 972 (App. Div. 2005); see also Sears Mortg. Corp. v. Rose, 134 N.J. 326, 356, 634 A.2d 74 (1993).  The policy for Rule 42 is to "discourage insurance

30

companies from attempting to avoid their contractual obligations and force their insureds to expend counsel fees to establish the coverage for which they have already contracted." <u>Occhifinto v. Olivo Const. Co.</u>, 221 N.J. 443, 450, 114 A.3d 333, 337 (2015).

A "successful claimant" is broadly defined under the Rule to include a party that succeeds on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit. <u>R.M. v. Supreme Court of New Jersey</u>, 190 N.J. 1, 10, 918 A.2d 7 (2007). "A party who obtains a favorable adjudication on the merits on a coverage question as the result of the expenditure of counsel fees" is a "successful claimant" under Rule 4:42-9(a)(6). <u>Occhifinto</u>, 221 N.J. at 450-51 (citing <u>Transamerica Ins. Co. v. Nat'l Roofing Inc</u>., 108 N.J. 59, 63, 527 A.2d 864 (1987)).

Indeed, the very reason Rule 4:42-9(a)(6) exists is (unfortunately for Aker) perfectly illustrated by the present case, wherein MCC and Zurich have wrongfully refused to provide Aker coverage and thereby compelled Aker to endure 10+ years of litigation and incur $1.4 million in legal costs in order to obtain the coverage to which it is entitled. Aker was totally successful in obtaining favorable adjudication of its entitlement to additional insured coverage for the underlying Liability Case against both MCC and Zurich (as well as its entitlement to contractual indemnity from their respective insureds, Advantage

31

and Epic, which MCC and Zurich also vigorously opposed), and thus is without question a "successful claimant" that is entitled to recover its legal costs under Rule 4:42-9(a)(6).

**B.**   **AKER IS ENTITLED TO RECOVER ALL FEES/EXPENSES INCURRED PROSECUTING ITS CLAIMS AGAINST EPIC AND ADVANTAGE PURSUANT TO THE ATTORNEYS' FEE PROVISIONS CONTAINED IN THE EPIC AND ADVANTAGE CONTRACTS**

The Epic and Advantage Contracts include identical Section 16.1 indemnification clauses (quoted below) that state Aker is entitled to recover all attorneys' fees/expenses it incurs to enforce Epic's and Advantage's contractual indemnity obligations:

> Contractor [Epic or Advantage] agrees to release, indemnify, hold harmless and defend Kvaerner Process and Owner [ImClone], the affiliated companies of each, and all of their directors, officers, employees, agents and representatives, from and against any claim, expense, or liability, cost and expenses (including court costs and attorney fees) on account of injury or death of persons (including the employees of Kvaerner Process, Owner, contractor and contractor's lower tier subcontractors and suppliers and any other contractors or subcontractors) or damage to or loss of property (including the property of Kvaerner Process or Owner) or delay (including all attorney's fees to enforce Contractor's indemnification obligations) arising out of this Contract, irrespective of any fault or negligence of Kvaerner Process and/or Owner, their affiliated companies, their respective officers, agents or employees excepting where the sole cause of such injury or death of persons or damage to or loss of property is the negligence of Kvaerner Process or Owner. (Emphasis added.)

Epic is insured for any liability it incurs under Section 16.1 under the Zurich Policy.  Likewise, Advantage is insured against any such liability under the MCC Policy.

Contractual fee shifting provisions like Section 16.1 of the Epic and Advantage contracts are enforceable.[24]  Aker has incurred significant legal costs prosecuting its contractual indemnity claims against Epic and Advantage, and thus is entitled to recover such costs.  Zurich (representing and acting on behalf of Epic) has consistently and wrongfully disputed and failed to provide the contractual indemnity that Epic owes.  Aker was thus forced to enforce Epic's obligation, which it did successfully by dispositive motion.  [DE 589 and 590].

Similarly, MCC (representing and acting on behalf of MCC) wrongfully disputed and failed to recognize the contractual indemnity obligation that Advantage owes Aker.  Through this litigation, Aker compelled MCC to admit that Advantage must indemnify Aker for its own negligence and the Liability Case claims.  Yet, to this day, MCC has failed and refused to satisfy that admitted obligation of Advantage.

**C.**    **AKER HAS PROPERLY DOCUMENTED AND ALLOCATED ITS FEES/EXPENSES BETWEEN MCC, ZURICH, ADVANTAGE AND EPIC**

As demonstrated above, Aker is entitled to recover its legal fees/expenses from MCC, Zurich, Advantage and Epic on multiple grounds.  As required, Aker's declaration by counsel is accompanied by contemporaneously recorded time records that fully

---

[24] A leading New Jersey case, <u>Litton Indus., Inc. v. IMO Indus., Inc.</u>, 200 N.J. 372, 385 (2009), interpreted a clause very similar to Section 16.1 quoted above and found that it plainly provided for recovery of attorney's fees.

