**<u>NOT FOR PUBLICATION</u>**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHELBY OWNBEY and JOYCE OWNBEY,<br>      *Plaintiffs*,<br><br>     v.<br><br>AKER KVAERNER PHARMACEUTICALS,<br>INC.; R&R SCAFFOLDING, LTD.; IMCLONE<br>SYSTEMS, INC.; SAFE WORKS, LLC d/b/a<br>POWER CLIMBER, JOHN DOE<br>CORPORATIONS 1, 2, and 3; and JOHN and<br>JANE DOES, 1, 2, 3, 4, and 5,<br>      *Defendants*.<br><br>and<br><br>IMCLONE SYSTEMS, INC.,<br>      *Third-Party Plaintiff*,<br><br>     v.<br><br>ADVANTAGE BUILDINGS & EXTERIORS,<br>INC.; MID-CONTINENT CASUALTY CO.;<br>LIBERTY MUTUAL INSURANCE CO.; and<br>ZURICH AMERICAN INSURANCE CO.,<br>      *Third-Party Defendants*,<br><br>and<br><br>AKER KVAERNER PHARMACEUTICALS,<br>INC.,<br>      *Third-Party Plaintiff*,<br><br>     v.<br><br>ADVANTAGE BUILDINGS & EXTERIORS,<br>INC.; MID-CONTINENT CASUALTY CO.;<br>ZURICH AMERICAN INSURANCE CO.; and<br>NATIONAL UNION FIRE INSURANCE CO. OF<br>PITTSBURGH, PA,<br><br>      *Third-Party Defendants*, | Civil No.: 07-cv-02190 (KSH) (CLW)<br><br><br>**<u>OPINION</u>** |

1

and

R&R SCAFFOLDING, LTD.,
                    *Third-Party Plaintiff,*

        v.

ADVANTAGE BUILDINGS & EXTERIOR, INC.,
                    *Third-Party Defendant.*

__Katharine S. Hayden, U.S.D.J.__

**I.    Introduction**

One issue remains for decision in this long-running litigation:  the amount of attorneys'

fees and expenses recoverable by Aker Kvaerner Pharmaceuticals, Inc. ("Aker") from Mid-

Continent Casualty Company ("MCC"), Advantage Buildings and Exterior, Inc. ("Advantage,"

MCC's insured), Zurich American Insurance Company ("Zurich"), and Epic Interiors, LLC

("Epic," Zurich's insured).  The Court already decided definitively that Aker is entitled to an

award of fees and costs from these parties (D.E. 672); nonetheless, fixing the amount involves a

lengthy and intricate analysis.[1]  Absent the parties' agreement on some or all of the issues, the

decision-maker conducts a highly technical review of, in this case, a massive amount of fee data,

to be measured against legal standards that govern the basic reasonableness inquiry.

Appointing a special master would have been the most resource-conscious means of

undertaking that review and making recommendations to the undersigned.  Instead, the

appointment of a special master became the most recent casualty of the culture of this litigation.

Zurich and MCC threw up roadblocks to the process and proposed solutions that they had to

---

[1] The task has been colorfully described as a "hellish judicial duty."  *United States ex rel. Palmer v. C&D Techs., Inc.*, 897 F.3d 128, 131 (3d Cir. 2018) (quoting *United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123, at *1 (E.D. Pa. Apr. 25, 2017) (Pratter, J.).)

know Aker would not accept.  And when that happened, Aker proposed another course of action without vetting it with MCC or Zurich first, inviting more objections instead of a resolution. Also characteristic, the whole exercise was marked by extension requests and delay.

Recognizing that the selection process was becoming another opportunity for vigorous combat, the recommendations would be contested, and the "hellish duty" belonged to the undersigned notwithstanding the considerable deployment of resources, the Court abandoned its effort to make an appointment and held oral argument on the remaining issues raised by Aker's fee motion.  It advised the parties at the end of the hearing that this matter would be given as much time as it needed; there was "a lot that [the Court has] got to get done."  (D.E. 726, 11/16/21 Tr. 102:22-25.)

Having reviewed the parties' relevant filings,[2] having considered their oral arguments and the history of this case, and having applied the overarching reasonableness standard, the Court sets forth its findings on the amounts recoverable by Aker.  To be clear: Aker is entitled to a substantial portion of the fees and expenses it seeks, and the Court rejects the narrative pushed by MCC and Zurich depicting Aker as waging an out-of-control fee-generating pursuit.  Instead, as to the discrete areas in which Aker's billing was unreasonable, the award will be reduced accordingly.  As well, Aker is not entitled to recover certain categories of fees and expenses, and those will be deducted.

---

[2] D.E. 637, 644, 645, 656, 657, 658, 661, 662, 664, 702, 703, 704, 708, 709, 720, 721, 722. To the extent the parties, and particularly MCC, purported to incorporate by reference several additional filings made in this matter (*see* D.E. 702), the Court has considered them where appropriate.

## II.     Background

Plaintiff Shelby Ownbey filed this personal injury action 16 years ago in 2007.[3]  Over a decade ago, the liability portion of the case was resolved in three different settlements between Ownbey and the relevant entity defendants.  While the liability case was ongoing, insurance coverage and contractual indemnity issues emerged and persisted long after Ownbey settled and was paid.

In June 2021, the Court ruled on three motions that relate to the present decision: Zurich's motion to compel a jury trial to allocate fault between and among Aker, Advantage, and Epic; MCC's motion for summary judgment dismissing Aker's third-party complaint and fee claims or, alternatively, to allocate the claimed fees; and Aker's motion for attorney's fees and expenses.  (*See* D.E. 672, 6/30/21 Op.)  Only Aker's motion survives; the Court had already decided against Zurich and MCC on the issues they were pressing.  Specifically, in prior Court rulings Aker had prevailed in securing a determination that it was an additional insured under the policy MCC issued to Advantage and under the policy Zurich issued to Epic.  Aker had also prevailed in securing a determination that Epic had a contractual obligation to indemnify Aker, and MCC recognized, in settling with Ownbey, that Advantage had a contractual indemnification obligation to Aker.  Accordingly, the Court held as follows:

> Plainly, Aker prevailed, and it is entitled to an award of legal fees and expenses;
> in that respect, its motion (D.E. 637) is granted.  Remaining for determination are

---

[3] Ownbey was a worker on a project begun in 2002 for the construction of a pharmaceutical manufacturing plant for ImClone, the site owner.  Aker was in charge of construction management.  As part of the project, Advantage had contracted with the plant owner to install certain portions of the exterior walls of the plant.  Epic Interiors had contracted to furnish labor and materials required to build and finish the project's building interiors. In connection with the Epic contract, a field order was issued to provide laborers for project cleanup.  Two union laborers provided by Epic were assisting in raising scaffolding (supplied by R&R) erected along an outside wall.  On July 22, 2005, Ownbey, employed by Advantage, was standing on the scaffolding and fell 15 feet, sustaining serious injuries.

the amounts to which it is entitled (1) from the insurers, MCC and Zurich, under [New Jersey Court] Rule 4:42-9(a)(6), and (2) from Advantage and Epic under the attorney's fee provisions contained in their contracts with Aker.

(*Id.* at 7-8.)

Aker's fee motion is fully briefed, with oppositions from MCC on its behalf and Advantage's, and from Zurich on its behalf and Epic's.  (D.E. 637, 644, 645, 656-57, 661-62, 664).[4]  Aker has also filed a supplemental motion seeking fees and expenses incurred after September 30, 2019, which is also fully briefed (D.E. 703-704; 708-09, 720-22).  In total, Aker seeks **$1,680,202.56** in fees and expenses from MCC, Zurich, Advantage, and Epic, with specific amounts allocated to each on a sole liability basis and to subsets of those entities in combination on a joint and several liability basis.  (D.E. 703-2, Proposed Order.)  Breaking this amount down further, Aker seeks $1,665,998.07 in fees and expenses for the services of its lead counsel (initially K&L Gates and later DFL Legal, with the same lead attorneys at both firms) and $14,204.49 for the fees of its local counsel, Marc Dembling of Methfessel & Werbel.  (D.E. 703-3.)  The fees represent over 4,800 hours of attorney time.

## III.   Legal Standards

Generally, parties to civil litigation bear their own legal fees, even when they prevail, unless a statute or contract provides otherwise.  *Peter v. NantKwest, Inc.*, 140 S. Ct. 365, 370 (2019); *Rendine v. Pantzer*, 141 N.J. 292, 322 (1995); *see also Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 385 (2009) (per curiam) (although New Jersey law generally disfavors the shifting of attorneys' fees, "'a prevailing party can recover those fees if they are expressly

---

[4] In addressing the arguments made by MCC for it and Advantage, the Court refers to them as MCC's arguments.  In addressing the Zurich/Epic arguments, the Court refers to them as Zurich's arguments.

provided for by statute, court rule, or contract'" (citation omitted)).[5]  Here, the "otherwise" that

allows for an award of fees and costs has two bases.  There is New Jersey Court Rule 4:42-

9(a)(6), which permits fee shifting "[i]n an action upon a liability or indemnity policy of

insurance, in favor of a successful claimant."  That rule exists to discourage insurers from trying

to circumvent their contractual obligations and "forc[ing] their insureds to expend counsel fees to

establish the coverage for which they have already contracted."  *Occhifinto v. Olivo Const. Co.,*

*LLC*, 221 N.J. 443, 450 (2015); *see also Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 356 (1993)

(rule aims to "discourage groundless disclaimers and to provide more equitably to an insured the

benefits of the insurance contract without the necessity of obtaining a judicial determination that

the insured, in fact, is entitled to such protection") (cleaned up).  Then there are the contracts

between Aker and Advantage, which contain fee-shifting language, as do the contracts between

Aker and Epic.  Those statutory and contractual provisions, previously determined to be

applicable, entitle Aker to reasonable attorneys' fees.

 Entitlement found, the next step is to calculate the fee award.  Aker has the burden to

prove that its request is reasonable by providing evidence of the hours its attorneys worked and

their hourly rates.  *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990); *Walker v. Giuffre*,

209 N.J. 124, 131 (2012). A party opposing the award must make and support its objections in a

way that is specific enough to put the movant on notice, and the Court cannot reduce an award

based on factors not raised by the opponent.  *Rode*, 892 F.2d at 1183.  Insofar as the fee

application is based on Rule 4:42-9, that rule requires the motion to be supported by an affidavit

that addresses the factors set forth by Rule 1.5(a) of the New Jersey Rules of Professional

Conduct and other relevant factors and specifies the amount of fees and expenses sought.  N.J.

---

[5] There is no dispute that New Jersey substantive law applies, and while both sides also cite federal case law, it does not appear to differ in any material way here.

Ct. R. 4:42-9(b).[6]  Aker has chosen to support its motion with briefing as well as declarations and certifications; the facts in its briefs are sworn to via its attorneys' declarations and together, these submissions address the requisite factors.

The Court applies the lodestar method, which involves determining "the number of hours reasonably expended by the successful party's counsel in the litigation" and multiplying it by a reasonable hourly rate.  *Litton*, 200 N.J. at 386.  Once the lodestar is determined, the award can be enhanced or reduced based on certain considerations, among them the attorney's degree of success and the differential between the amount sought and the amount recovered, and between the amount of the fee request and the amount of the underlying award.  *Id.* at 387; *New Jerseyans for Death Penalty Moratorium v. N.J. Dep't of Corr.*, 185 N.J. 137, 154 (2005); *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 23 (2004).[7]

To calculate the lodestar, the first step is the reasonableness of the proposed rates.  *Furst*, 182 N.J. at 22.  This involves "evaluat[ing] the rate of the prevailing attorney in comparison to rates for similar services by lawyers of reasonably comparable skill, experience, and reputation in the community."  *Id.* (quoting *Rendine*, 141 N.J. at 337) (internal quotation marks omitted).  The hourly rate must be "fair, realistic, and accurate, allowing for adjustments to the requested rate when appropriate," and has been described as the rate "that would be charged by an adequately experienced attorney possessed of average skill and ordinary competence—not those

---

[6] The rule also requires fee motions to state how much has already been paid to the attorney. N.J. Ct. R. 4:42-9(c).  Here, Aker's counsel certified that all invoiced fees have been paid, or, with respect to the final set of invoices, were approved and payment was in process.  (D.E. 637-8, Chleboski Decl. ¶ 6; D.E. 720, Chleboski Supp. Decl. ¶ 5.)

[7] A contingent fee arrangement may warrant an enhancement in certain circumstances, *see Furst*, 182 N.J. at 23, but there is no such argument here.  (*See* D.E. 662, Aker Reply to Zurich Opp. 13.)

that would be set by the most successful or highly specialized attorney in the context of private practice." *Walker*, 209 N.J. at 132-33 (cleaned up).

The party seeking a fee award must establish the reasonable market rate "'for the essential character and complexity of the legal services rendered in order to make out a prima facie case,'" and may discharge that obligation with affidavits from non-party attorneys with "'personal knowledge of the hourly rates customarily charged in the relevant community.'" *Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 2011 WL 2293334, at *1 (D.N.J. June 7, 2011) (Brown, J.) (citations omitted).  The opponent of the award must submit sufficient evidence to raise an issue about the reasonableness of the requested rate.  *Id.*

Next is whether the amount of time expended is reasonable; *i.e.*, whether it is equivalent to the time "competent counsel reasonably would have expended to achieve a comparable result."  *Furst*, 182 N.J. at 22 (cleaned up).  The reasonableness inquiry incorporates the factors in RPC 1.5, which states that "[a] lawyer's fee shall be reasonable," and that the "factors to be considered in determining the reasonableness of a fee include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent."

RPC 1.5(a).  *See also Furst*, 182 N.J. at 22 ("Those factors must inform the calculation of the reasonableness of a fee award in this and every case.").