33

support the calculation of hours expended by all attorneys and paralegals who provided services in the matter.  Walker v. Giuffre, 209 N.J. 124, 131, 35 A.3d 1177, 1180 (2012).  Coverage counsel's invoices provide more than sufficient detail to ascertain the tasks and work performed and the time and fees expended on specific activities.  Baughman v. U.S. Liab. Ins. Co., 723 F. Supp. 2d 741, 749 (D.N.J. 2010).  In this case, K&L Gates and DFL Legal contemporaneously recorded detailed daily time records, with time recorded by task in $1/10^{th}$ hour increments, allowing for great accuracy.

Aker's fees were allocated among the liable parties through careful analysis by counsel of each time and expense entry to connect it to the claims and defenses of each of Aker's four adverse parties.[25]  These allocations are shown in Exhibits 2 and 3, which present the same information in different formats.

In some instances, a given activity was allocated to two or more parties on a joint and several basis.  This is because the particular effort had to be undertaken and would have resulted in the same cost in order to prosecute each claim against each joint-and-severally liable party alone.  In other cases, a particular entry was allocated to one party because the entire entry related solely to Aker's claims against that party.

---

[25] When a given time entry contained multiple discrete tasks, each task was analyzed separately.

34

Ms. Smith Miller's time entry for February 24, 2009 described as "Research common interest doctrine" provides a concrete example of joint and several liability.  This research was equally necessary for prosecution of Aker's claims against both MCC and Zurich.  Thus, Aker would have necessarily incurred the full cost of this research even if it had pursued its claims solely against either MCC or Zurich alone, not both.  Because this entire research cost was properly incurred in pursuit of each separate claim, MCC and Zurich are jointly and severally liable for the full cost of this research.

Likewise, Mr. Chleboski's time entry of July 6, 2016 relating to attendance at a Court-mandated conference is properly allocated to MCC, Zurich, Advantage and Epic on a joint and several basis.  This is proper because the full cost of Mr. Chleboski's attendance at this conference was equally necessary for prosecution of Aker's claims against any one of the defendants individually.  Stated otherwise, Aker would have incurred the full cost of attendance at the conference even if it was pursuing claims only against any one of the defendants.  In both these examples, the absence of one or more parties from the case would not have made the work less; e.g., Ms. Smith Miller's research was not made more difficult or time-consuming because it related to two adverse insurers rather than one.

35

Sole liability is exemplified by time entries such as Mr. Chleboski's for April 1, 2009.  Because this work related to securing MCC's compliance with Aker's discovery requests, the entire amount is allocated solely to MCC.  Similarly, Mr. Chleboski's November 2, 2017 time entry reveals he was working solely on Aker's response to a motion filed by Zurich, so the entire amount is allocated solely to Zurich.

Where a single task relates to more than one party, but can be rationally distributed between the two or was made more difficult or time-consuming because it related to more than one party, it has been divided between the two on a sole liability basis.  For example, Mr. Chleboski's March 1, 2011 entry is divided equally between MCC and Zurich because his review of those parties' filings and settlement postures would have been less time-consuming had either been absent.

Although Aker is entitled to an award of certain attorneys' fees/expenses, Aker will not – and cannot – in any instance seek multiple recovery, but instead can <u>collect</u> amounts awarded on a joint and several basis only once.

### V.  <u>THE FEES/EXPENSES THAT AKER INCURRED WERE REASONABLE AND APPROPRIATE UNDER THE CIRCUMSTANCES OF THIS CASE</u>

The reasonableness of counsel fees under either state law or federal is governed by the Rules of Professional Conduct.  <u>R.M.</u>, 190 N.J. at 11.  Those rules require consideration of factors

36

such as the time required, the complexity and difficulties involved, and customary fee rates in the locality.  RPC 1.5(a).[26] The materials Aker submitted herewith show that it has more than met its burden of proving that the fees it seeks are reasonable.