In reviewing attorney fee motions, the Court engages in a "'thorough and searching analysis.'"  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n.5 (3d Cir. 2005) (quoting *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 362 (3d Cir. 2001)).  Its function is a "'positive and affirmative,'" rather than passive, one and involves a line-by-line review of the billing records offered by the movant to determine whether it has met its burden to justify its request against sufficiently specific objections raised by the adverse party.  *Id.* at 713 (citation omitted).  *See also Rendine*, 141 N.J. at 335 (determining lodestar requires trial court to "evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party," and court may not "accept passively the submissions of counsel"); *Hansen v. Rite Aid*, 253 N.J. 191, 215 (2023) (reaffirming approach described in *Rendine*).  Within the scope of the objections, a court "will inevitably be required to engage in a fair amount of 'judgment calling' based upon its experience with the case and its general experience as to how much time a case requires."  *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 721 (3d Cir. 1989).

The Court's discretion in fixing the amount of the fee award is well established.  *Hansen*, 253 N.J. at 211-12; *see also Litton*, 200 N.J. at 386 (noting that "a reviewing court will disturb a trial court's award of counsel fees only on the rarest of occasions, and then only because of a clear abuse of discretion") (cleaned up); *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 354 (3d Cir. 2021) (court's discretion is "'substantial'" (quoting *Palmer*, 897 F.3d at 137)).  The Court is afforded this discretion given

the fact-specific nature of the attorney fee inquiry and the trial court's greater familiarity with

how the underlying litigation proceeded.  *Palmer*, 897 F.3d at 137.

## IV.    Relevant Submissions

The record on this motion is substantial; these are the relevant submissions:

- Aker's opening motion for an award of attorneys' fees (D.E. 637) is supported by its

brief, exhibits, the declarations of its lead attorneys, Joseph Luciana, III, Esq., and Ronald

Chleboski, Jr., Esq., and the certification of its local counsel, Mark Dembling, as well as an

expert certification from Lynda Bennett, Esq.  The amounts sought encompass the period from

September 2008 to January 31, 2019.  The exhibits include ledger-sized spreadsheets reflecting,

for the entire length of the coverage case, each time entry by each biller, the number of hours for

the billed task, and a description of the service performed.  The spreadsheets, more than 230

pages each,[8] are organized by month, and reflect Aker's allocation of every time entry to one or

more of the four entities involved in this fee application, or an indication that it was not claiming

a fee or expense associated with that time entry.  Other exhibits present the invoice data in

various summary formats, including by task groupings created by counsel.  Luciana and

Chleboski have certified to the truth of the factual assertions in the moving brief and to the

contents of the invoices, effectively making them part of their declarations.  (D.E. 637-7,

Luciana Decl. ¶¶ 6-7; D.E. 637-8, Chleboski Decl. ¶¶ 6-7.) [9]  Dembling's certification attaches

---

[8] Aker supplied two versions of the spreadsheet: one that reflects fees and expenses by dollar amount (D.E. 637-4) and by hours (D.E. 637-5).  Updated versions submitted with subsequent filings follow the same convention.

[9] Aker's original submission was docketed at D.E. 637, and, as noted, included fees and expenses through January 2019.  On January 31, 2020, it filed a corrected version of the exhibits at D.E. 664, along with counsel's declaration explaining that the original submission erroneously included $4,100 more than it should have. That submission also updated the fees and expenses through September 30, 2019.  Aker has certified that it did not bill Aker for, and is not seeking

his firm's invoices through August 12, 2019, and represents that all invoices issued by his firm have been paid.  (D.E. 637-9.)

- Zurich's opposition (D.E. 644) is supported by its brief, an affidavit from Kathleen J. Devlin, Esq., an attorney for Zurich (D.E. 644-2), and the expert report of William Mergner, Esq. (D.E. 644-1).  Devlin's affidavit offers a competing summary of Aker's requested fees by task, attaching charts prepared for that purpose, as well as filings made earlier in the case and copies of Court rulings.

- MCC's opposition is supported by its brief (D.E. 645) and the certification of its counsel, Jerald Howarth, Esq. (D.E. 645-1).  The exhibits to Howarth's certification include deposition transcripts, correspondence MCC considers relevant, and its recalculations of various categories of Aker's fees.  MCC has also purported to incorporate sections from other briefs it filed.  (*See* D.E. 702, referring to D.E. 638 and 655.)

- Aker's reply brief in response to MCC's opposition (D.E. 661) is accompanied by exhibits that include, among other documents, fee calculations in response to MCC's calculations (D.E. 656-1 to 656-5).

- Aker's reply brief in response to Zurich's opposition (D.E. 662) is supported by exhibits that include rebuttals to certain calculations by Zurich and a summary of timekeeper information and rates (D.E. 657-1 to 657-3), and the declaration of Richard P. Maggi, Esq., who served as Aker's defense counsel for the underlying liability case and as local counsel for the coverage

---

any fees or expenses for, its work in connection with the corrected filing at D.E. 664.  (*See* D.E. 703, Chleboski Supp. Decl. ¶¶ 18-19.)

case until his retirement in 2013 (D.E. 657-5),[10] after which Dembling began serving as Aker's local counsel.

- Chleboski's reply declaration is offered in support of Aker's replies to both MCC and Zurich.  (D.E. 658.)  The accompanying exhibits include updated versions of the fee and expense spreadsheets and related documentation covering the period ending September 30, 2019.  They also include additional backup for the expense claims, as well as details and emails concerning the negotiations that ultimately resulted in settlement of the liability case.

- Aker's supplemental fee motion (D.E. 703, 704) updates the fees and expenses through August 27, 2021, and is supported by Chleboski's declaration with updated exhibits (including updated spreadsheets—now close to 300 pages each—reflecting each time entry and an allocation to one or more of the relevant entities).  The supplemental motion is also supported by Dembling's certification attaching his firm's invoices from August 7, 2019 through August 24, 2021, which the certification states have been paid.  (D.E. 703-13.)

- Zurich's opposition to Aker's supplemental motion is supported by its brief (D.E. 708-2) and an attorney declaration (D.E. 708) from Timothy Smith, Esq., attaching a copy of Dembling's attorney biography.

- MCC's opposition to the supplemental motion is supported by a letter brief (D.E. 709) and exhibits.

- Aker's reply briefs in response to MCC's submission (D.E. 721) and in response to Zurich's submission (D.E. 722) are supported by the declarations of Chleboski and Dembling (D.E. 720).  Attached to Chleboski's declaration is a narrative summary of legal services provided to Aker from February 1, 2019 through August 27, 2021, which includes a detailed

---

[10] D.E. 661 and 662 are corrected versions of D.E. 656 and 657.  The supporting exhibits were filed with the original versions of the briefs and were not refiled with the corrected versions.

account of how it prepared the filings that comprise its fee application.  (D.E. 720-1.)

Dembling's declaration addresses his role and the nature of his and his firm's practice.  (D.E.

720-2.)

## V.    Hourly Rate

Aker seeks hourly rates of $405 to $522 for the two partners who represented it; $220 to

$350 for associates; $200 to $250 for a contract attorney later promoted to associate; $140 to

$150 for contract attorneys; and $90 to $243 for support staff, including paralegals, clerks,

summer associates, and librarians.  (D.E. 703-9.)  Generally, rates at the high end of that range

were charged when the matter was with K&L Gates at the beginning of the engagement.

Overall, Aker represents that the average hourly rate of its timekeepers was $324.90.[11]  For

partners, the average rate was $437.71/hour; for associates and contract attorneys, $245.47/hour;

for non-attorney staff, $155.78/hour.  (D.E. 703, Chleboski Supp. Decl. ¶ 24.)  While the highest

rate charged was $522/hour, that rate applied to approximately 18 hours and amounts to less than

half of one percent of the fee sought.  (D.E. 703-10.)  Of the timekeepers who billed time on this

matter, six – two partners, two associates, an associate/contract attorney, and a paralegal –

accounted for more than 80% of the hours billed.  (Chleboski Supp. Decl. ¶ 24(e); D.E. 703-11.)

In support of its motion, Aker submitted the certification of Lynda A. Bennett, Esq, who

states, based on her own experience in this specific field of practice, that partners providing

similar services in the northern New Jersey market command hourly rates of $500 to $800, while

associates charge hourly rates of $300 to $525.  (D.E. 637-10, Bennett Cert. ¶ 7.)  She further

indicates that for the "vast majority" of this case, rates were locked in for this matter at the low

end of those ranges, and that the rates Aker charged were reasonable in view of each attorney's

---

[11] That average factors in the fees sought through August 27, 2021.  (D.E. 703, Chleboski Supp. Decl. ¶¶ 4, 24.)

"experience, reputation, and ability." (*Id.* ¶¶ 7, 12.)  Although they are based outside of New Jersey, Aker's attorneys seek hourly rates that fall within the ranges Bennett identifies as typical for this legal market.  *Interfaith Cmty. Org.*, 426 F.3d at 699 ("[U]nder normal circumstances, a prevailing party's attorneys should be compensated based on market rates in the vicinage of the litigation.").  *See also United Rentals (N. Am.) Inc. v. Liberty Mut. Fire Ins. Co.*, 2022 WL 7997043, at *4 (D.N.J. Oct. 14, 2022) (Chesler, J.); *Illinois Nat'l*, 2011 WL 2293334, at *2 (approving similar rates in coverage cases).

Zurich urges the Court to reject these rates as "far outside the range charged by counsel prosecuting claims for additional-insured coverage and contractual indemnification, which are invariably part of multi-party suits and are routinely handled by defense counsel." (D.E. 644, at 15.)[12]  As support, it relies on the report of William H. Mergner, Jr., Esq., who opines that "typical rates for a partner handling these types of cases during the relevant time frame" was $145 to $225 per hour, and notes that Aker's local counsel charged even less ($130/hour).  (D.E. 644-1, Mergner Rpt. ¶ 18.)[13]  Mergner's report fails to reflect the reality of how this litigation was conducted, and the complexity occasioned by legal positions Zurich and MCC espoused. Instead, Mergner echoes language in Zurich's (and MCC's) briefs that likewise characterizes the issues in this case as routine and easily resolved.  (*See id.* ¶ 21 (suggesting that "neither the contractual indemnification issues involving Epic nor the additional insured issues in the underlying litigation were 'complex'"); D.E. 644, Zurich Opp. 15, 17 (describing claims for additional-insured coverage and contractual indemnification as "routinely handled by defense counsel" and "standard litigation practice in construction injury suits, not a novel claim"); D.E.

---

[12] MCC adopts Zurich's challenges to Aker's rate request.

[13] Mergner appears to consider the relevant legal market to be New Jersey as a whole.  (*Id.* ¶¶ 9, 19.)

645, MCC Opp. 12 (coverage issues relating to MCC were "far from complex"); D.E. 708-2,

Zurich Opp. to Supp. Mot. 1 (claim raised "no novel issue of law").)

> Bennett's declaration better describes the playing field:
>
> The issues presented in the litigation were complex and required a deep
> knowledge and understanding of insurance coverage, which is a specialty practice
> area. In addition, Aker faced aggressive adversaries that engaged in protracted
> discovery and serial motion practice to challenge and re-challenge orders from the
> Court which upheld and enforced Aker's rights to indemnification and insurance
> coverage.

(D.E. 637-10, Bennett Cert. ¶ 6.) Aker was not, of course, entitled to the "most successful or

highly specialized attorney," *Walker*, 209 N.J. at 132-33, but it *was* entitled to counsel

sufficiently versed in insurance coverage issues to competently meet the sophisticated and

aggressive challenges the insurers asserted. As explored in greater detail below, the 10,000-foot

view reveals the insurer entities mounted a whack-a-mole strategy to avoid or seriously limit

exposure under the underlying policies and contracts between and among them. To prevail, Aker

needed counsel that could keep pace.

Zurich and MCC argue that the $130 hourly rate charged by Aker's local counsel, Marc

Dembling, is reasonable and exposes the *un*reasonableness of lead counsel's rates. (*See, e.g.*,

D.E. 708-2, Zurich Opp. to Supp. Mot. 6; D.E. 709, MCC Opp. to Supp. Mot. 10-11.) This

facially appealing argument quickly fails. Dembling has certified that his role was limited: he

was not responsible for prosecuting the coverage or indemnification issues. (D.E. 720-2,

Dembling Reply Cert. in Support of Supp. Mot., ¶¶ 7-8.) He explained that his firm serves as

preferred counsel for many insurers with whom it has negotiated discounted billing arrangements

that vary based on the nature of the matter involved. The rate Dembling charged in this matter

represented the firm's "lowest discounted rate," one that it typically charges for "auto accident

cases or narrow local counsel engagements, like this case." (*Id.* ¶ 11.) His firm "rarely"

represents litigants in Aker's position of seeking coverage from its carriers, and for such engagements the applicable hourly rate would be $450 – not $130.  (*Id.* ¶¶ 12, 15.)[14]  Dembling's information and the Bennett certification provide a solid basis for awarding Aker's requested rates, which the Court concludes are reasonable and appropriate.

## VI.    Amount of Time Expended

In evaluating the reasonableness of the number of hours for which Aker seeks a fee award, the Court's exercise of its discretion is guided by case law and the factors set forth in RPC 1.5(a).  *See supra* and *Twp. of W. Orange v. 769 Assocs., LLC*, 198 N.J. 529, 542 (2009) ("The list is not exhaustive and all factors will not be relevant in every case.").  Five of the eight factors are particularly relevant here: (i) the time and labor involved, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly, RPC 1.5(a)(1); (ii) the amount involved and the results obtained, RPC 1.5(a)(4); (iii) the time limitations imposed by the client or by the circumstances, RPC 1.5(a)(5); (iv) the nature and length of the professional relationship with the client, RPC 1.5(a)(6); and (v) the experience, reputation, and ability of the lawyer or lawyers performing the services.  RPC 1.5(a)(7).[15]  Also

---

[14] Dembling's certification goes on to opine that based on his more than 50 years of experience in the field (experience that, in fact, Zurich and MCC highlight in their effort to depict his local counsel rate as the rate that would be appropriate to apply to lead counsel's services), hourly rates of $450 or more in similar coverage disputes are reasonable and common in New Jersey. (*Id.* ¶ 13.)