Applications for counsel fees are to be supported by an affidavit of services addressing factors set forth in RPC 1.5(a). A fee petitioner must "submit evidence supporting the hours worked and rates claimed."  Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).  Specifically, the court must determine the reasonableness of the hours expended, multiplied by a reasonable hourly rate, often referred to as the lodestar.  R.M., 190 N.J. at 10.  Determining the lodestar requires a determination of whether the number of hours worked is reasonable and whether the hourly rates sought are reasonable.  Id.  Regardless of the source of authority for fee shifting, the same reasonableness test governs.  Litton Indus., 200 N.J. at 386.  The court's

---

[26] New Jersey Rule of Professional Conduct 1.5(a) sets forth the following factors to be considered in determining reasonableness:

> 1.5(a) A lawyer's fee shall be reasonable.  The factors to be considered in determining the reasonableness of a fee include the following:  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; (8) whether the fee is fixed or contingent.

37

review should also be informed by the difficulty of the litigation, Saffos v. Avaya Inc., 419 N.J. Super. 244, 274, 16 A.3d 1076, 1094 (App. Div. 2011), and the degree of success achieved by the prevailing party. Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22, 860 A.2d 435, 447 (2004).

## A.    AKER'S COVERAGE COUNSEL FEE RATES ARE REASONABLE

A party submitting a fee petition is entitled to a reasonable fee rate, meaning a rate for an attorney of similar skill to the petitioning attorney, practicing in the geographic area of the case at issue.  Generally, a reasonable hourly rate is to be determined considering market rates in the relevant community. Thus, the court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.  Rendine v. Pantzer, 141 N.J. 292, 337, 661 A.2d 1202, 1227 (1995).  This need not be a protracted inquiry; instead, the court need only satisfy itself that the hourly rates charged are reasonable in comparison to market rates.  Id.

A party seeking fees can substantiate the reasonableness of its fees by submitting statements from local attorneys who are familiar with rates of attorneys in the same field with the same experience, and who can attest that the submitted rates are reasonable.  Baughman, 723 F. Supp.2d at 748.  Aker has presented

38

the opinion of an experienced and respected New Jersey insurance coverage attorney who found the rates to be reasonable.[27]

**B.      THE SERVICES AND WORK PERFORMED BY AKER'S COVERAGE COUNSEL WERE REASONABLE AND APPROPRIATE FOR PROSECUTION OF AKER'S INSURANCE COVERAGE AND CONTRACTUAL INDEMNITY CLAIMS**

The records provided by Aker give meaningful descriptions of the services rendered, as required by Rule 4:42-9.  This Court can easily determine how many hours were spent in what manner by which attorneys.  Rendine, 141 N.J. at 337.

Where the opposing party has made litigating the case more difficult, this will obviously increase necessary fees expended, and these fees should not be reduced.  Saffos, 419 N.J. Super. at 274.  See also In re AT & T Corp., 455 F.3d 160, 174 (3d Cir. 2006) (difficulty and length of the litigation were appropriate factors to consider in setting fees); Triffin v. Automatic Data Processing, Inc., 411 N.J. Super. 292, 313, 986 A.2d 8, 20 (App. Div. 2010) (in awarding fees to a successful defendant, the court properly considered plaintiff's dilatory behavior that increased defendant's legal fees).

Aker has detailed at some length the machinations MCC and Zurich have compelled it to endure to prevail in this litigation. In this case, MCC, Zurich, Advantage and Epic forced Aker to endure more than a decade of litigation as a result of their

---

[27] See Certification of Lynda A. Bennett.

wrongful and meritless denials of their coverage and indemnity obligations to Aker and highly aggressive (and in the case of MCC, sometimes frivolous) defenses and litigation tactics. Aker's coverage counsel fees were reasonable under the circumstances that these defendants alone caused.

The reasonableness and necessity of the legal costs Aker incurred are further supported by the accompanying Certification of Lynda Bennett, a partner at the law firm of Lowenstein Sandler LLP ("Lowenstein"). Ms. Bennett is a well-regarded and highly-experienced New Jersey insurance coverage lawyer. Ms. Bennett undertook a detailed assessment of Aker's counsel fees and has opined that the fees incurred were reasonable and necessary.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, Aker respectfully requests that the Court grant Aker's Application for an award of legal fees and expenses under both Rule 4:42-9(a)(6) and the attorneys' fee provisions in the Advantage and Epic Contracts, and enter an order in the form of the proposed order submitted herewith.

Dated:    August 14, 2019

Respectfully submitted,

/s/ Marc L. Dembling, Esq.

Marc L. Dembling, Esquire
Methfessel & Werbel P.C.
2025 Lincoln Highway, Suite 200
Edison, New Jersey 08818

and

Joseph L. Luciana, III, Esquire (pro hac)
Ronald J. Chleboski, Jr., Esquire (pro hac)
Dingess, Foster, Luciana, Davidson &
Chleboski LLP
20 Stanwix Street, 3rd Floor
Pittsburgh, PA   15222

*Attorneys for Aker Kvaerner Pharmaceuticals*

41