[15] The remaining factors are less or not relevant.  The third factor (the fee customarily charged in the locality for similar legal services), is addressed in Part V's discussion of the hourly rates Aker seeks.  The seventh factor (the experience, reputation, and ability of the lawyers performing the services), while addressed briefly here, is also subsumed in the discussion of hourly rates; the procedural history discussed *infra* also illustrates why Aker had to engage and keep on experienced coverage counsel adept at navigating the issues.  The second factor (the likelihood, if apparent to the client, that the lawyer would be precluded from other employment by accepting this case) appears to be a non-issue, as does the eighth (whether the fee was fixed or contingent).

relevant is "the substance of the work performed," and whether it reflects what a "reasonably skilled attorney" would do under the circumstances. *Twp. of W. Orange*, 198 N.J. at 545.

These factors and the substance of Aker's attorneys' work support a fee award encompassing the significant majority of the hours for which Aker seeks reimbursement. The history of this case illustrates why this is so, particularly with respect to the first, fourth, and fifth factors under RPC 1.5(a).[16]  In the following paragraphs, the Court sets forth a necessary summary of how this case progressed over the years to illustrate why in the main, the fees generated by Aker's attorneys spent are recoverable.

Ownbey's complaint was filed in May 2007, and on several occasions in 2008 MCC agreed to provide Aker coverage under the MCC policy.  Zurich, and through it Epic, refused. Because MCC changed course on the eve of a mediation aimed at, in relevant part, settling Ownbey's claims against Aker, Aker found itself pursuing a coverage case against MCC beginning around October 2008.[17]  For that purpose, it hired K&L Gates, which it describes as its "customary insurance coverage counsel with whom it had a longstanding relationship," which gained it a 10% fee discount.  (D.E. 637-1, Aker Moving Br. 9 & n.8.)  Luciana and Chleboski, "experienced insurance and construction litigators who had previously represented Aker and its affiliates," oversaw the coverage case.  (*Id.* at 9.)  In other words, with respect to the "nature and length of the professional relationship with the client," RPC 1.5(a)(6), Aker's attorneys had a history of representing their client in matters of a similar type that supported their retention in

---

[16] The Court credits Aker's version of events, which better accords with how this case proceeded.  As such, the ensuing summary (which focuses on the events and rulings in the litigation that pertain to Aker's rights specifically) draws heavily from Aker's moving brief, as supplemented by the Court's review of the docket and experience presiding over the case.

[17] MCC's current counsel stated at oral argument that he had not yet been retained by the time of the first mediation and that it was handled by prior counsel.  (11/16/21 Tr. 34:1-7.)

this matter.  Their experience in this field, as reflected in the attorney biographies attached to their initial round of declarations (D.E. 637-7, Luciana Decl., Ex. A; D.E. 637-8, Chleboski Decl., Ex. A), also supports their retention and, ultimately, the hours that they billed.  *See* RPC 1.5(a)(7).

Luciana and Chleboski were assisted by a "core team" of a mid-level associate, a senior associate, and a paralegal.  Additional associates and staff were assigned "discrete tasks" to assist in complying with the Court-ordered schedule for the coverage case, which was expedited in view of the then-ongoing liability case.  (*Id.* at 9-10.)[18]  At all times, however, one of the two lead attorneys bore the overall responsibility for Aker's prosecution of its claims and for the invoices sent to Aker for legal services.  (D.E. 637-7, Luciana Decl. ¶¶ 5-6; D.E. 637-8, Chleboski Decl., ¶¶ 5-6; D.E. 703, Chleboski Supp. Decl. ¶ 20.)

In the first few months of the coverage case, Aker's attorneys engaged in the necessary research and review of discovery exchanged to acquaint themselves with the legal landscape; evaluated the potential claims and made demands accordingly; and began prosecuting Aker's coverage and indemnity claims.  (D.E. 637-1, Aker Moving Br. 10-11.)  Those initial steps accounted for 146.2 hours of attorney and paralegal time and $37,628.89 in fees.  (D.E. 704-1, Summary of Fees by Task Code, at 3 (task grouping A).)

 MCC pivoted and agreed to participate in mediation with Aker, but that failed due to a new MCC theory that came up in the mediation session.  According to Aker, Zurich consistently declined to make any settlement offer.  (D.E. 637-1, Aker Moving Br. 12-13.)

In February 2009, MCC agreed to defend and indemnify Aker specifically based on contractual indemnification (through the contract between Aker and Advantage) and not because

---

[18] In 2010, Luciana and Chleboski started their own firm, DFL Legal, and the case remained with them.

of language in the insurance policy MCC issued to Advantage.  (*Id.* at 13.)  The first round of

summary judgment motion practice ensued, involving 16 motions addressing who owed what to

whom in terms of insurance coverage and contractual indemnification, 10 of which required

Aker to respond.  (*Id.* at 15.)  Zurich represented to the Court that the decision as to whether its

insured, Epic, owed contractual indemnity to Aker would be the key to resolving the relative

coverage obligations of both MCC and Zurich, shifting the coverage litigation's focus to that

issue.  The Court initially denied summary judgment, reasoning that fact issues remained, but

after further argument, ruled in Aker's favor on the issue in July 2010—that is, Epic *did* owe

contractual indemnification to Aker.  (*Id.* at 16-17; *see also* D.E. 340.)  Aker seeks $210,604.05,

representing 638.75 hours, for its work in briefing and opposing the 2009 round of summary

judgment motions.  (D.E. 704-1, Summary of Fees by Task Code, at 8 (task grouping F).)

The docket reflects that MCC was contemporaneously taking the position, apparently

with Zurich's support, that mediation would be "fruitless," despite the Court's order sending the

parties to mandatory mediation before Judge John E. Keefe, Sr. (ret.).  (D.E. 334 (6/7/10 Order

directing parties to appear for oral argument).)  Noting MCC's "surprisingly willful conduct,"

the Court ordered the parties to appear for oral argument on the summary judgment issues and

their failure to proceed to mediation as required.  (*Id.* at 3.)  But that did not prompt MCC or

Zurich to change course:  even though the Court once again directed the parties to mediation in

its July 2010 order (D.E. 340), Aker represents that a November 2010 mediation went nowhere

because "both MCC and Zurich failed to make reasonable, good faith offers to resolve Plaintiff's

claims."  (D.E. 637-1, Aker Moving Br. 17.)

MCC did, however, propose that the parties pursue a *DeBlon* settlement to resolve

Ownbey's claims against Aker and ImClone.  (*Id.* at 18; D.E. 658, Chleboski Reply Decl.

¶ 13.)[19]  When MCC failed to take practical steps to that end, ImClone drafted an agreement in

January 2011 for MCC to use in negotiations with Ownbey's lawyers.  (D.E. 637-1, Aker

Moving Br. 19.)  Although MCC and Ownbey reached a settlement in principle fairly quickly,

protracted negotiations followed during which MCC sought to make any settlement of Ownbey's

claims against Aker and ImClone contingent on Aker either limiting or relinquishing its fee

claim against MCC/Advantage—a position that became a major sticking point and caused the

parties to come quite close to a jury trial on the liability case.  (Chleboski Reply Decl. ¶¶ 13-15

& Ex. 8 to 49; *see also id.*, Ex. 39 (3/25/11 email from ImClone's attorney to MCC's attorney

asserting that MCC was not entitled to extract concessions from entities to which it owes

indemnification and that MCC acted in bad faith by refusing to settle Ownbey's claim against

ImClone because Aker would not agree to MCC's demanded concessions).)  In fact, it appears

that during the course of the negotiations MCC even attempted to back off its 2009 concession

on contractual indemnity—the concession it now invokes to argue that no fees should be

awarded to Aker for work done after that point.  (*Id.*, Ex. 27 (3/14/11 email from Chleboski to

Lentz saying that as he understands letter circulated by Howarth, "MCC is trying to undo the

Advantage contractual indemnity to which it previously admitted to better posture itself for

counsel fee disputes").)

MCC's recalcitrance during the *DeBlon* negotiations drew the ire of the others involved,

including Ownbey's "fed up" attorney, Gavin Lentz, who reportedly advised his client in early

---

[19] A *DeBlon* settlement or release refers to the procedure described in *DeBlon v. Beaton*, 103 N.J. Super. 345 (Law Div. 1968), and *CNA Ins. Co. v. Selective Ins. Co.*, 354 N.J. Super. 369 (App. Div. 2002), whereby a settling insurer (in a case involving multiple insurers) executes a special or limited release with the plaintiff to resolve claims against its insured in a manner that releases the insured to the extent of its own assets and to the extent of its coverage with the settling insurer while retaining the plaintiff's right to pursue its claims to the extent other coverage is or may be available via a non-settling insurer (*e.g.*, from the insured's excess insurer or from another primary insurer).

March 2011 that MCC was not trustworthy and that even if they got a "signed deal," he could "not guarantee that MCC will pay the money as agreed based upon [its] prior conduct" and that Ownbey had "been jerked around enough."  (D.E. 658, Chleboski Reply Decl., Ex. 14.)  By mid-March, with a trial date approaching, Luciana, Aker's attorney, emailed Lentz that Aker was "done" negotiating with MCC and its attorney, Jerald Howarth, and Lentz responded that he would "fall out of my chair if they actually do the right thing."  (Chleboski Reply Decl., Ex. 30; *see also id.*, Ex. 36 (3/22/11 email from Luciana to Howarth reiterating Aker's position that any settlement would have to preserve its coverage counsel fee claims and that as to MCC's assertions otherwise, "We are all scratching our heads trying to figure out why you are making these blatantly false statements."), Ex. 37 (3/23/11 email from Luciana to Howarth standing on "blatantly false" characterization and repeating demand that MCC and Advantage settle the underlying claim to eliminate Aker's exposure to a judgment in excess of the policy limit).)

At that point, Zurich, which had largely remained on the sidelines,[20] agreed to fund a *DeBlon* settlement without requiring Aker to concede its coverage counsel fee claims.  (D.E. 637-1, Aker Moving Br. 19-20.)  This ultimately led to the agreement in April 2011 resolving Ownbey's claims against Aker and ImClone.  (*See id.*; D.E. 473 (order of dismissal).)  Ownbey reached subsequent settlements with MCC, Advantage, and R&R (which, as noted earlier, had supplied the scaffolding).  For its attorneys' role in the *DeBlon* settlement, one that involved "t[aking] the lead" in negotiating and revising drafts and incorporating input from the others

---

[20] That's not to say that Zurich was completely uninvolved.  The exhibits to Aker's fee motion include correspondence between Zurich's attorney and MCC's attorney about the terms of the settlement then being negotiated and Zurich's efforts to insulate itself from paying Aker's counsel fees.  (Chleboski Reply Decl., Exs. 8, 10, 11.)

(Chleboski Reply Decl. ¶ 13), Aker seeks $72,528.75, representing 161.18 hours.  (D.E. 704-1, Summary of Fees by Task Code, at 14 (task grouping L).)

Prior to these settlements with Ownbey, the liability and coverage portions of the action had been moving ahead and a trial was fast approaching.  Written and deposition discovery had been conducted already,[21] and the parties refiled summary judgment motions in January and February 2011.  The motions on the coverage case addressed whether Aker was entitled to additional insured coverage under the relevant policies.[22]  The Court had deferred consideration of the coverage issues while the liability case remained pending.  (*Id.* at 17-18.)  Now coverage and indemnification moved to the forefront.

At that point MCC filed for the Court's signature what Aker describes as "sham" consent judgment in favor of Ownbey and against ImClone, putting MCC into position to assert claims against Aker via subrogation.  (D.E. 637-1, Aker Moving Br. 21; D.E. 496.)  The intent was to recover from Aker what MCC said it had paid Ownbey *after* Ownbey had already settled with Aker and others in the Zurich-funded *DeBlon* settlement.  (*See* D.E. 510, at 2.)  After receiving nearly a dozen submissions from the parties, the Court rejected the "consent" judgment by order of August 1, 2011, finding that MCC's arguments were factually and legally untenable.  (D.E. 496.)  Notwithstanding, MCC continued to pursue the subrogation issue.

---

[21] Aker seeks approximately 340 hours for written discovery, 205 hours for deposition discovery involving MCC and Advantage, and 109 hours for deposition discovery involving Zurich and Epic.  (D.E. 704-1, Summary of Fees by Task Code, at 4-6 (task groupings B, C, D).)  This discovery, done on an expedited basis by Court order, involved around 13,000 pages of document discovery exchanged, interrogatories, eight depositions, and multiple discovery disputes.  (D.E. 637-1, Aker Moving Br. 13-14.)  This was in addition to discovery in the liability case, which Aker's attorneys had to review as necessary to pursue the coverage case.  (*Id.* at 14.)

[22] Aker attributes $14,151.50, representing 36.10 hours, of its fee request to this 2011 round of summary judgment motion practice.  (D.E. 704-1, Summary of Fees by Task Code, at 9 (task grouping G).)

Also on August 1st, the Court, in an effort to streamline resolution of the remaining issues, directed the parties to file a joint spreadsheet reflecting each party's claims, including the legal and factual basis for them, and the opposition to each claim and the basis for that opposition.  (D.E. 495.)  Aker's attorneys took the lead in preparing what became a 17-page document with 45 pages of attached exhibits, which it filed on August 26, 2011.  (D.E. 497; *see also* D.E. 637-1, Aker Moving Br. 22).  Aker seeks $20,455.00, representing 51.90 hours, for this work.  (D.E. 704-1, Summary of Fees by Task Code, at 15 (task grouping M).)

Over the next months, the parties negotiated a consent order dismissing claims against an excess insurer, National Union Fire Insurance Company, on the basis that it had no role in the remaining claims.  Correspondence leading to the dismissal demonstrates that there remained some uncertainty about the survival or existence of MCC's purported subrogation claim against Aker.  (D.E. 503, Ltr. from National Union's attorney to the Court.)  As to the remaining parties, the spreadsheet of remaining claims did not prompt settlement discussions, and ultimately, on request of Aker and its insurer, Liberty Mutual, the reassigned Magistrate Judge Cathy Waldor held a status conference after the Court required the parties to identify which issues remained in contention.  (D.E. 508).  Aker's attorney listed the remaining issues on behalf of Aker, Liberty, ImClone, MCC, Advantage, Zurich, and Epic.  In that February 2013 submission (D.E. 510), Chleboski identified Aker's issue:  "Aker is seeking to recover approximately $800,000 in attorneys' fees and expenses" from MCC and Zurich and their respective insureds.

After the conference, Judge Waldor granted Aker leave to file two motions: a motion to strike MCC's cross-claim for subrogation, and a motion for summary judgment on the issue of whether Aker is an additional insured under the MCC policy.  (D.E. 519.)  Those motions were fully briefed by March 2014.  The submissions were in excess of 1800 pages.  (D.E. 520, 521,

524, 525, 526, 527, 528.)  Judge Waldor issued a report and recommendation in October 2014, in which she recommended granting both motions.  (D.E. 531.)  MCC filed objections to the report and recommendation and the Court ordered supplemental briefing.  (D.E. 537.)  Even that generated problems; MCC's supplemental submission was initially stricken because it "fail[ed] to adhere to instructions on content and formatting."  (D.E. 540).

On September 2, 2015, this Court reviewed the report and recommendation *de novo* and declined to adopt it in full.  The Court granted Aker's motion to dismiss MCC's subrogation claim—thereby putting that issue to rest for purposes of this litigation.  But it parted with Judge Waldor and ruled that Aker was not entitled to coverage as an additional insured under the MCC policy.  (D.E. 545, 546.)  Aker moved for reconsideration as to the coverage issue, and the Court denied the motion on November 17, 2015.  (D.E. 551.)  For its fees from 2011-2015 addressing the subrogation and MCC additional insured issues, Aker seeks $155,077.50, representing 444.55 hours.  (D.E. 704-1, Summary of Fees by Task Code, at 10 (task grouping H).)

Following pretrial conferences in January 2016, Judge Waldor directed the parties to return to mediation before Judge Keefe (D.E. 554), which they did on April 26, 2016.  (D.E. 637-1, Aker Moving Br. 26.)  Aker represents that MCC and Zurich made only nominal settlement offers on what was, by then, Aker's approximately $1 million fee claim.  (*Id.*)  Once again, mediation was unsuccessful.  At a July 2016 conference before Judge Waldor, MCC and Zurich "refused to make any further offers," and instead urged the Court to direct Aker to supply them with detailed information about Aker's fee request and proposed allocations, notwithstanding the costs involved.  (*Id.*)  Judge Waldor granted that request, and on September 9, 2016, Aker supplied counsel for MCC and Zurich with the data it had requested, subject to a stipulated protective order to enable Aker to provide the material with fewer redactions than it would have

otherwise included.  (D.E. 637-6, Ex. 4 to Aker Moving Br. (Aker correspondence to MCC and

Zurich); D.E. 561 (Aker letter to Judge Waldor requesting entry of stipulated protective order).)

Aker lays out the scope of what it provided as follows:

> The detailed fee allocation that Aker provided in September 2016 reflected Aker's
> allocations between MCC, Zurich, Advantage and Epic of the $1.1 million in
> coverage counsel fees/expenses it incurred from September 2008 through June
> 2016.  The work product provided was comprised of an explanatory letter and 90
> pages of ledger-sized spreadsheets reflecting each and every time and expense
> line item included in coverage counsel's invoices and Aker's allocation of each
> item to one or more of the defendants. . . . The 2016 detailed allocations replaced
> the preliminary, summary-level fee claim allocations that Aker provided to MCC
> and Zurich in connection with prior settlement discussions and mediations.

(D.E. 637-1, Aker Moving Br. 26 n.22.)  Aker previously stated preparing these materials had

been "a significant and time-consuming effort" because it required allocation of "several

thousand fee tasks" from more than eight years of invoices by that point with attendant privilege

issues.  (D.E. 561, at 1.)

On October 21, 2016, Judge Waldor held another conference.  Even though MCC and

Zurich had by then requested and received volumes of data on fees and allocation they again

refused to make a settlement offer.  (D.E. 637-1, Aker Moving Br. 27.)  Judge Waldor therefore

set a briefing schedule for renewed summary judgment motion practice directed in relevant part

to Aker's additional insured claims against Zurich, with the motions to be fully briefed in

January 2017.  (D.E. 568.)  Nearly 1,700 pages of motion papers followed.  (*See* D.E. 570 to

584.)

The Court's decision of September 1, 2017 (D.E. 589) was squarely in Aker's favor, and

should have set the course for the remainder of the case.  In that ruling, the Court denied Zurich's

motion for summary judgment and found that Aker was an additional insured under the Epic

policy.  Accordingly, Aker's motion for summary judgment on that issue was granted.  Zurich

owed it coverage.  In the same opinion, the Court revisited and vacated its September 2, 2015 ruling against Aker on the issue of its status with respect to MCC's policy to Advantage.  Re-examining its prior reasoning and finding the ruling was incorrectly based on language in an umbrella policy, not the relevant policy between MCC and Advantage, the Court found that Aker was an additional insured and MCC owed it coverage.  As of that point, then, where Aker stood was definitive: it was an additional insured under both insurers' policies and it was owed contractual indemnification by Advantage and Epic.  The time for focused attention on Aker's long-asserted claim for legal fees was at hand.

Zurich moved for reconsideration, followed by MCC, followed by a second motion for reconsideration by Zurich 11 days later that it styled as a "joinder" in MCC's motion.  (D.E. 591, 592, 593.)  Aker opposed (D.E. 597, 598, 599), and Zurich (unsuccessfully, D.E. 603) sought leave to file a reply (D.E. 600), a request Aker and ImClone opposed (D.E. 602).  The Court denied the motions for reconsideration on July 9, 2018 (D.E. 604, 605), and sent the parties to Judge Waldor for a schedule to promptly resolve the outstanding issue in the coverage case: what was Aker entitled to recover in attorneys' fees and expenses?[23]

After a conference with the parties on September 28, 2018, Judge Waldor set a schedule for briefing on Aker's attorney fee request to be completed by February 8, 2019.  (D.E. 609.) The parties repeatedly asked for adjournments (D.E. 610 to 619), and ultimately briefing began in May 2019.  Then, with the insurers in the lead, the parties' submissions burst into a dispute over what the issues were, with Aker taking the position that only the quantum of its attorneys' fees and costs remained for resolution and MCC and Zurich arguing that Aker's fee entitlement

---

[23] For this 2017-2018 motion practice, Aker seeks $82,830, representing 255.20 hours.  (D.E. 704-1, Summary of Fees by Task Code, at 10 (task grouping I).)

was not yet established and that there were threshold issues for the Court to rule on.  (*See* D.E. 620-633.)

How that dispute unfolded is particularly emblematic of why Aker's attorneys had to be equipped to respond skillfully and why the amount of time they spent doing so is reasonable.  To repeat: Aker won the fight over coverage in the decision entered in September 2017.  The Court denied the insurers' motions for reconsideration.  In July 2018 it directed the parties "prompt[ly]" to litigate to conclusion the issue of how much the insurers owed Aker.  (D.E. 604, at 7.)  After much delay, the insurers prompted yet more delay by inserting additional issues into the mix (*e.g.*, Zurich's motion, which preempted Aker's opening fee submissions by a day, seeking a jury trial to allocate fault) instead of briefing what they were supposed to—primarily, the quantum of Aker's fee entitlement.  This tactic forced Judge Waldor to once again set forth the briefing that was expected.

Finally, the relevant motion practice was queued up, albeit with the insurers *still* injecting extraneous, already-decided issues.  Aker filed its fee application (D.E. 637), while Zurich moved to compel a jury trial to allocate fault (D.E. 635) and MCC sought summary judgment dismissing Aker's third-party complaint and fee claims (D.E. 636, 638).  The Court's ruling (D.E. 672, 673) firmly rejected Zurich's and MCC's arguments on the basis that the issues they were attempting to raise had already been decided against them.  Again, the Court determined that there was one and only one issue remaining:  deciding what Aker would recover in legal fees and expenses.

As earlier indicated, determining that recovery amount has required the Court's close scrutiny of more than 3,500 pages of briefing, declarations, exhibits—which, again, included many hundreds of pages of ledger-sized spreadsheets in minute type setting forth over a decade's

worth of every time entry Aker's attorneys charged, with accompanying proposed allocations—and corrective and/or updated versions of the foregoing against the backdrop of the lengthy litigation that led to those submissions.  Also as indicated earlier, the Court tried unsuccessfully to appoint a special master under Fed. R. Civ. P. 53.  In the order that abandoned an appointment (D.E. 692), the Court set down oral argument on Aker's fee application and outlined a schedule and procedure for Aker to seek fees and expenses for the time period after September 30, 2019 (the end date for its submissions to that point).  (*Id.*)

Per the Court's order, Aker filed its supplemental declaration, which updated its fee and expense claims through August 27, 2021.  (D.E. 703, 704.)  Zurich (D.E. 708) and MCC (D.E. 709) opposed.  MCC's brief once again argues that Aker should not be awarded fees for its pursuit of additional insurance coverage, framing the issue as one of reasonableness rather than entitlement.  This round of briefing, as others before it, was marked by multiple extension requests.  (*See, e.g.*, D.E. 705, 710.)

This historical summary supports the Court's conclusion that with the exceptions discussed below, the time Aker's attorneys billed for the above tasks was reasonable and equivalent to amount of time "competent counsel reasonably would have expended to achieve a comparable result."  *Furst*, 182 N.J. at 22.  As should be crystal clear (and will become even clearer), a substantial investment of time and skill was necessary to counter the insurers' approach, and Aker's attorneys were often required to act within the time constraints imposed by the circumstances, whether by Court order or, particularly before the *DeBlon* settlement was concluded, by the threat of having to try the liability case to a jury.

## VII.    Objections

Out of the gate the Court rejects certain arguments threaded throughout Zurich's and MCC's objections.  First, MCC has continued to argue that Aker is not entitled to any fees at all after MCC's February 2009 agreement to provide contractual indemnification and that because Aker's pursuit of additional insured coverage could gain it nothing it didn't already have, that pursuit was solely aimed at generating fees.  In its view, the sole liability figure applicable to it is just over $61,000.  (D.E. 645-1, Howarth Cert., Ex. C; 11/16/21 Tr. 43:6-7.)  The Court has repeatedly rejected the premise of MCC's argument, most recently in its June 30, 2021 decision (D.E. 672), and declines to revisit the matter yet again.

Both MCC and Zurich have suggested that Aker's fees are excessive because it chose to treat simple issues as complicated, partly due to its decision to be represented by the out-of-state attorneys it chose instead of counsel its own insurer assigned.  Here too, the Court must reject the premise of the argument: even if in theory the legal issues involved in the coverage case were straightforward, and they were not, MCC's and Zurich's litigation strategy made sure that in practice reaching a resolution would be anything *but* straightforward.  To the extent using out-of-state counsel resulted in identifiable excess charges, appropriate reductions can, and will, be made.  But Aker has explained why it chose the representation it did, and that those attorneys were based outside of New Jersey does not make their fees inherently unreasonable.

At oral argument, Zurich shifted gears, arguing that Liberty Mutual was the real party in interest on the fee application because having paid most of Aker's legal bills in the coverage case, and having "fl[own] in an army of out-of-state lawyers," Liberty now wanted to recover its outlay.  (*See* 11/16/21 Tr. 11:24-15:22.)  This shift is apparently aimed at showing that the public policy rationale for fee-shifting under Rule 4:42-9(a)(6) – giving the insured the full benefit of its

insurance contract without requiring litigation by "discourag[ing] groundless disclaimers," *Sears*, 134 N.J. at 356 – does not apply because the fee application isn't really about Aker's interests. (11/16/21 Tr. 12:8-19.)  To the extent this is a disguised entitlement argument, the Court has already determined that Aker is entitled to the fee award—the rule applies, and its policy rationale applies.[24]  To the extent the Court has to decide the *amount* of that award, who paid the bills is beside the point.  *Grow Co., Inc. v. Chokshi*, 403 N.J. Super. 443, 471-73 (App. Div. 2008); *see also* Pressler & Verniero, Current N.J. Court Rules, cmt. 2.10 on R. 4:42-9 (2023) (citing *Grow* for the proposition that "where the contractual provision for payment of attorney's fees is enforceable, it is immaterial that the fees of the party entitled thereto were paid for him by another.").  The inquiry is one of reasonableness, guided primarily by the factors in RPC 1.5(a).

That clarified, the Court considers Zurich's and MCC's remaining objections *seriatim*.

## A. Certifications from Timekeepers and Redacted Time Entries

The record supporting Aker's fee request must detail the requested hours with sufficient specificity to allow the Court to assess whether the claimed hours are reasonable for the work that was done.  *Gelis v. BMW North Am.*, 49 F.4th 371, 379-80 (3d Cir. 2022) (citing *Rode*, 892 F.2d at 1190).  The application must also comply with the requirements of Rule 4:42-9 and RPC 1.5(a).  Here, Zurich contends that Aker's documentation is deficient in several respects.  It argues that although Aker seeks to recover fees for billing by 27 different timekeepers, it only offered certifications from two – Luciana and Chleboski – and that "[n]othing in the record" indicates the position (associate, paralegal, and so forth) of the remaining timekeepers or their

---

[24] And in any event, Aker has demonstrated that it has, in fact, been negatively impacted by MCC's and Zurich's wrongful denials and has a stake in the fee award. (*See, e.g.*, D.E. 662, Aker Reply to Zurich Opp. 3; 11/16/21 Tr. 58-59.)

"experience, skill, reputation, and ability." (D.E. 644, at 5, 22.)[25] Zurich further argues that because the Court must evaluate the RPC 1.5 factors for each lawyer and the record is, in its view, insufficient to permit that evaluation, the Court should "deny in their entirety all fees billed by the remaining twenty-five billers." (*Id.* at 22.)

Aker rejects this argument as "absurd and impractical" and "novel" (D.E. 662, Aker Reply to Zurich Opp. 13) and has supplied a supplemental exhibit reflecting, for each timekeeper, which firm the biller worked for (K&L Gates, DFL Legal, or both), as well as the biller's title, education, rates, number of hours billed, the amount of fees billed, and the time span of involvement in the case. (D.E. 703-9, Chleboski Supp. Decl., Ex. 9.)[26]

The exhibit describes the meaning of each title (*e.g.*, "partner" is an attorney at partner level; "paralegal" is "non-attorney staff with higher level of responsibility and typically holding a paralegal certificate") and indicates that the K&L Gates rates included a 10% discount and generally increased annually, while the DFL Legal rates didn't increase, except for when one attorney was promoted. This additional information sufficiently addresses Zurich's concerns. Moreover, the cases Zurich cites do not support the proposition that each and every attorney must sign a certification for the fee application to comply with RPC 1.5(a) or that the factors in RPC 1.5(a)(6) and (7) must be separately evaluated for each lawyer who provided services for the client even when those lawyers are part of a firm retained by the client and are on a team supervised by attorneys who have the requisite experience and relationship with the client. (*Cf.*

---

[25] MCC similarly argues that Aker has provided insufficient information about the billers. (D.E. 645, MCC Opp. Br. 33.)

[26] The original version of this exhibit accompanied Aker's reply to Zurich's opposition in the initial round of fee motion practice. (*See* D.E. 657-3, Ex. C. to Aker Reply to Zurich.) The updated version cited above was included in Aker's supplemental motion and supersedes the original. (D.E. 703, Chleboski Supp. Decl. ¶ 22.)

D.E. 644, Zurich Opp. Br. 22-23 (citing *Twp. of W. Orange*, 198 N.J. at 545; *Litton*, 200 N.J. at 387).)  The two lead attorneys here "determined and executed the strategy, assisted where appropriate by non-partner attorneys (associates and contract attorneys) and non-attorney staff (paralegals, clerks, librarians, and summer associates)" and were "responsible for reviewing, finalizing, approving and issuing invoices to Aker and for collecting the sums invoiced."  (D.E. 703, Chleboski Supp. Decl. ¶ 20.)

Zurich also argues, again citing *West Orange* and *Litton*, that Aker "has not identified what fees were paid by Liberty Mutual, what fees if any were paid by Aker, and what fees remain unpaid" (*id.* at 23), and claims that RPC 1.5 requires that information. Neither case supports that argument, and while Rule 4:42-9(c) requires fee applications to "state how much had been paid to the attorney . . . and what provision, if any, has been made for the payment of fees to the attorney in the future," the record reflects that all invoiced amounts have been paid or were in the process of being paid.  (D.E. 637-7, Luciana Decl. ¶ 6; D.E. 637-8, Chleboski Decl. ¶ 6; D.E. 720, Chleboski Supp. Reply Decl. ¶ 5.)[27]  Who paid is not relevant.  *Grow Co.*, 403 N.J. Super. at 471-73.

To the extent Zurich argues that the Court should disallow an award of fees for all redacted time entries because it cannot evaluate them under RPC 1.5, Aker subsequently supplied unredacted versions, rendering this argument moot.  (*See, e.g.*, D.E. 703-4.)

**B.  Successive Motion Practice**

Both MCC and Zurich argue that Aker spent an excessive number of hours briefing the various rounds of summary judgment motion practice because there is significant overlap in the

---

[27] Chleboski's supplemental reply declaration, which was submitted as part of Aker's supplemental motion seeking fees through August 27, 2021, states that only the three most recent (at that point) invoices were outstanding, and even those had "been approved and [were] in process for payment."  (D.E. 720, Chleboski Supp. Reply Decl. ¶ 5.)

contents of the briefs.  (D.E. 645, MCC Opp. Br. 8-11; D.E. 644, Zurich Opp. Br. 5-12, 24.)  The emphasis on how specific sections or arguments in briefs are the same misses the bigger picture, which is that although some issues persisted, the procedural context of each round was different and the focus of the motions also evolved, requiring Aker to respond accordingly.  Aker's billing so reflects.  For example, the 2009 round involved all parties litigating all issues, while the 2011 round specifically addressed additional insured issues, and the fees sought for the latter are significantly lower than the former.  (*See* D.E. 704-1, Chleboski Supp. Decl., Ex. 6A, at 8-9.)  The issues were complex and vigorously contested, and the insurers' arguments fail to account for this or for the additional filings that accompanied the briefs they challenge.  (*See, e.g.*, D.E. 662, Aker Reply to Zurich Opp. 11 (discussing filings that accompanied 2017 brief).)

MCC and Zurich's arguments about excessiveness also rely on incorrect calculations of how much time Aker is seeking for each round of motion practice.  As Aker points out, their figures fail to account for Aker's allocation of its time entries among the appropriate parties, resulting in the inaccurate assumption that Aker billed much more for overlapping work than it actually did.  (D.E. 661, Aker Reply to MCC Opp. 6; D.E. 662, Aker Reply to Zurich Opp. 4-6, 10; *see also* 11/16/21 Tr. 76:2-77:1 (Aker asserting that failure to account for allocations is found throughout MCC's and Zurich's arguments).)  For example, Zurich's summary of Aker's fees for the 2011 Zurich motion includes a February 9, 2011 time entry for 1.80 hours that was allocated to "not claiming" – *i.e.*, Aker did not allocate it to Zurich (nor to MCC, Epic, or Advantage) and is not seeking any fees for it.  (*Compare* D.E. 644-2, Devlin Aff., Ex. 6 *with* D.E. 703-4, at 102.)  Similarly, it includes a 3.50-hour entry for the next day, in its entirety (implying that the entire $1,575 fee was being sought from Zurich) even though Aker allocated less than half of that

amount to Zurich and the rest to either MCC or Advantage.  (Devlin Aff., Ex 6; D.E. 703-4, at 102.)[28]

The Court instead credits Aker's version, which is that it incurred approximately $475,000 to prosecute and defend against 17 dispositive motions that were filed across 139 docket entries, and is satisfied that the fees engendered were "reasonable and appropriate considering the work and complexity involved as well as the results obtained."  (D.E. 662, Aker Reply to Zurich Opp. 9.)

To the extent MCC contends that it was unnecessary for Aker to brief certain issues because MCC had conceded them, MCC's history of taking positions and then changing course is well documented; seeking definitive rulings in its favor was entirely reasonable on Aker's part.

## C.  Legal research

Zurich argues that approximately $60,000 in fees for legal research, representing 253.50 hours of attorney time, should be excluded because this research concerned "basic" New Jersey law and Aker was paying high rates for attorneys that should already have that expertise.  (D.E. 644, Zurich Opp. Br. 23-24; D.E. 644-2, Devlin Aff., Ex. 18.)  It is true that "[e]xcessiveness of time spent in light of an applicant's expertise is a legitimate reason for reducing a fee award," and a fee applicant "'cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law.'"  *Bell*, 884 F.2d at 721 (quoting *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983)).

---

[28] This February 10, 2011 entry also includes "review [of] motions for summary judgment filed in 2009 against Zurich and MCC," reflecting that Aker was building on its earlier work in briefing successive rounds—appropriately so.  (D.E. 703-4, at 102.)

But that principle does not warrant a reduction here.  The time entries Zurich questions are not limited to research and reflect additional tasks including drafting briefs and other documents, researching other states' law, and reviewing briefs and correspondence filed by adversaries; Zurich's figure is therefore artificially high.  (D.E. 644-2, Devlin Aff., Ex. 18.)  The researched issues were also not so "basic" as to make the hours billed for them "inordinate."  The paragraph-long list of issues on page 11 of Zurich's brief (D.E. 644) shows instead how the issues sprawled as the insurers repeatedly moved the target.[29]  Moreover, Aker's time entries reflect an appropriate delegation of work whereby the partners, who accounted for approximately 20% of the fees, set the research agenda in light of the case's needs at the time and reviewed the results, while lower-billing associates or staff conducted the actual research, making up the other 80%.  *See, e.g.*, *Baughman v. U.S. Liab. Ins. Co.*, 723 F. Supp. 2d 741, 751 n.9 (D.N.J. 2010) (Simandle, J.) (noting that plaintiffs' counsel "efficiently allocated resources between associate and partner, so that [partner's] time was largely used in a supervisory capacity").

MCC also challenges Aker's research fees as excessive because the issues weren't sufficiently complex.  (D.E. 645, MCC Opp. Br. 12-14.)  But as Aker points out, MCC omits critical information, including the complexity occasioned by its shifting positions; the fact that Aker's research fees pertained to all of the defendants, not just MCC; and that Aker had to update its research multiple times because the litigation was so drawn out (in large part due to positions the insurers took and their repeated failure to engage in meaningful mediation efforts). (D.E. 661, Aker Reply to MCC Opp. 7-9.)  With the exception of fees for time spent researching the recovery of counsel fees—a narrow subset of this research category that is discussed *infra*— the hours Aker devoted to legal research are reasonable and will be awarded.

---

[29] Aker's reply to MCC's opposition also lists nearly a dozen issues that it had to research as a consequence of the positions taken by MCC, Advantage, Zurich, and Epic.  (D.E. 661, at 8.)

**D. Fees for services rendered before Zurich or Epic appeared**

Invoking the Court's discretion generally in fee matters and its obligation to carefully review fee applications, Zurich contends that no fees should be awarded against it for time periods before it appeared in the litigation. (D.E. 644, Zurich Opp. 24.) This would, as Aker points out, make preparing the complaint or other initial pleading a noncompensable task (D.E. 662, Aker Reply to Zurich Opp. 14), and the Court declines to create such a rule. Moreover, Aker's billing entries for the time period in question reflect tasks that are not just reasonable and appropriate, but encouraged or necessary, such as researching relevant law, corresponding with the adversaries, conferring with the client about strategy, and drafting the relevant pleadings and other documents. Zurich's proposed approach would create a perverse incentive to file the pleading first and carry out the diligence later, and the Court will not endorse it.

**E. Allocation**

Zurich and MCC object to Aker's proposed fee allocations for different reasons. Zurich argues that its reimbursement responsibility is limited to the hours Aker spent litigating against Zurich and not the other defendants. (D.E. 644, Zurich Opp. Br. 24-25.) It is foregone that Aker's fee award should be allocated among the relevant entity defendants. *See, e.g.*, *Empower Our Neighborhoods v. Guadagno*, 453 N.J. Super. 565, 583 (App. Div. 2018); *Rode*, 892 F.2d at 1185. Aker does not contend otherwise. In fact, its fee spreadsheets allocate each time entry ("approximately 3,000 daily time entries and 200 expense item entries," D.E. 720-1, App'x to Chleboski Supp. Decl.) to one or more of the defendants on a sole or joint and several liability basis or to a "not claiming" category that indicates the entry or part of it is not being charged to any of the four defendants. As Aker explained in its opening brief:

> Aker's fees were allocated among the liable parties through careful analysis by
> counsel of each time and expense entry to connect it to the claims and defenses of

each of Aker's four adverse parties.* . . . In some instances, a given activity was
allocated to two or more parties on a joint and several basis.  This is because the
particular effort had to be undertaken and would have resulted in the same cost in
order to prosecute each claim against each joint-and-severally liable party alone.
In other cases, a particular entry was allocated to one party because the entire
entry related solely to Aker's claims against that party. . . . When a single task
relates to more than one party, but can be rationally distributed between the two
or was made more difficult or time-consuming because it related to more than one
party, it has been divided between the two on a sole liability basis.

* When a given time entry contained multiple discrete tasks, each task was
analyzed separately.

(D.E. 637-1, Aker Moving Br. 34-36; *see also* 11/16/21 Tr. 79:6-16.)  At oral argument, Aker

elaborated on this methodology, providing an example of how it accounted for a task that was

made more time-consuming because more than one party was involved:

One example I will give you on allocations is the way we allocated our efforts on
the fee claim and the fee allocations.  We would take that time, if I was spending
time working with my fee application brief, or if we were spending time working
on these spreadsheets to allocate these fees across the different parts, we split that
time 35 percent to MCC, 35 percent to Zurich, 15 percent to Advantage, and 15
percent to Epic.  The reason there is, we acknowledge that the effort was
increased.  It was more costly because we were claiming against four people.  In
that case joint and several wasn't appropriate.  So we split the time up to the
different parties on a sole liability basis on these percentages.  And that
percentage is a good approximation of the amount of claim we had against those
parties and the efforts that we understood in connection with the fee application
submissions.

(11/16/21 Tr. 75:5-20.)

Trial courts have "'wide discretion on how to divide liability,'" and one acceptable

approach is to allocate among the defendants the amount of time necessary to litigate against

each one.  *Guadagno*, 453 N.J. Super. at 583 (citations omitted).  Apportionment "is never a

precise calculation, never the result of a 'universal' method," *id.*, and the approach Aker has

taken reasonably ensures that each of MCC, Zurich, and their insureds will only be liable for

those fees that were required for Aker to litigate the claims and issues relevant to each one, while

accounting for the fact that certain work Aker did necessarily applied to its claims against more than one of the defendants.  (*See* D.E. 637-10, Bennet Cert. ¶ 6 ("typical" to use "best efforts" allocation for work that results in overlapping benefits).)

MCC's argument is that up to 2018 at the earliest, Aker had to appear at all hearings, conferences, and mediations because it was defending against ImClone's claims and had affirmative claims against National Union.  In other words, Aker had to be there anyway, so none of the fees associated with these events should be included as part of this fee application involving MCC, Zurich, Epic, and Advantage.  (D.E. 645, MCC Opp. Br. 2, 31-32.)  The Court disagrees.

As Aker's reply to MCC explains, a time entry allocated solely to one of the four relevant entities meant that the associated fee was "incurred solely and exclusively in prosecuting a claim against that party" (such as summary judgment briefing that involved only Zurich's policy) and joint and several allocations were used where Aker "had to complete a particular activity separately and independently for prosecution of claims against multiple parties" (such as research on additional insured coverage, which was necessary to Aker's claims against both MCC and Zurich).  (D.E. 661, Aker Reply to MCC Opp. 2-3.)  This is appropriate.  While hours devoted to prosecuting claims against one defendant should not be attributed to a different one, hours "'fairly devoted' to one defendant that also support the claims against other defendants" *are* compensable.  *Rode*, 892 F.2d at 1185; *see also Hebela v. Healthcare Ins. Co.*, 370 N.J. Super. 260, 276-77 (App. Div. 2004) (rejecting notion that plaintiff was not entitled to recover fees for discovery in defending against (covered) counterclaim where most or all of that discovery would have been necessary for prosecuting (not covered) affirmative claim).  The Court is satisfied that Aker's apportionment figures appropriately and reasonably match each

38

defendant with the fees generated by the litigation involving that defendant.  *See Guadagno*, 453

N.J. Super. at 583 (apportionment not a "precise calculation"); *Hebela*, 370 N.J. Super. at 278

(apportionment is "difficult and not always amenable to scientific accuracy," and as such, a

"reasonable estimate" suffices).  MCC's approach, on the other hand, would give it a windfall.

### F.  Fees for *DeBlon* settlement negotiations

MCC and Zurich both contend that Aker billed excessively in relation to the *DeBlon*

settlement.  (D.E. 644, Zurich Opp. Br. 25-26; D.E. 645, MCC Opp. Br. 20-21; *see also* D.E.

644-1, Mergner Report ¶ 34.)  The thrust of their objections is that the end product was a

straightforward settlement agreement made up largely of boilerplate, and that they each billed far

less than Aker did for it: 8.5 hours for Zurich and 61 hours for MCC, compared to 161 hours for

Aker.

These arguments fail to acknowledge the protracted and contentious path that led to the

agreement whereby Zurich (at the eleventh hour) funded a settlement that extinguished Aker's

liability exposure to Ownbey.  Aker's reply declaration described that path in great detail (D.E.

658, Chleboski Reply Decl. ¶¶ 12-16 & Ex. 8-60), and has sufficiently rebutted any implication

that it spent too much time combatting the insurers' strategies.  MCC, for example, nearly forced

the parties to go to trial.  Zurich decided to wait until the last minute to change its position and

fund a settlement,[30] and its hedge had consequences in generating fees Aker reasonably looks to

recover.  Nor is the Court persuaded that comparing the time Zurich and MCC billed with Aker's

time demonstrates the unreasonableness of Aker's billing.  Aker has established that it "took the

lead" in drafting, negotiating, and revising and that its counsel was the "central driver of the

process" (D.E. 661, Aker Reply to MCC Opp. 13), and it has established why (*e.g.*, *id.* (stating

---

[30] *See* Chleboski Reply Decl., Ex. 11 (describing Zurich's position as of late February 2011).

that Ownbey's counsel "advised that MCC 'jerked around' the [p]laintiff so many times that he did not trust MCC to make good on a settlement payment even if it signed a written agreement").)  No deduction is warranted.

### G. Fees for preparing fee application

Zurich argues that Aker's fees and expenses for its fee application are excessive and should be reduced.  It contends that this work should have been done by paraprofessionals instead of partners and other attorneys and questions the role of LitCon, which billed a substantial amount in connection with Aker's fee application.  (D.E. 644, Zurich Opp. 26-27.) Aker responds that it did, in fact, have a contract attorney performing most of the fee allocations, under partner supervision, and that it hired LitCon, a litigation accounting firm, to develop the spreadsheets and validate the allocations.  (D.E. 662, Aker Reply to Zurich Opp. 5-6; D.E. 658, Chleboski Reply Decl. ¶ 6.)

More generally, the fee application, including the spreadsheets and the detailed fee allocations in them, reflects an enormous amount of work that was largely appropriate.  Zurich objects that Aker spent too much time preparing fee allocations in 2016, and again from 2017 to 2019 when it prepared its fee application,[31] but review of the time entries supports the opposite conclusion.  Instead of starting from scratch when it came time to make its formal fee application, Aker built on the extensive work it did several years earlier after the Court ordered it to give MCC and Zurich detailed fee allocations when they suggested that receiving such information might facilitate a resolution.

---

[31] Despite expressly mentioning the fee allocations, Zurich also argues that the Court should "require Aker to apportion its fees generated in its allocation between the relevant parties." (D.E. 644, at 27.)  Aker has done so for every time entry involved in the fee application, as the spreadsheets reflect.

Having carefully reviewed the relevant Aker time entries, including the entries Zurich identified in Exhibit 28 to the Devlin Affidavit (D.E. 644-30), the Court concludes that Aker expended a reasonable number of hours on its fee application, with one exception.  Aker spent nearly 44 hours of attorney time and billed $16,800 for its efforts between September 2017 and December 2018 to retain an expert for its attorney fee application.  (*See* D.E. 644-2, Devlin Aff., Ex. 28, at 12-27.)  The majority of the relevant time entries reflect preliminary work to get the expert on board, including conferring with candidates, internal discussions, internal and external communications, and conferring about parameters and billing guidelines.  Recognizing that retaining an expert does require initial diligence, but also that a "no pebble unturned" approach should not be assessed in full against an adversary, *Grow Co., Inc. v. Chokshi*, 2012 WL 715978, at *4, 11 (App. Div. Mar. 7, 2012), the Court will exercise its discretion to reduce Aker's fee request in this respect by half, and deducts $8,400 from the joint and several amount against MCC, Zurich, Epic, and Advantage.

### H.  Fees and costs for travel, *pro hac vice* admission, and local counsel

Zurich argues that the Court should deny Aker fees and costs for time spent and expenses incurred for its lead counsel to travel to New Jersey from offices in Pittsburgh.  (D.E. 644, Zurich Opp. Br. 27-28.)[32]  Aker largely does not defend these fees and costs, aside from responding that Zurich has only cited Third Circuit case law on federal causes of action and points to nothing requiring that result under New Jersey law.  (D.E. 662, Aker Reply to Zurich Opp. 15.)  It is ultimately Aker's burden to support its fee request, and it fails to cite any case law affirmatively supporting an award of travel fees here; thus, the Court follows the Third Circuit's guidance that "under normal circumstances, a party that hires counsel from outside the forum of the litigation may not be compensated for travel time, travel costs, or the costs of local

---

[32] Via a cross-referenced brief (*see* D.E. 702), MCC echoes this argument.  (D.E. 655, at 33.)

counsel." *Interfaith Cmty. Org.*, 426 F.3d at 710.  The exception is when no counsel within the

forum is willing to represent the plaintiff, *id.*, and Aker has not argued that that is the case here.

At oral argument, Aker's counsel suggested that when his team was at K&L Gates, their

rates as Pittsburgh-based attorneys were on average lower than the rates for attorneys based in

New Jersey or New York.  (11/16/21 Tr. 96:4-8.)  If having Pittsburgh-based counsel billing at

lower rates had saved Aker a significant amount in legal fees, or at least enough to offset

additional expenses of having out-of-state counsel, there may have been a case for allowing

travel and related fees and expenses.  *See Jarwick Developments, Inc. v. Wilf*, 2018 WL

2449133, at *27, 28 (App. Div. June 1, 2018) (per curiam) (upholding award of travel fees and

expenses where out-of-state attorney had saved "extraordinary amount of money" by charging

his local rate from Baltimore and to do that had to travel to New Jersey for trial).  Aker has not

so demonstrated here, and the Court will exercise its discretion to exclude the following amounts

from Aker's award: attorneys' fees for travel (totaling $47,498.85, representing 99.6 hours of

attorney time),[33] expenses associated with travel (totaling $17,955.59),[34] local counsel's fees

(which total $14,204.49, reflecting 111.2 hours of attorney time),[35] and fees ($1600)[36] and

---

[33] Devlin Aff., Ex. 29; D.E. 703-4, at 258 (travel entries for 1/31/20).  Aker contends that many of its travel-related time entries indicate that the attorney also did work while traveling, "which means such hours are reimbursable."  (D.E. 662, Aker Reply to Zurich Opp. 15 (citing *Interfaith Cmty. Org.*, 426 F.3d at 711 n.15).)  The cited footnote from *Interfaith* actually supports the opposite: it says that "[t]o the extent [the relevant] attorneys did actual work on this case while traveling, that time should be incorporated into *other portions of the fee award*."  (Emphasis added).

[34] Devlin Aff., Ex. 30; D.E. 703-4, at 259 (travel expenses for January 2020).

[35] D.E. 637-9, Dembling Cert.; D.E. 703-13, Dembling Supp. Cert.  To be clear, this is not a commentary on the quality or utility of local counsel's services; it reflects instead a categorical exclusion based on Third Circuit precedent.

expenses ($300)[37] for *pro hac vice* applications.  In total, $81,558.93 will be deducted from the joint and several amount against MCC, Zurich, Epic, and Advantage.

## I.  Overhead charges

Zurich seeks to exclude various expenses, including Westlaw and Lexis charges, word processing and secretary overtime, and preparing litigation budgets.  It also argues that the fee award should not include charges for Aker's change in local counsel in 2013, when Maggi (who was Aker's defense counsel on the underlying claims and also served as coverage counsel's local counsel) retired and Dembling stepped in as local counsel.  (D.E. 644, Zurich Opp. Br. 28-29.)

Zurich has calculated the Westlaw and Lexis charges to be $23,971.94 through April 2018 (D.E. 644-35, Ex. 33 to Devlin Aff.), currently adding up to approximately $27,000, all invoiced for and paid for.  They will be awarded.  This amount is not unreasonable for more than a decade of complex litigation and the cost is justified by the offsetting efficiency gains. *Guadagno*, 453 N.J. Super. at 588 (using such online research systems "no doubt reduced the amount of time for the work to be accomplished," benefitting both plaintiff in pursuing its rights and keeping down costs potentially payable by defendants); *see also Matter of Estate of Reisen*, 313 N.J. Super. 623, 636 (Ch. Div. 1998) (allowing recovery of charges for use of Lexis).

On the other hand, charges for word processing, secretarial overtime, litigation budgeting, and costs associated with changing local counsel will not be included in the fee award.  Administrative expenses are considered law firm overhead not typically passed on to

---

[36] The relevant time entries are identified in Exhibit 31 to the Devlin Affidavit, but that exhibit includes an incorrect calculation for the September 29, 2008 Chleboski entry and fails to account for the fact that several entries are not devoted solely to *pro hac vice* admission.  Having done its own review of the entries, the Court concludes that a deduction of no more than $1600 is warranted for these fees.

[37] D.E. 703-4, at 50.

clients, even if Aker paid bills that included them. *United Rentals*, 2022 WL 7997043, at *8; *Estate of Reisen*, 313 N.J. Super. at 635; *see also Bilazzo v. Portfolio Recovery Assocs., LLC*, 876 F. Supp. 2d 452, 471 (D.N.J. 2012) (Hillman, J.) ("'Hours that would not generally be billed to one's own client are not properly billed to an adversary.'" (quoting *Pub. Interest Research Grp. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995)).[38]   Aker has not shown why a different rule should apply here.   Therefore, 9.5 hours, representing $4,185, will be deducted for fees associated with changing local counsel; $905.39 will be deducted for word processing and secretarial overtime expenses; and 11.5 hours representing $5,134.50 will be deducted for budgeting, for a total deduction of $10,224.89.  (D.E. 644-2, Devlin Aff., Ex. 32, 35, 36.)  This amount will be deducted from the joint and several amount attributed to MCC, Zurich, Advantage, and Epic.

### J.  Depositions and Written Discovery

MCC and Zurich both challenge Aker's deposition-related fees.  MCC argues that four of the five MCC witnesses Aker deposed were unnecessary because MCC's "three simple" coverage defenses were adequately covered by the Rule 30(b)(6) witness, Kirby Pancoast.  (D.E. 645, MCC Opp. Br. 17-19.)  As support, MCC points to a purported concession it had made about one defense and to Aker's lack of citations in its summary judgment papers to most of the depositions.  It similarly argues that Aker spent an unreasonable amount of time on written discovery because the issues were simple and what Aker learned was not incorporated into its filings.  (*Id.* at 22-23.)  But as Aker persuasively responds (D.E. 661, at 11-12), the legal issues were far more complex than MCC's argument admits, and it was entitled to pursue discovery

---

[38] *See also* Mergner Report ¶ 18.

that was commensurate with the claims it was prosecuting and the defenses it expected to have to address—which were, in light of MCC's ever-changing positions, a moving target.

Zurich contends the fees Aker billed in connection with the deposition of its representative, Jon Connor, are excessive.  (D.E. 644, Zurich Opp. Br. 29.)  It calculates that Aker spent 122.5 hours, corresponding to $34,653.76 in fees, for preparation, conducting the deposition, and corresponding and conferring about it afterward, and that no more than 11.55 hours should be allowed.  (D.E. 644-2, Devlin Aff., Ex. 41.)  In other words, Zurich contends that 110.95 hours of Aker's request are unreasonable and should be deducted; applying the hourly rate Zurich believes would be appropriate here (somewhere in the range of $130 to $225, as discussed earlier) would result in reducing $34,653.76 of Aker's fee request to no more than approximately $2600.

This is an instance where Zurich has "dramatically overstate[d]" the fees Aker incurred, with the result that its proposed figure is "totally unreliable."  (D.E. 662, Aker Reply to Zurich Opp. 1, 4.)  Zurich has pulled in time entries that were in any way connected to depositions regardless of the party involved, or whether the legal work related to taking depositions or defending them, and regardless of whom the charge was allocated to.[39]  The challenged entries include some that are actually not allocated to Zurich and some that are not charged to any of the four entities involved here or related to depositions at all.  For example, Zurich included a March 9, 2009 entry by Aker attorney Korgul that was allocated solely to MCC and a February 2, 2009 Chleboski entry for which Aker is not seeking any reimbursement.  (*Compare* Devlin Aff., Ex. 41, at 3, 9 *with* D.E. 703-4, at 33, 41.)  Zurich has also included a February 26, 2009 Chleboski entry concerning correspondence about a consulting agreement, review of an Aker-MCC

---

[39] Aker's time entries reflect that it was also preparing for depositions of the other parties besides Zurich and was preparing to defend the depositions of its own witnesses.

stipulation, and drafting of an Aker-MCC settlement agreement—none of which pertains to depositions, and none of which is allocated to Zurich; instead, the charge is partially allocated to MCC and the remainder to the "not claiming" category. (*Compare* Devlin Aff., Ex. 41, at 4 *with* D.E. 703-4, at 36.)  A March 4, 2009 Chleboski entry similarly pertains only to MCC, not Zurich, with the description "draft correspondence to court seeking to compel Mid-Continent Casualty to produce its representatives for depositions and for costs"; the fee for this is allocated solely to MCC. (*Compare* Devlin Aff., Ex. 41, at 6 *with* D.E. 703-4, at 39.)

Whether Zurich's significant over-inclusiveness is attributable to mistakes or some other reason (D.E. 662, Aker Reply to Zurich Opp. 5), the result is the same: rather than undermining Aker's argument that it needed to expend significant attorney time combatting Zurich's positions and in prosecuting this fee application, Zurich has supported Aker's application.  The time entries attributable specifically to the Connor deposition (many of which also include additional tasks) add up to no more than 25 hours, including the deposition itself, representing approximately $10,000, an amount the Court concludes is reasonable under the circumstances of this case.[40]

_____

[40] Zurich relies on *Palmer*, which affirmed a decision to award a maximum of 1.75 hours of preparation time for every hour of deposition time, for its argument that no more than 11.55 hours should be awarded to Aker in relation to the Connor deposition.  *Palmer* did not make that ratio a rule, and its discussion must be taken in context: the district judge had previously given the parties "express guidance" during the litigation about the time that would be considered reasonable for depositions and had expressed concern over the "crowd" at depositions (*e.g.*, four attorneys for movant at straightforward depositions).  Despite having the burden to do so, the movant had at no point shown why more preparation time was necessary or substantiated the "exorbitant" deposition fees it sought to recover—not at the trial level or on appeal, and despite the specific objections made by its opponent. 897 F.3d at 139-40.  In finding the district court's reduction to be an appropriate exercise of discretion, the Third Circuit observed that judges can rely on their experience with a case in determining reasonableness of a fee.  *Id.* at 140 (citing *Bell*, 884 F.2d at 721).  As has been said elsewhere in this opinion, Aker's fee request reflects, by and large, a reasonable expenditure of attorney time for the tasks undertaken, in light of the climate of this litigation.  It has also gone to great lengths to substantiate its request.  Put simply,

**K. Fees for researching recovery of counsel fees**

Zurich argues that no fees can be awarded for researching the recovery of counsel fees, citing *Twp. of West Orange*, 198 N.J. at 546.  (D.E. 644, Zurich Opp. Br. 30.)  Aker has not addressed this objection, and as such has not rebutted it.  Aker's basic research regarding counsel fees, as well as its fees for discussing, corresponding, or summarizing the research, are therefore not recoverable and will be deducted from the award.  Applied too broadly, however, this principle would encompass all or most research in cases that involve insurance coverage or indemnification where fee-shifting is in issue, which would collide with the purposes of the fee-shifting provision in Rule 4:42-9(a)(6).[41]  The Court does not read *Township of West Orange*, an eminent domain case, to require that result.  Having reviewed the Aker time entries identified by Zurich (D.E. 644, Devlin Aff., Ex. 19) with these principles in mind, the Court will exclude 44.2 hours of time and deduct $15,660, to be subtracted from the joint and several amount attributed to MCC, Advantage, Zurich, and Epic.  This amount also includes several entries with descriptions that were too vague to permit the Court to determine whether the time was reasonably expended for the identified task; it excludes an entry that Zurich included twice and entries that were for tasks other than research concerning recovery of fees.

**L. Joint spreadsheet of remaining claims**

As to Aker's fee request for preparing the Court-required joint spreadsheet of remaining claims, MCC concedes that Aker "took the laboring oar" but contends that its fees were

---

Aker's fees for the Connor deposition do not present the concerns that led to the limitation imposed by the trial judge in *Palmer*, and the Court declines to apply the ratio from that case here.

[41] For example, Zurich cites a May 6, 2011 entry for research and related tasks concerning "coverage issues" and "defense cost reimbursement claim." (D.E. 644-2, Devlin Aff., Ex. 19, at 3.)

excessive because the task was not complex.  (D.E. 645, MCC Opp. Br. 27-28.)  One glance at the spreadsheet (D.E. 497) makes that characterization ludicrous.  MCC also expresses suspicion that Aker's fees fail to account for Liberty's and ImClone's roles but offers no basis for the Court to discredit Aker's representation that it allocated tasks solely attributable to those entities to a "not claiming" category.  Generally, as discussed earlier, the Court has accepted Aker's methodology for joint and several allocations as they appear on the fee invoice spreadsheets. (*See* D.E. 661, Aker Reply to MCC Opp. 15 (reiterating that "[w]hile Aker is not claiming legal expenses that were incurred solely in regard to ImClone, Liberty or National Union, the parties against which Aker has viable fee claims are not entitled to discounts on activities that Aker would have had to undertake in any event").)

### M. Miscellaneous MCC Objections

MCC makes several objections best described as grasping at straws.  Aker has adequately rebutted each one, and they need be addressed only briefly.

#### 1. Trial Preparation

MCC objects to Aker's "trial preparation" fees on the ground that the trial would have been handled by Aker's defense counsel, and that in any event the fees were excessive because the topics were covered elsewhere (*e.g.*, in motion practice).  (D.E. 645, MCC Opp. Br. 29-30.) Aker responds, and the Court agrees, that these fees were appropriately incurred in preparing the (Court-required) pretrial orders, which were not limited to the liability case. That the topics covered were also addressed in other filings does not detract from the reality that preparing these pretrial orders was a significant undertaking.

### 2.  MCC Subrogation Claim

MCC asserts that Aker should not be awarded fees for tasks related to defending against MCC's efforts to pursue, via subrogation, claims by ImClone against Aker.  (D.E. 645, MCC Opp. 15-16.)  As Aker explains in response, its efforts (which bore fruit, because the Court agreed with it and ruled against MCC on this issue) were "a necessary part of [its] successful prosecution of its claim for insurance coverage under the MCC Policy," and it did not assign away its recovery rights under the *DeBlon* settlement.  (D.E. 661, Aker Reply to MCC Opp. 9-10.)

### 3.  Miscellaneous and Client Communication

MCC objects to the fees associated with task grouping O, reflecting client communications and miscellaneous tasks, as "too broad and non-specific to appreciate what was done by [Aker] for which party or claim, and the necessity of same in relation to the claims against MCC/Advantage."  (D.E. 645, MCC Opp. Br. 33.)  As Aker points out, this ignores the actual time entries that make up that category and the allocations Aker assigned to each one; the time entries contain sufficient descriptions and indicate the party or parties to whom the task was attributed.  (D.E. 661, Aker Reply to MCC Opp. 15.)  For example, a November 17, 2008 "miscellaneous" entry (task code 27) reflects a telephone conference about MCC's offers for defense and discovery issues and an associated email, and is allocated solely to MCC.  (D.E. 703-4, at 20.)

### 4.  Setup of Insurance Case

MCC challenges the time Aker spent at the outset of the coverage case on the ground that entries pertaining to ImClone were improperly allocated to MCC and that certain entries do not contain sufficient descriptions.  (D.E. 645, MCC Opp. Br. 24-26.)  Aker explains that references

to "ImClone" were artifacts from its firm's timekeeping system, and that the work it performed during this time was attributable to the coverage and indemnification positions taken by MCC and Zurich and their insureds, not to ImClone.  (D.E. 661, Aker Reply to MCC Opp. 14.)  The Court is satisfied that the description of work in the time entries combined with Aker's careful allocations of them among one or more of MCC, Zurich, Epic, and Advantage defeats this challenge.

### 5.  Access to Records and Examination of Counsel

By cross-referencing a different brief, MCC suggests that it is entitled to review Aker's files and examine its attorneys to determine whether the services they performed were necessary and billed reasonably.  (D.E. 638-1, at 19; D.E. 702 (purporting to rely on this brief as part of MCC's opposition to Aker's fee application).)  The case it relies on, *Scott v. Salerno*, reversed a fee award that had been based on affidavits and the trial court's *in camera* review of the movant's files. 297 N.J. Super. 437, 452 (App. Div. 1997).[42]  The panel directed that the defendant be permitted to review the movant's attorney's files "and, if necessary, examine counsel with respect to the necessity of the services rendered and the reasonableness of the fees requested."  *Id.*  As recognized in a later case, *Scott* involved a fee award pursuant to Rule 4:42-9(a)(6) against an insurer that failed to provide a defense as its policy required.  Under its facts, the insurer, who had not been involved in the underlying liability case, had "no other way to assess the necessity of the hired counsel's services and the reasonableness of its fee." *Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 2009 WL 2365960, at *18 (App. Div. July 30, 2009).  To borrow from that case:

---

[42] It also cites *Sears Roebuck & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 340 N.J. Super. 223, 243 (App. Div. 2001), which relies on *Scott* and involved the same scenario.

> That was not the situation here, where defendant does not complain about a lack of detail in the affidavits and billing summaries themselves, and in which defendant's participation at every stage of this lengthy litigation provided it the needed basis to understand the representations by plaintiff's counsel about the nature of the work performed and to form an opinion about the work's necessity and reasonableness.

*Id.* Here, not only did MCC (and Zurich) "participat[e] at every stage," they have been supplied with volumes upon volumes of Aker's detailed time entries covering the entire length of the coverage litigation. There is no basis to require more.

### N. Objections to Supplemental Fee Motion

#### 1. Zurich

Zurich's opposition (D.E. 708-2) to Aker's supplemental fee motion repeats several of its earlier arguments regarding Aker's proposed rates, the extent of complexity of the legal issues, the documentation Aker offers in support of its fee request, Liberty's supposed interest in the fee award, and allocation. For the reasons discussed previously, those arguments lack merit. Zurich's challenge that requires attention is that Aker has sought an unreasonable amount for the work that is within the scope of the supplemental fee motion. It contends that Aker has sought to recover approximately $290,000 in fees for the period after September 30, 2019, which it attacks as "outrageous" and a "farce" because all Aker did during that period was prepare two opposition briefs and a reply, participate in two court conferences, and prepare correspondence related to the Court's proposal to appoint a special master. (*Id.* at 1, 4.)[43]

Zurich's premise is false. The fee and expense request for October 1, 2019 through August 27, 2021 (the time period covered by the supplemental fee motion) totals $137,077.60— less than half of what Zurich says it is —and includes amounts Aker paid for its expert's

---

[43] MCC, adopting Zurich's $290,000 figure, describes it as "shocking." (D.E. 709, MCC Supp. Opp. Br. 3.)

declaration and the litigation accounting vendor that Aker used in preparing its fee application. Zurich's figure incorrectly includes approximately $80,000 in fees and expenses that are not part of Aker's fee request (*i.e.*, Aker allocated them to the "not claiming" category), and includes amounts that go back to January 2019, instead of September 2019.  (D.E. 720, Chleboski Supp. Reply Decl. ¶¶ 6, 13-18.)  These facial errors are an unfortunate aspect of Zurich's overall attack on this application.

Zurich also takes issue with time (calculated at 49.5 hours) that Aker supposedly dedicated to preparing for court conferences on October 20 and October 31, 2019.  (D.E. 708-2, Zurich Supp. Opp. Br. 10.)  There were no court conferences on or around those dates, and the only time entries for October 31 (there being none on October 20) had nothing to do with preparing for court conferences.  (D.E. 703-4, at 250.)  Even assuming Zurich was referring to a Court conference on *January* 31, 2020, Aker's entire billing request for January 2020 was 30.5 hours (which includes time for tasks other than preparing for the conference), well short of the "49.5 hours" Zurich's brief cites.  (*See* D.E. 703-4, at 257-58.)  The basis for this argument, therefore, "remains elusive," as Aker's reply puts it.  (D.E. 722, at 12 n.5.)  Even so, MCC parrots the argument in its own brief.  (D.E. 709, MCC Supp. Opp. 13.)  Whether attributable to an innocent mistake, carelessness, or some other reason, this error caused Aker to incur fees to respond and the Court to devote attention to reviewing whether Aker's fee request had to be reduced by nearly 50 hours.  This is hardly the only instance where an argument by Zurich or MCC has dissolved on scrutiny, and it exemplifies why the Court has little patience for Zurich's and MCC's recasting of this litigation as straightforward and made complicated only by Aker's choices.

Some of Zurich's other challenges are similarly problematic.  For example, Zurich suggests that the hours Aker billed for preparing its reply to Zurich's opposition to its initial fee application were unreasonable and excessive, citing the resulting "nineteen-page brief and an eighteen-page certification with attachments" and alluding to the supposedly straightforward law involved.  (D.E. 708-2, Zurich Supp. Opp. Br. 9-10, 13.)  Those documents were part of a nearly one-thousand-page reply submission, which responded to a Zurich opposition that ran close to 600 pages, included updated fee spreadsheets, and involved Aker addressing not only the substance of Zurich's challenges to its figures – including calculations in the Devlin affidavit that ignored Aker's proposed fee allocations – but also contentions Zurich made about background issues (such as who retained Aker's counsel and who had paid the invoices) in an effort to cast Aker as engaged in fee litigation for its own sake.  Having reviewed the relevant time entries and Aker's response to Zurich's arguments, including its narrative summary of the work it performed (D.E. 720-1), the Court is satisfied that, save for some discrete categories discussed below, Aker has met its burden to demonstrate that its fee request for this time period is reasonable. In particular, the Court specifically rejects Zurich's effort to describe the issues involved as straightforward; the descriptions in the billing entries tell the opposite story.

The Court will deduct two categories from Aker's supplemental fee motion: (1) time spent researching counsel fees, and (2) fees related to the proposed special master appointment. As discussed earlier, Aker has not rebutted the argument, supported by reference to *Township of W. Orange*, 198 N.J. at 546, that fees for research regarding counsel fees are not recoverable under New Jersey law.  Zurich has not identified the amount of the deduction it considers appropriate here, and the Court therefore presumes that Zurich intended to leave the matter to the Court's discretion.  (*See, e.g.*, 11/16/21 Tr. 20:8-12, 22-23; 30:3-9 (Zurich deferring to Court's

discretion as to amount of reduction).)  Aker's time entries from October 1, 2019 to August 27, 2021, reflect only one entry specifically for research of the standards governing recovery of attorneys' fees: October 10, 2019, for 3.20 hours of associate time at $300 per hour, for a total of $960.  This amount will be deducted, allocated one-third to Epic and two-thirds to Zurich (as reflected in Aker's fee invoice spreadsheet).  (D.E. 703-4, at 250.)

As to the special master issue, such appointments are intended to make resolution of disputes more, not less, efficient.  *See, e.g.*, *Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331, 338 (3d Cir. 2015).  Both sides' approach failed to advance the process and ultimately caused the failure of an appointment at all.  Each side will bear its own fees for their filings in this area.  Aker's associated time entries add up to $9,885 in fees (representing 0.6 hours of attorney time on June 30, 2021, plus 14.8 hours of attorney time from July 1, 2021 through August 11, 2021, *see* D.E. 703-4, at 274-76), which will be deducted from the joint and several amount attributed to MCC, Zurich, Advantage, and Epic.

### 2.  MCC

MCC contends that Aker's supplemental fee motion reflects duplicative and unnecessary billing in a handful of areas.  (D.E. 709, MCC Supp. Opp. Br. 12-14.)  In the main, these contentions lack merit.  First, MCC challenges references in Aker's October 2019 invoices to negotiations concerning the *DeBlon* settlement because that work was done in 2011.  The invoices reflect that Aker's attorneys were revisiting the history of those negotiations, a time-consuming undertaking given the complexity of the negotiations and how long ago they happened, which was required to prepare a brief and related papers for the fee submission in 2019.

Second, MCC argues that Aker's charges for preparing its reply in support of its initial fee motion were excessive because it "submitted a 15 page legal brief with billings in excess of 55 hours." (D.E. 709, MCC Supp. Opp. Br. 13.) This description completely ignores the true volume and depth of the reply, as discussed earlier.

Third, MCC appears to be challenging Aker's fees for preparing for court conferences in January 2020 and October 2019. But no conferences occurred in October 2019, and upon review of the January 2020 time entries MCC seems to be referencing, the Court concludes that Aker's descriptions are sufficient and the work and amount of time it billed are reasonable.

Only two arguments in MCC's brief raise valid objections. The first relates to the proposed special master appointment; those fees will be deducted as discussed above. The second pertains to Aker's fees and expenses from December 2020 to June 2021 on a draft protocol it intended to use in requesting oral argument on its fee motion. In response, Aker has explained that it drafted a stipulation, which it discussed with MCC and Zurich, that would involve the parties requesting oral argument on the fee motion and proposing parameters for the conduct of that argument. (D.E. 720-1, App'x to Chleboski Supp. Reply Decl., at 9.)

A copy of the draft stipulation and accompanying cover letter (which were never filed because the Court issued its June 2021 opinion on the motions, a development Aker claims it "could not have foreseen" (*id.*)) reveals a convoluted procedure whereby the parties would engage in multiple rounds of submitting updated legal authorities and objections or responses to those submissions, be subject to specified time limits at argument, and exchange in advance PowerPoint presentations that they would use at argument. (D.E. 720-1, Attachment to App'x to Chleboski Supp. Reply Decl.) The associated time entries add up to 19.8 hours, $8,535 in attorneys' fees, and $101.11 in Westlaw charges. (D.E. 703-4, at 268-74.)

In this district, whether oral argument will be heard on a motion is a matter within the Court's discretion, and although a party may make a request, the default rule is that motions will be decided on the papers.  L. Civ. R. 78.1(b); *see also 7 Eleven Inc v. Sodhi*, 706 F. App'x 777, 779 (3d Cir. 2017) ("The District Court has discretion to determine whether to hold oral argument on a motion.").  A request for oral argument is to be "clearly marked on the first page of the notice of motion and/or the brief filed by the party making such request."  L. Civ. R. 78.1(b).

Instead, Aker spent nearly 20 hours and more than $8,500 researching, discussing, strategizing, and drafting the protocol discussed above.  Overthinking does not require reimbursement.  *Grow Co.*, 2012 WL 715978, at *4, 11 (affirming reduction based on attorney's "no pebble unturned" approach; although style was "perfectly fine," it was not appropriate to assess "that level of lawyering" against adversary).  Because the 19.8 attorney hours associated with this work were not reasonably expended, they will be deducted, resulting in a reduction of $8,636.11 from the lodestar amount.[44]

The rest of MCC's brief recycles earlier arguments (which are addressed above); rehashes ones it already lost; and repeats points from Zurich's opposition (several of which are factually wrong, as discussed above).  Moreover, MCC's challenge to Aker's proposed order (*id.* at 11-12) is hard to follow.  As best the Court can discern, MCC takes issue with Aker's allocation of fees to Advantage on a joint and several (but not sole) liability basis after MCC's February 2009 concession on contractual indemnity.  That "concession" did not end the liability

---

[44] Of this, $7,395 is deducted from the joint and several amount attributed to MCC, Zurich, Advantage, and Epic; $585 from the joint and several amount attributed to MCC and Advantage; and $555 from the joint and several amount attributed to Zurich and Epic.  The Westlaw charge is deducted from the sole liability amounts: $35.39 from MCC, $35.39 from Zurich, $15.17 from Advantage, and $15.16 from Epic. (*See* D.E. 703-4, at 268-74.)

case against Aker; at times, MCC's continued commitment to it was not clear and that stance occasioned more litigation.

MCC also either cannot figure out how Aker accounted for fees attributable to National Union and ImClone or believes that those entities should be included in the joint and several liability figure.  (D.E. 709, at 12.)  MCC's confusion is perplexing: Aker's spreadsheets reflect that it is not claiming fees for tasks attributable specifically to National Union or ImClone, and as to joint and several liability, the Court has already accepted Aker's methodology for its allocations and declines to revisit that determination.

Finally, MCC cites factors set forth in *Enright v. Lubow*, 215 N.J. Super. 306, 313 (App. Div. 1987), that "a Court may consider in a fee application," and suggests that "at most" an award of approximately $61,000 would be appropriate.  (*Id.* at 15-16.)[45]  As Aker points out (D.E. 721, at 13 n.15), these factors are used in determining whether a fee award would be appropriate under Rule 4:42-9(a)(6), not the amount of an award.  *See, e.g., Jignyasa Desai, D.O., LLC v. New Jersey Mfrs. Ins. Co.*, 473 N.J. Super. 582, 589 (App. Div. 2022); *Hartford Cas. Ins. Co. v. Peerless Ins. Co.*, 2020 WL 1650545, at *2 (D.N.J. Apr. 3, 2020) (McNulty, J.). Even to the extent these factors overlap with considerations the Court has already discussed under RPC 1.5(a) and related case law, using them here does not benefit MCC and certainly does not warrant the fee reduction it seeks.

---

[45] The factors are "(1) the insurer's good faith in refusing to pay the demands; (2) excessiveness of plaintiff's demands; (3) bona fides of one or both of the parties; (4) the insurer's justification in litigating the issue; (5) the insured's conduct in contributing substantially to the necessity for the litigation on the policies; (6) the general conduct of the parties; and (7) the totality of the circumstances."  215 N.J. Super. at 313.

## VIII.  Award

After all deductions are made in accordance with the foregoing, Aker's request of

$1,680,202.56 in fees and expenses is reduced by $135,324.93 to **$1,544,877.63**.

Zurich repeatedly suggests that Aker's fee claim of approximately $1.6 million is grossly

disproportionate to the amount of the underlying settlement with Ownbey, which it puts at

$650,000.  (*See, e.g.*, D.E. 708-2, Zurich Supp. Opp. Br. 1, 4, 13.)  MCC claims that the fees

Aker seeks "easily double[]" the settlement paid to Ownbey.  (D.E. 709, MCC Supp. Opp. Br. 4.)

Neither, however, makes a formal proportionality argument, settling instead for implying

that the delta between the two figures proves Aker billed excessively.  That appears to be a

deliberate decision, or put otherwise, reflects that a formal proportionality argument cannot

practically be made here because the total amount Ownbey settled for is not of record before the

Court.  Nor has that information been disclosed to Aker, apparently, which contends that

"Zurich, MCC and the other parties who settled with and paid [Ownbey] settlement amounts

have withheld from Aker any evidence of actual settlement payments they made."  (D.E. 722,

Aker Supp. Reply to Zurich 5 n.3.)  Even assuming Zurich's figure for its own settlement is

accurate, a comparison of that number to the fee request here would be misleading and

incomplete, as Aker's success was broader than simply achieving an attorney fee award.  (*See

also* D.E. 637-10, Bennett Cert. ¶ 8 (stating that Aker's results here included securing coverage

under MCC and Zurich policies, which had a cumulative total indemnity coverage limit of $4

million, and an outside-of-limits defense obligation).)

* * *

The foregoing investment of judicial time was required by the nature of the lodestar

analysis.  The Court has applied it faithfully in this diversity case, *see Hansen*, 253 N.J. at 219

(reaffirming use of lodestar in fee awards), and as an expression of longstanding Third Circuit jurisprudence in effect since *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166 (3d Cir. 1973) (*Lindy I*) and *Lindy Bros. Builders, Inc. v. Am. Radiator Standard Sanitary Corp.*, 540 F.2d 102, 117 (3d Cir. 1976) (en banc) (*Lindy II*).  The Court makes these concluding observations.

A 60-page opinion on attorneys' fees begs the question of whether the lodestar method remains an appropriate use of judicial time.  The question was raised quite awhile ago, in the Report of the Third Circuit Task Force on Court Awarded Attorney Fees, which was published in October 1985 and later reported at 108 F.R.D. 237 (1986).  Judge H. Lee Sarokin (D.N.J.) was the Chair, and Judge Dickinson Debevoise (D.N.J.) and Joseph L. McGlynn, Jr. (E.D. Pa.) were the judicial members of the Third Circuit Task Force; Professor Arthur R. Miller was the Reporter; and numerous lawyers from law firms around the country and interested persons participated.  The Report began with this Foreward:

> Over ten years ago the Third Circuit devised the *Lindy* time/rate (lodestar) method for the determination of court-awarded attorneys' fees. Because a number of difficulties have been encountered in applying the *Lindy* formulation, Chief Judge Aldisert requested that a Task Force of judges and lawyers be formed to study the subject and to make recommendations on the criteria to be utilized in determining attorneys' fee awards.

108 F.R.D. at 238.

The Task Force Report identifies nine problem areas, leading off with the impact on the judicial system.

> Lindy *increases the workload of an already overtaxed judicial system.* As a result of *Lindy*, the fee-setting process has become more costly in terms of the time and effort expended on it. The increased documentation demanded by the *Lindy* approach, the practice of conducting fee hearings (including the use of "experts"), and the desire to avoid misfeasance have so magnified the process that the system's human and physical resources are being deflected from other, perhaps more important, duties.

*Id.* at 246 (footnote omitted).

The Court need not go further into the Task Force Report to make the point that nothing has changed.  Thirty-one years later Judge Gene Pratter's fee award decision in *Palmer* brought lodestar jurisprudence into the 21st century this way:

> Certain observations about hourly billing generally and as used in this case ought to be made at the outset. According to the 2017 Report on the State of the Legal Market, released by Georgetown Law's Center for the Study of the Legal Profession and Thomson Reuters Legal Executive Institute, https://www.law.georgetown.edu/news/press-releases/legal-market-report-2017.cfm, because of budgets and caps imposed by clients, perhaps as much as 80 to 90 percent of contemporary law firm work is done outside of the traditional billable hour model. This suggests the demise of the billable hour in the face of clients demanding efficiency, expecting outsourcing, and limiting use of both new associates and the most senior lawyers. In short, in this century the focus in the marketplace may be to highlight and pay for profitability, not hours. If the marketplace is moving in such a direction, it at least behooves the Court to be aware of the realities in the profession. There is no requirement that court-approved fees be the last bastion of the hourly rate. The judiciary ought to prepare itself to embrace and apply means, methods, and mores other than those appearing in Jurassic Park.

2017 WL 1477123, at *5 n.10.

The changes to the billable hour method do not harmonize with the lodestar requirement that counsel perform the grueling process of presenting line-by-line entries for the Court's pick-and-shovel review.  From the conclusion of the Task Force Report:

> The Task Force recognizes that the recommendations contained in this document may be imperfect and that numerous questions about court-awarded fees remain. We expect and invite criticism so that the federal courts will have the opportunity to meet and eliminate the deficiencies. The Task Force hopes that its recommendations will be accepted for what they are-an effort to simplify and rationalize the activities of the federal courts in setting attorneys' fees in a broad range of factual circumstances and in a variety of legal contexts. These matters obviously are complex and the Task Force's time was limited. However, we are convinced that this report, even if its recommendations are not acted upon or otherwise accepted, serves an important function in enumerating the myriad problems posed by the *Lindy* doctrine as it is now employed and begins the process of seeking solutions for the deficiencies in current practice.

108 F.R.D. at 273-74.

These observations about the "deficiencies in current practice" were made 37 years ago. And yet the judicial role is hardly more streamlined than it was back then. *Hansen*, decided four months ago, reviewed a trial court's 73-page fee decision accompanied by a 54-page spreadsheet. *See* 253 N.J. at 207. Because a fee award is generally ancillary to the heart of a litigated case, whether fee-shifting derives from statute, contract, or otherwise, it may be time to revisit whether the time has come for a more rational and efficient approach.

## IX.    Conclusion

For the reasons set forth above, Aker is awarded fees and expenses in the total amount of **$1,544,877.63.** No later than July 18, 2023, Aker shall file an amended version of its proposed order at D.E. 703-2 (to be denominated a proposed "Order and Judgment") that reflects these rulings. An appropriate order on this opinion follows.

/s/ Katharine S. Hayden
Date: July 11, 2023                                                                 Katharine S. Hayden, U.S.D.J.